No. 25-1187

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

NYZIER FOURQUREAN,

*Plaintiff–Appellee,*

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant–Appellant.*

_____

Appeal from an Order of the United States District Court for the
Western District of Wisconsin
Honorable William M. Conley, District Judge

_____

## BRIEF OF DEFENDANT-APPELLANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

Rakesh Kilaru
Tamarra Matthews Johnson
Wilkinson Stekloff LLP
2001 M Street, N.W., 10th Floor
Washington, DC 20036
202.847.4046 (RK)
202.847.4020 (TMJ)
rkilaru@wilkinsonstekloff.com
tmatthewsjohnson@wilkinsonstekloff.com

Thomas L. Shriner, Jr.
Kate E. Gehl (Counsel of Record)
Max S. Meckstroth
David J. Wenthold
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.297.5601 (TLS)
414.297.5279 (KEG)
414.319.7022 (MSM)
414.297.4985 (DJW)
tshriner@foley.com
kgehl@foley.com
mmeckstroth@foley.com
dwenthold@foley.com

*Counsel for Defendant-Appellant*
*National Collegiate Athletic Association*

March 19, 2025

4916-2252-0864

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National Collegiate Athletic Association

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    National Collegiate Athletic Association

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Foley & Lardner LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Kate E. Gehl      Date: 2/12/2025

Attorney's Printed Name:  Kate E. Gehl

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address:  777 East Wisconsin Avenue

    Milwaukee, WI 53202

Phone Number: 414-297-5279      Fax Number: 414-297-4900

E-Mail Address: kgehl@foley.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National Collegiate Athletic Association

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Collegiate Athletic Association

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Foley & Lardner LLP

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

N/A

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Thomas L. Shriner, Jr.　　　　Date: 2/12/2025

Attorney's Printed Name:　Thomas L. Shriner, Jr.

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☑

Address:　777 East Wisconsin Avenue

Milwaukee, WI 53202

Phone Number: 414-297-5601　　　　Fax Number: 414-297-4900

E-Mail Address: tshriner@foley.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As          Clear Form

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National Collegiate Athletic Association

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    National Collegiate Athletic Association

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Foley & Lardner LLP

(3)      If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Max S. Meckstroth      Date: 2/12/2025

Attorney's Printed Name:  Max S. Meckstroth

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  777 East Wisconsin Avenue

    Milwaukee, WI 53202

Phone Number: 414-319-7022      Fax Number: 414-297-4900

E-Mail Address: mmeckstroth@foley.com

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National Collegiate Athletic Association

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 National Collegiate Athletic Association

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Foley & Lardner LLP

(3)     If the party, amicus or intervenor is a corporation:

   i)     Identify all its parent corporations, if any; and

   N/A

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A

Attorney's Signature: /s/ David J. Wenthold          Date: 2/12/2025

Attorney's Printed Name:  David J. Wenthold

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☐     **No** ☑

Address:  777 East Wisconsin Avenue

  Milwaukee, WI 53202

Phone Number: 414-297-4985          Fax Number: 414-297-4900

E-Mail Address: dwenthold@foley.com

rev. 12/19 AK

| Save As | | Clear Form |

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National Collegiate Athletic Association

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

National Collegiate Athletic Association

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Foley & Lardner LLP, Wilkinson Stekloff LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Rakesh Kilaru        Date: March 19, 2025

Attorney's Printed Name: Rakesh N. Kilaru

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: 2001 M Street NW, 10th Floor,

       Washington, DC 20036

Phone Number: (202) 847-4000        Fax Number: (202) 847-4005

E-Mail Address: rkilaru@wilkinsonstekloff.com

rev. 12/19 AK

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National Collegiate Athletic Association

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
         National Collegiate Athletic Association

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
         Foley & Lardner LLP, Wilkinson Stekloff LLP

(3)      If the party, amicus or intervenor is a corporation:

         i)      Identify all its parent corporations, if any; and
                 N/A

         ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
                 N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
         N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
         N/A

Attorney's Signature: /s/ Tamarra Matthews Johnson           Date: March 19, 2025

Attorney's Printed Name:   Tamarra Matthews Johnson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐    No ✓

Address:  2001 M Street NW, 10th Floor,

          Washington, DC 20036

Phone Number:  (202) 847-4000          Fax Number:  (202) 847-4005

E-Mail Address: tmatthewsjohnson@wilkinsonstekloff.com

rev. 12/19 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ................................................................ 3

    A.    Fourqurean Competed in Four Seasons of College Football, and His Request to Play a Fifth Season Was Denied for Failing to Satisfy Established Exception Criteria. ........................................ 5

    B.    Fourqurean Files His Complaint and Obtains an Order Enjoining the NCAA from Enforcing its Eligibility Rules. ...................... 9

SUMMARY OF ARGUMENT ............................................................. 11

ARGUMENT ............................................................................................. 13

I.    THE DISTRICT COURT ERRED IN FINDING THAT FOURQUREAN MADE A "STRONG SHOWING" THAT HE WAS LIKELY TO SUCCEED ON ANY OF HIS CLAIMS. .................................................. 14

    A.    The District Court's Finding that Fourqurean Is Likely to Succeed on the Merits of His Antitrust Claim Is Legally Unsound. ............................................................................................... 15

        1.    The District Court Ignored a Long Line of Cases, Including Cases from This Court, the Ninth Circuit, and Alston Itself, that Recognize the Validity of True Eligibility Rules. ............................................................... 16

        2.    The District Court Erred in Granting the Preliminary Injunction Despite Fourqurean's Failure to Define the "Relevant Market." ..................................................................... 22

        3.    The District Court Erred by Finding, in the Absence of Any Economic or Empirical Evidence, that Division I's Eligibility Rules Have a Substantial Adverse Effect on Competition. ...................................................................... 25

        4.    The District Court Did Not Give Appropriate Weight to the Procompetitive Justifications of the Eligibility Rules. .......... 32

5.      The District Court Erroneously Held that the NCAA Failed to Adopt and Apply "Meaningful Exceptions" to the Eligibility Rules as a Less Restrictive Alternative to Achieving Procompetitive Benefits.................................................... 35

B.      As the District Court Acknowledged, Fourqurean's State-Law Claims Are Not Likely to Succeed. .............................................................. 42

II.     THE DISTRICT COURT ERRED IN HOLDING THAT FOURQUREAN'S SPECULATIVE, FINANCIAL HARM WOULD BE IRREPARABLE AND AN EVENTUAL AWARD OF DAMAGES WOULD NOT REMEDY IT. ........................................................................ 43

CONCLUSION ............................................................................................... 49

CERTIFICATE OF COMPLIANCE ................................................................ 51

CERTIFICATE OF SERVICE ........................................................................ 52

CIRCUIT RULE 30(d) STATEMENT ............................................................ 53

4916-2252-0864

## TABLE OF AUTHORITIES

| **Federal Cases** | **Pages** |
|---|---|

*A.C. Metro. Sch. Dist. of Martinsville,*
    75 F.4th 760 (7th Cir. 2023)..................................................................... 2

*Abbott Laboratories v. Mead Johnson & Co.,*
    971 F.2d 6 (7th Cir. 1992) ..................................................................... 14

*Agnew v. National Collegiate Athletic Ass'n,*
    683 F.3d 328 (7th Cir. 2012) ........................................................... *passim*

*Anderson v. U.S.F. Logistics (IMC), Inc.,*
    274 F.3d 470 (7th Cir. 2001) ................................................................. 43

*Arbolida v. Nat'l Collegiate Athletic Ass'n,*
    No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025)..................... 28, 34, 42

*Banks v. Nat'l Collegiate Athletic Ass'n,*
    977 F.2d 1081 (7th Cir. 1992) ......................................................... *passim*

*Bensiek v. Lamone,*
    585 U.S. 155 (2018) ............................................................................. 47

*Bewley v. Nat'l Collegiate Athletic Ass'n,*
    No. 23 CV 15570, 2024 WL 113971 (N.D. Ill. Jan. 10, 2024) ........................ 18, 31

*Brantmeier v. Nat'l Collegiate Athletic Ass'n,*
    No. 24 CV 238, 2024 WL 4433307 (M.D. N.C. Oct. 7, 2024) ................................ 31

*Ciulla-Hall v. Nat'l Collegiate Athletic Ass'n,*
    No. 25-CV-10271-DJC, 2025 WL 438707 (D. Mass. Feb. 7, 2025) ........................ 42

*Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.,*
    841 F.2d 163 (7th Cir. 1988) ................................................................. 43

*Cosgrove v. Bartolotta,*
    150 F.3d 729 (7th Cir. 1998) ................................................................... 1

*D.U. v. Rhoades,*
    825 F.3d 331 (7th Cir. 2016) ................................................................. 43

*DeRance, Inc. v. Painewebber,*
    872 F.2d 1312 (7th Cir. 1989) ............................................................(17

4916-2252-0864

*Doe v. Univ. of S. Ind.*,
 43 F.4th 784 (7th Cir. 2022) ........................................................... 25

*East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*,
 414 F.3d 700 (7th Cir. 2005) ..................................................... 44, 45

*EEOC v. City of Janesville*,
 630 F.2d 1254 (7th Cir. 1980) ........................................................ 13

*Elliott v. United Center*,
 126 F.3d 1003 (7th Cir. 1997) ........................................................ 22

*Gaines v. Nat'l Collegiate Athletic Ass'n*,
 746 F. Supp. 738 (M.D. Tenn. 1990) .............................................. 17

*Goldstein v. Nat'l Collegiate Athletic Ass'n*,
 No. 3:25-CV-00027-TES, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025) ........... *passim*

*Graham v. Med Mut. of Ohio*,
 130 F.3d 293 (7th Cir. 1997) .......................................................... 13

*Greenlaw v. United States*,
 554 U.S. 237 (2008) ................................................................. 25, 36

*Havoco of America, Ltd. v. Shell Oil Co.*,
 626 F.2d 549 (7th Cir. 1980) .......................................................... 28

*Hennessy Industries, Inc. v. FMC Corp.*,
 779 F.2d 402 (7th Cir. 1985) .......................................................... 22

*Horne v. Electric Eel Mfg. Co.*,
 987 F.3d 704 (7th Cir. 2021) ..................................................... 25, 36

*Ill. Republican Party v. Pritzker*,
 973 F.3d 760 (7th Cir. 2020) .......................................................... 14

*Jones v. Nat'l Collegiate Athletic Ass'n*,
 392 F. Supp. 295 (D. Mass. 1975) ................................................... 17

*Lukaszczyk v. Cook County*,
 47 F.4th 587 (7th Cir. 2022) ...................................................... 14, 43

*Mays v. Dart*,
 974 F.2d 810 (7th Cir. 2020) ...................................................... 14, 43

*McCormack v. Nat'l Collegiate Athletic Ass'n*,
 845 F.2d 1338 (5th Cir. 1988) ........................................................ 18

4916-2252-0864

*McDermid Printing Solutions LLC v. Cortron Corp.*,
    833 F.3d 172 (2d Cir. 2016) .................................................................... 27

*Michigan v. U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) ............................................................ 14, 47

*Munaf v. Green*,
    553 U.S. 674 (2008) .............................................................................. 13

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021) ......................................................................... *passim*

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998) .............................................................................. 26

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) ............................................................. 20

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ....................................................................... *passim*

*Pavia v. Nat'l Collegiate Athletic Ass'n*,
    No. 3:24-CV-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024) ...................... 16

*Praefke Auto Elec. & Battery Co. v. Tecumseh Products Co.*,
    123 F. Supp. 2d 470 (E.D. Wis. 2000) ....................................................... 48

*Redbox Automated Retail, LLC v. Xpress Retail LLC*,
    310 F. Supp. 3d 949 (N.D. Ill. 2018) ................................................... 47, 48

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ............................................................ 13, 46

*Sanchez v. Nat'l Collegiate Athletic Ass'n*,
    No. 3:25-CV-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025) ................... 16, 28, 41

*Smith v. Nat'l Collegiate Athletic Ass'n*,
    139 F.3d 180 (3d Cir. 1998) ................................................................. 17

*Smith v. Nat'l Collegiate Athletic Ass'n*,
    266 F.3d 152 (3d Cir. 2001) ................................................................. 17

*State Wholesale Groc. v. Great Atl. Pac. Tea*,
    258 F.2d 831 (7th Cir. 1958) ................................................................. 42

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................................ 14, 43, 46

**Federal Statutes**

15 U.S.C. § 4 ............................................................................................... 1

15 U.S.C. §§ 1–7 ................................................................................. *passim*

28 U.S.C. § 1292(a)(1) ............................................................................... 2

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1332 ................................................................................... 1, 2

28 U.S.C. § 1367 ........................................................................................ 1

**Federal Rules**

Fed. R. App. P. 32(a)(5) ........................................................................... 51

Fed. R. App. P. 32(a)(6) ........................................................................... 51

Fed. R. App. P. 32(a)(7)(B)(i) ................................................................. 51

Fed. R. App. P. 32(f) ................................................................................ 51

Fed. R. App. P. 32(g) ............................................................................... 51

4916-2252-0864

## JURISDICTIONAL STATEMENT

The District Court's Jurisdiction

Plaintiff-Appellee Nyzier Fourqurean ("Fourqurean") invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1367. (SA at 3, ¶ 14.)[1] Fourqurean asserted two federal antitrust claims under the Sherman Act, 15 U.S.C. §§ 1–7; the district court had jurisdiction over them under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 4. (SA at 6–10, ¶¶ 31–61.) Fourqurean's remaining five claims arise under the contract and tort law of Wisconsin. (SA at 10–17, ¶¶ 62–130.) Although the complaint did not mention 28 U.S.C. § 1367 specifically, its reference to "ancillary jurisdiction" (SA at 3, ¶ 14) makes clear that Fourqurean invoked the district court's supplemental jurisdiction over his "remaining state law claims." (*See id.*)

Fourqurean did not invoke diversity jurisdiction under 28 U.S.C. § 1332. It bears noting that the district court has no diversity jurisdiction because the NCAA, an unincorporated association of colleges and universities (*see id.*, ¶ 4), has members that are citizens of Wisconsin and of all other states and is accordingly treated as a citizen of all its members' states for diversity purposes. *See Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) ("members of associations are citizens for diversity purposes unless Congress provides otherwise"). Although not specifically alleged in the complaint, it seems likely from his allegations that Fourqurean "resides in

---

[1] References to "RSA __" and "SA __" are to the Required Short Appendix bound and submitted with this brief and the Separate Appendix, respectively. References to "Order __" are to the district court's Opinion and Order issued on February 6, 2025, located at RSA 1–22. References to "Dkt. __" are to the district court docket, Case No. 25-cv-68-wmc.

Madison, Dane County, Wisconsin" (*id.*, ¶ 2) and from the box for "Citizen of this State" checked on the civil cover sheet, Dkt. 1–2, that Fourqurean is also a citizen of Wisconsin. (*See* SA at 1–2, ¶¶ 2, 4.)  There is, therefore, no possibility of jurisdiction under 28 U.S.C. § 1332.

The district court entered its order and the preliminary injunction (RSA at 23) on February 6, 2025.

<u>This Appeal</u>

The NCAA filed a notice of appeal on February 7, 2025.  (Dkt. 41.)  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because the NCAA appeals from both the district court's order granting Fourqurean preliminary injunctive relief and the injunction itself.  (Order; RSA at 23); *see also A.C. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023) ("Orders granting or denying preliminary injunctive relief are immediately appealable.").

## STATEMENT OF THE ISSUES

1.     Did the district court abuse its discretion in holding that Fourqurean established a likelihood of success on the merits of his antitrust challenge under Section 1 of the Sherman Act to Article 12.8 of the NCAA Division I Bylaws?

2.     Did the district court abuse its discretion in holding that Fourqurean's purported speculative financial injury established irreparable harm that could not be redressed by an award of damages?

## STATEMENT OF THE CASE

This case addresses the validity of eligibility rules that govern who can compete in college sports.  For decades, the NCAA's member schools have established such eligibility rules to ensure that college sports are played by college students.  These rules include everything from GPA minimums, to degree progress requirements, to regulations of how long student-athletes can participate in college sports.

One of those rules, known as the "Five-Year Rule," is at the center of this case.  The Five-Year Rule provides that student-athletes may compete in no more than four seasons of competition within five years of having enrolled in college, tracking the period of time a student would be expected to be in college pursuing a degree.  For purposes of this rule, competition in college athletics, whether at the Division I, II, or III level, counts toward a season of competition.

Historically, courts have upheld ***eligibility*** rules – unlike certain ***compensation***-related rules – on the rare occasions they have been challenged under the antitrust laws, and for good reason.  In addition to preserving college sports as a unique offering (differentiated, for example, from professional sports), the rules ensure that student-athletes across all sports can excel in athletics and academics, secure a degree, and then move on to the next phase of their lives – making way for the next group of student-athletes to benefit from the same life-changing opportunities.  Stated differently, true eligibility rules, including the Five-Year Rule, define who may participate in college sports; they do not limit the compensation

3

available to student-athletes.

The district court upended this judicial taxonomy. Based on a misapprehension of the Supreme Court's decision in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021), the court engaged in a flawed rule of reason analysis to explain its conclusion that the NCAA should have granted Fourqurean a waiver request to compete for a fifth season of college football. The court did this despite acknowledging the longstanding procompetitive justifications for eligibility rules recognized by this Court, but nevertheless concluding that Fourqurean is likely to succeed on his antitrust claim because, it said, the NCAA "fail[ed] to adopt and apply *meaningful* exceptions" to the Five-Year Rule.

The court's ruling is contrary to basic antitrust law, and it is belied by the record. It has already proven to be consequential. Other student-athletes have filed similar actions (or submitted pre-litigation waiver requests) seeking to invalidate the Five-Year Rule and other eligibility rules, and more cases are sure to come. This is particularly troubling because the court's order requiring "meaningful exceptions" to the Five-Year Rule would effectively make federal courts the *de facto* arbiters of eligibility-related waiver requests. This sort of "judicial micromanagement," forbidden by *Alston*, threatens to erase the defining feature of college sports – that it is played by athletes who are college students.

4

**A.    Fourqurean Competed in Four Seasons of College Football, and His Request to Play a Fifth Season Was Denied for Failing to Satisfy Established Exception Criteria.**

Fourqurean competed in four full seasons of college football at NCAA member schools—2021 and 2022 at a Division II school in Michigan and 2023 and 2024 at Division I University of Wisconsin ("UW"). He graduated from UW in December 2024 and was eligible for the 2025 NFL draft. Deciding that he wanted to play another college season in 2025, Fourqurean worked with UW to file a request for waiver of the Five-Year Rule,[2] on December 6, 2024, so that he could compete in a fifth season of college football.   Although the waiver request sought relief based on the circumstances of Fourqurean's *first* season of competition years earlier in 2021, his decision to wait until December 2024 to seek the waiver meant that his deadline to withdraw from the draft, February 7, 2025, was already rapidly approaching as the waiver process kicked off. (Order at 1–4.)

The waiver request invoked two of the NCAA's member-established rules. (SA at 95; *see also* SA at 31, ¶¶ 35–36.)  It sought to have Fourqurean's "2021-22 season be considered a missed opportunity under NCAA Division I Bylaw 12.8.1.7.1.1 (Circumstances Beyond Control) and flexibility be granted under NCAA Division II Bylaw 14.4.3.4.1.7[.]" (SA at 95.)  The waiver request further provided the following reasons in support of the request:

---

[2] Despite being referred to as the "Five-Year Rule," the rule consists of two components – a student-athlete's "eligibility clock" (five years) and the number of seasons during that period in which a student-athlete may participate (four).  This dispute concerns Fourqurean's wish to compete for a fifth season after having played for four; there are no issues on appeal regarding his eligibility clock.

> 1) Nyzier's total snaps during the 2021 [season] were significantly less than those in the 2022, 2023, and 2024 seasons. Thus the 155 snaps equate to 3 contests or less, 2) year two, after a canceled COVID-19 season, should be considered his initial year of collegiate enrollment as it relates to application of NCAA Division II Bylaw 14.4.3.4.1.7, and 3) based on the totality of circumstances (cancelled 2020 season as a result of a national pandemic, lack of roster depth, team injuries, blow out victories, and the death of Nyzier's father). In summary, the 2021 season may have resulted in 11 total contests, however, the overall experience equates to 3 contests.

(*Id.*)

Division I Bylaw 12.8.1.7.1(b), upon which the waiver request relied, permits the NCAA to grant a waiver regarding the five-year eligibility clock if the student-athlete has been "deprived of the opportunity to participate for more than one season in his or her sport within the five-year period of eligibility for reasons that are beyond the control of the student-athlete or the institution." (SA at 53, DI Bylaw 12.8.1.7.1(b).) Related Division I Bylaw 12.8.1.7.1.1 includes as something "beyond the control of the student-athlete" that the "student-athlete is unable to participate" in their sport "as a result of a life-threatening or incapacitating injury or illness suffered by a member of the student-athlete's immediate family, which clearly is supported by contemporaneous medical documentation," or "[e]xtreme financial difficulties as a result of a specific event (e.g., layoff, death in the family) experienced by the student-athlete . . . which prohibit the student-athlete from participating" in their sport when such circumstances are "clearly supported by objective documentation." (*Id.*, DI Bylaws 12.8.1.7.1.1(b) & (e).)

The other regulation relied on was Division II Bylaw 14.4.3.4.1.7, which provides a "season of competition" exception for student-athletes playing football. Specifically, "a student-athlete representing a Division II institution, in their initial year of collegiate enrollment, may participate in up to three contests in a season without using a season of competition." (SA at 80, DII Bylaw 14.4.3.4.1.7.) A student-athlete "participates" in a contest if he appears at all in the contest; participation is *not* determined by how much (or how many snaps) the student-athlete played in that contest. (SA at 32, ¶ 39; *see also* SA at 54–55, DI Bylaw 12.8.3.1; SA at 79, DII Bylaw 14.4.3.4.1.)

The NCAA staff engaged in several conversations with representatives of UW, and with Fourqurean's attorney, during December and January, stressing the need for objective, contemporaneous or other appropriate medical documentation concerning the effect that Fourqurean's father's death had on him in 2021, as required for a "hardship" or "season-of-competition" waiver. (*See* SA at 58–59, DI Bylaws 12.8.4 & 12.8.4.2.2 (hardship waiver); SA at 60–61, DI Bylaws 12.8.6 & 12.8.6.2 (season-of-competition waiver).) The NCAA evaluated the waiver under these alternative bylaws because the bylaws that UW relied on could not have provided Fourqurean an additional season of competition. Specifically, even if Fourqurean had qualified for a waiver under Division I Bylaw 12.8.1.7.1, that would at most have provided him with an additional year on his five-year *eligibility clock*; it would not have addressed his desire for an additional, fifth *season of competition*. (SA at 32, ¶¶ 41–42.) Still, no such documentation was provided. (SA at 90, ¶¶ 13–14.)

Additionally, Division II Bylaw 14.4.3.4.1.7 was not adopted until January 14, 2023, and, thus, did not even apply to Fourqurean's 2021 season. (SA at 29, ¶ 26.) Even if it did, however, Fourqurean would not have satisfied its criteria because he played in more than "three contests" during the 2021 season. (SA at 32, ¶ 39.)

After giving full consideration to all the materials submitted in support of the request, as well as the information discussed during the aforementioned communications, the NCAA denied the waiver request on January 29, 2025, stating:

> Requirements of the legislation are not satisfied:
>
> Specifically, staff noted legislation, as established by the Division II membership, specifically identifies circumstances that support relief from use of a season of competition following participation in competition. Staff noted [student-athlete] completed 11 contests, two of which occurred during post season, which exceeds legislated limit, and institution was unable to provide objective documentation satisfying any of the legislated exceptions or other extenuating circumstances which would enable staff to provide relief consistent with intent of legislation.

(SA at 20; SA at 31, ¶ 37; SA at 91, ¶ 17.) The notice of denial informed UW and Fourqurean of the right to appeal to the student-athlete reinstatement committee, a committee comprised of representatives from member schools and conferences, rather than NCAA staff, within 30 days. (SA at 20.) No appeal was taken.[3] (SA at 31, ¶ 38.)

---

[3] UW sent the NCAA a letter on February 28, 2025, purporting to reserve its right to appeal the denial of the waiver request at a later date, given this litigation.

## B. Fourqurean Files His Complaint and Obtains an Order
Enjoining the NCAA from Enforcing its Eligibility Rules.

Rather than appeal, later that day on January 29, 2025, Fourqurean filed this lawsuit to enjoin the NCAA from enforcing its eligibility rules, asserting that the "Five-Year Rule" violates § 1 of the Sherman Act because it prevents him from playing college football and therefore prevents him from being compensated for the use of his name, image, and likeness ("NIL") at UW.  (SA at 1, 3, 5–6, ¶¶ 1, 11, 30.) Fourqurean alternatively asserted that the NCAA arbitrarily and capriciously denied his waiver request and sought a finding that his waiver request should have been granted, enabling him to play one more season for UW in 2025.  (SA at 17, ¶ 129.)[4]

The district court held an evidentiary hearing on February 4, 2025. Fourqurean testified that he did not have any contracts in place, but that he would "likely" earn "hundreds of thousands of dollars" from NIL if he were permitted to play an additional season at UW.  (SA at 197, 202, 41:14–19, 46:7–15.)

At the close of the hearing, the court encouraged Fourqurean "to provide any other information that demonstrates the actual likely loss of NIL money" if he was not permitted to play another season of college football and declarations or affidavits from the individuals who had previously submitted letters in support of the waiver request.  (SA at 203, 47:4–11.)  The court also encouraged the NCAA to submit "evidence of a more robust decision by whoever it was who issued the one-paragraph

---

[4] The complaint also asserted common-law tort and contract claims under Wisconsin law. (SA at 10–17, ¶¶ 29, 62–130.)  These claims have never been developed, and the district court did not rely on them, holding that Fourqueran was not likely to succeed under them. (Order at 18 n.9.)

ruling" denying the waiver request. (*Id.* 47:16–22.)  Both parties submitted additional materials the following day.[5]  (Dkts. 25–35, 38 (Fourqurean's submissions); SA at 87–123 (NCAA's submission).)

On February 6, 2025, despite recognizing that (i) Fourqurean "offered little proof that the Five-Year Rule . . . harms competition by limiting student-athletes to four seasons of eligibility" (Order at 9–10); and (ii) the Five-Year Rule is procompetitive because "linking a student-athlete's college athletic career to ordinary degree progression differentiates NCAA Division I football from professional football" (Order at 11), the court relied on what it viewed as "trends" in the application of federal antitrust laws to NCAA bylaws since the Supreme Court's decision in *Alston* to issue a preliminary injunction – determining that "plaintiff is likely to succeed on his Sherman Act claim on the current record, and would suffer irreparable injury without injunctive relief[.]" (Order at 1.)

The order enjoined the NCAA from "enforcing the Five-Year Rule (Article 12.8) as to [Fourqurean] absent a more meaningful demonstration that exceptions to that rule should not apply to [his] requested, additional season of eligibility given the unique circumstances surrounding his 2021-2022 season at Division II Grand Valley State University."  (RSA at 23; *see also* Order at 22.)  Saying that it was assessing whether there were "less restrictive alternatives" available to achieve the procompetitive ends of the Five-Year Rule for purposes of the court's rule of reason

---

[5] The NCAA moved to strike two of the additional declarations concerning his alleged harm that Fourqurean filed after the hearing, one from his counsel and another from a sports marketing consultant.  (Dkt. 36.)  The court granted the motion. (Order at 22.)

analysis, it held that the NCAA must have "*meaningful* exceptions to its generally applicable" Five-Year Rule.  (Order at 13 (emphasis in original).)  The court then found that the NCAA should have granted Fourqurean an exception – either under its existing bylaws or new exceptions – given his particular circumstances.  (Order at 16–17.)

The NCAA took this appeal the next day, on February 7, 2025.  (Dkt. 41.)  It moved for expedited consideration of the appeal, which the Court granted on February 20, 2025.

## SUMMARY OF ARGUMENT

This appeal arises out of what should have been an ordinary application of the NCAA's longstanding eligibility rules.  Instead, the district court overrode, as an antitrust violation, the NCAA's denial of Fourqurean's request to play an additional season for failing to meet the criteria for a waiver of the Five-Year Rule.  Rather than deny Fourqurean's request for a preliminary injunction by applying black-letter antitrust law, the court misapplied the Supreme Court's decision in *Alston* to grant this extraordinary preliminary relief.  The court erred in two important aspects.

First, the ruling, as a matter of law, misapplied the Supreme Court's decision in *Alston*, which merely held that certain NCAA **compensation** rules violated the Sherman Act.  In doing so, the court disregarded several relevant decisions, including decisions from this Court, that speak directly to the legitimacy of and procompetitive justifications for the NCAA's eligibility requirements.  The court's rule of reason analysis was resultingly flawed at each step, ultimately erring in its conclusion that

Fourqurean is likely to succeed on the merits of his antitrust claim because (it believes) the NCAA "fail[ed] to adopt and apply *meaningful* exceptions" to the Five-Year Rule. This holding makes no sense in light of the rule of reason analysis that should have applied to Fourqurean's claim. The court first should have focused on market-wide effects, not individual ones. Instead, it turned the rule of reason analysis into an individualized fairness assessment. The ruling, moreover, is unmoored from the record, which shows that the NCAA does, in fact, recognize numerous exceptions to the Five-Year Rule (that account for extenuating circumstances that may warrant departure from the Five-Year Rule) and that Fourqurean – objectively – did not qualify for any of them. The court's decision also disregards the NCAA appeals process, which would have permitted an appeal of the waiver denial to a committee comprised not of NCAA staff, but exclusively of representatives from member schools and conferences.

The basis for Fourqurean's waiver request – that the effect of his father's death before his first season of competition in 2021 prevented him from being able to participate and should not be counted against his eligibility – was unsupported by any objective or contemporaneous documentation and was belied by the fact that he played in eleven of twelve games (92%) during the 2021 season, including post-season play. His response was that he played in "only 155 total snaps." But the fact that a student-athlete played sparingly or as a backup is neither unusual (indeed, it was his freshman season) nor a justification to set that season aside and grant additional seasons of competition. Nor is it unusual for a waiver request to be denied for failing

to submit sufficient documentation in support of a waiver – otherwise the application of exceptions and waivers to eligibility rules would become difficult to apply consistently and fairly to all student-athletes.

Second, even if Fourqurean had shown that he was likely to succeed on the merits of his antitrust claim, the court erred when it held that Fourqurean's speculative, demonstrably *financial* injury was sufficient to establish irreparable harm that could not later be redressed by an award of damages if he were ultimately to succeed on the merits.

Either one of these errors constituted an abuse of discretion, requiring reversal of the court's order and preliminary injunction.

## ARGUMENT

"A preliminary injunction is an extraordinary and drastic remedy" that imposes a weighty burden on a movant. *See Munaf v. Green*, 553 U.S. 674, 690 (2008) (internal quotation marks omitted). Granting "[a] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984). This is particularly true where, as here, the required injunction would "alter" rather than maintain the "status quo." *See EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980) ("The purpose of a preliminary injunction is to preserve the object of controversy in its then existing condition, i.e., to preserve the status quo."); *see also Graham v. Med Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) ("mandatory injunctions" requiring affirmative acts are "cautiously viewed and sparingly used").

To carry his burden, a movant must establish that he is (1) likely to succeed on the merits of his claims, (2) that he will suffer irreparable harm without preliminary relief, and (3) that traditional legal remedies would be inadequate. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.2d 810, 818 (7th Cir. 2020). If a movant fails to establish "any one" of these requirements, the injunction must be denied and the court need not move on to balance the potential harm of wrongly denying the preliminary injunction against the harm of wrongly granting it. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Lukaszczyk v. Cook County*, 47 F.4th 587, 598 (7th Cir. 2022). "A district court abuses its discretion when it commits a clear error of fact or an error of law." *Id.* (citation and internal quotation marks omitted). Thus, the Court "considers the district court's legal conclusions de novo and its findings of fact for clear error." *Id.*; *accord Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 769 (7th Cir. 2011).

Here, the district court improperly applied the governing law interpreting Section 1 of the Sherman Act as it relates to NCAA eligibility rules in assessing the merits of Fourqurean's antitrust claim. The court also erred in assessing Fourqurean's proof of irreparable harm.

## I.   THE DISTRICT COURT ERRED IN FINDING THAT FOURQUREAN MADE A "STRONG SHOWING" THAT HE WAS LIKELY TO SUCCEED ON ANY OF HIS CLAIMS.

To obtain a preliminary injunction, movants must establish that they are "***likely*** to succeed on the merits." *Mays*, 974 F.3d at 821–22 (7th Cir. 2020) (quoting *Winter*, 555 U.S. at 20) (emphasis in original); *Ill. Republican Party v. Pritzker*, 973

F.3d 760, 762–63 (7th Cir. 2020) (observing that this requires a "strong showing" that a movant is "likely to succeed on the merits," which "normally includes a demonstration of how the applicant proposes to prove the key elements of its case"). Fourqurean failed to meet this standard with respect to his antitrust claims.

### A.     The District Court's Finding that Fourqurean Is Likely to Succeed on the Merits of His Antitrust Claim Is Legally Unsound.

Section 1 of the Sherman Act prohibits agreements in restraint of trade. 15 U.S.C. § 1. To establish a violation, Fourqurean had to show: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Under the rule of reason standard, which applies here, the district court should have assessed Fourqurean's claim under the following burden-shifting framework: First, the plaintiff has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market," and, if satisfied, "the burden shifts to the defendant to show a procompetitive rationale." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). If the defendant makes its showing, then the final burden shifts back to the plaintiff "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

1.     ***The District Court Ignored a Long Line of Cases, Including Cases from This Court, the Ninth Circuit, and Alston Itself, that Recognize the Validity of True Eligibility Rules.***

The district court erred by misapprehending the Supreme Court's decision in *Alston*, which affirmed a narrow finding – after years of litigation and a 10-day bench trial – that certain NCAA compensation rules violated the Sherman Act. At the same time, the court erroneously ignored guiding principles espoused by this Court and elsewhere that support the upholding of "true" eligibility rules against antitrust challenges. Indeed, the court acknowledged that its holding that Fourqurean made a "strong showing of likelihood of success" was based on what it perceived as a "trend in the law since *Alston*." (Order at 7.)

That "trend," however, amounts to nothing more than an inapposite district court decision, *Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024), that is currently on appeal[6] and has since been disagreed with by other district courts – including another Tennessee district court. *See Sanchez v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-CV-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025); *Goldstein v. Nat'l Collegiate Athletic Ass'n,* No. 3:25-CV-00027-TES, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025). Put simply, *Alston* dealt with a narrow subset of NCAA rules restricting education-related **compensation** benefits; it does not control the outcome of this case, which pertains to true eligibility rules. *See Goldstein*, 2025 WL 662809 at *4 (explaining that *Alston* "didn't touch" the eligibility rules). *Alston's* holding was not intended to (and should not be contorted

---

[6] *Pavia v. NCAA*, Appeal No. 25-6153 (6th Cir.).

to) meet each element of a student-athlete's antitrust claim. Nor does *Alston* even suggest departing from prior case law that speaks directly to the validity of the NCAA's eligibility requirements. It is not the district court's role to read tea leaves, but to apply the law as it is.[7] The court should have recognized a clear demarcation between the treatment of NCAA "compensation" rules and "true eligibility" rules under the antitrust laws.

In fact, other courts faced with antitrust challenges to NCAA eligibility rules have concluded that those rules ***are not commercial in nature*** and therefore are not even subject to antitrust scrutiny. *See Smith v. Nat'l Collegiate Athletic Ass'n*, 139 F.3d 180, 185–86 (3d Cir. 1998) (holding that "eligibility rules are not related to the NCAA's commercial or business activities" and that the "Sherman Act does not apply");[8] *Goldstein,* 2025 WL 662809 at *3 (holding that Five-Year Rule is "not subject to the Sherman Act"); *Gaines v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 738, 743 (M.D. Tenn. 1990) (holding that rules denying eligibility to student-athletes who entered a professional sports draft or hired an agent were not "subject to scrutiny" under the Sherman Act); *Jones v. Nat'l Collegiate Athletic Ass'n*, 392 F. Supp. 295, 303 (D. Mass. 1975) (holding antitrust laws did not apply to eligibility rules governing payments received from non-NCAA ice hockey leagues). While this Court noted, even before

---

[7] *See DeRance, Inc. v. Painewebber*, 872 F.2d 1312, 1327 n. 9 (7th Cir. 1989) (observing that, notwithstanding a pending Supreme Court review in another matter, this Court was obliged to apply the "law as we find it").

[8] The Supreme Court denied certiorari on the Third Circuit's antitrust ruling, but granted certiorari and reversed on claims raised under Title IX of the Education Amendments of 1972. *Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152, 153–154 & n.1 (3d Cir. 2001).

4916-2252-0864

*Alston*, that the "Sherman Act applies to the NCAA bylaws generally," *Agnew*, 683 F.2d at 340, it described the NCAA eligibility rules in that same case as necessary for the product of college football – differentiated from professional football – to exist in the first place. *Id.* at 342–43.

This Court explained in *Agnew* that eligibility rules "are clearly necessary" to preserve any semblance of "amateurism and the student-athlete in college football" precisely because eligibility rules "define what it means to be an amateur or a student-athlete, and are therefore essential to the very existence of the product of college football." *Id.* at 343. From an antitrust perspective, this is why such eligibility rules have been "blessed" as "presumptively procompetitive," *Agnew*, 683 F.3d at 341, and it is why courts have found that they withstand antitrust scrutiny. *See, e.g.*, *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1344–45 (5th Cir. 1988) (recognizing that "eligibility rules create the product and allow its survival"); *Bewley v. Nat'l Collegiate Athletic Ass'n*, No. 23 CV 15570, 2024 WL 113971, at *3 (N.D. Ill. Jan. 10, 2024), *appeal dismissed*, No. 24-1213, 2024 WL 3742287 (7th Cir. Mar. 13, 2024) (denying motion for preliminary injunction to enjoin application of eligibility rule because plaintiffs failed to demonstrate likelihood of success, observing that the challenged rule "directly promotes defendant's 'unique product' of amateur sports"). This Court has long held this view and even mocked the notion in *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081 (7th Cir. 1992) that someone might someday seek to advance an antitrust claim challenging the Five-Year Rule:

> The no-draft rule has no more impact on the market for college football players than other NCAA eligibility

requirements such as grades, semester hours carried, or requiring a high school diploma. They all constitute eligibility requirements essential to participation in NCAA sponsored amateur athletic competition. ***Banks might just as well have alleged that only permitting a student five calendar years in which to participate in four seasons of intercollegiate athletics restrains trade***. Banks' allegation that the no-draft rule restrains trade is absurd. None of the NCAA rules affecting college football eligibility restrain trade in the market for college players because the NCAA does not exist as a minor league training ground for future NFL players but rather to provide an opportunity for competition among amateur students pursuing a collegiate education.

*Id.* at 1089–90 (emphasis added).

Yet that is precisely what Fourqurean has done, and the district court countenanced, here. The court discounted this Court's decisions in *Agnew* and *Banks* under the erroneous belief that *Alston* had overruled them. (*See* SA at 164, 8:14–15 (stating that "the earlier Seventh Circuit decisions before *Alston* can't be relied on"); *see also generally* Order (no substantive discussion of *Agnew* or *Banks*).) While the shift in treatment of student-athlete compensation post-*Alston* suggests a tempering of "amateurism" as a compelling justification for certain NCAA bylaws, there is little dispute that the linking of a student-athlete's college athletic career to ordinary degree progression is important to maintaining the differentiated product of NCAA sports. Even the district court recognized as much. (Order at 11). And, while *Banks* and *Agnew* both speak about amateurism as a procompetitive justification for the bylaws at issue in those cases, they do not hang their hat on it. Rather, these cases also recognize that when an NCAA bylaw is "clearly meant to help maintain" the "preservation of the student-athlete in higher education," – as is indisputably the case

19

for true eligibility rules like the Five-Year Rule – "the bylaw will be presumed procompetitive." *Agnew*, 683 F.3d at 342–43; *Banks*, 977 F.2d at 1089–90.

The district court also ignored the Ninth Circuit's decision in *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015), another pre-*Alston* case that involved a challenge to the prohibition on student-athletes' ability to profit from their NIL, which aptly articulated the distinction between *compensation*-related rules and "true eligibility" rules. *O'Bannon*, 802 F.3d at 1063, 1065–66. There, the court explained that there is a fundamental difference between rules that "clearly regulate the terms of commercial transactions" and "***a true 'eligibility' rule, akin to the rules limiting the number of years that student-athletes may play collegiate sports*** or requiring student-athletes to complete a certain number of credit hours each semester." *Id.* at 1065–66 (emphasis added). The Five-Year Rule is explicitly the latter and has no relation to the NCAA's "commercial or business activities." *See id.* at 1066.

There is nothing about *Alston* that changes this analysis. The holding itself – more "scalpel than ax"[9] – was exceedingly narrow and involved rules that had limited the education-related benefits schools could offer as **compensation** to student-athletes. *Alston*, 594 U.S. at 74; *see also Goldstein,* 2025 WL 662809, at *6 (denying motion to enjoin Five-Year Rule, holding that *Alston* did not abrogate *O'Bannon*). Thus, like *O'Bann*on, *Alston* did not address NCAA eligibility rules, which have nothing to do with the setting of prices for student-athletes' labor, and it certainly did not suggest that "true 'eligibility' rules" are commercial in nature or otherwise violate

---

[9] *Goldstein*, 2025 WL 662809, at *4.

the Sherman Act. Even Justice Kavanaugh's concurring opinion in *Alston* recognized that "[e]veryone agrees that the NCAA can require student athletes to be enrolled students in good standing." *Id.* at 110 (Kavanaugh, J., concurring). This is a far cry from the district court's unsupported and erroneous belief here that *Alston* "arguably . . . holds that any restraints by [the NCAA] on student-athlete eligibility harms competition." (Order at 9.) The court did not disclose where it found that "arguable holding," and its location remains a mystery.

Whatever *Alston* says about rules limiting education-related **compensation**, the NCAA's "true eligibility rules" – including the Five-Year Rule – continue to raise no reason for antitrust concern. This is because "true eligibility rules" do not limit or restrain the compensation available to student-athletes; they simply define who may participate in college sports. *See, e.g.*, *Agnew*, 683 F.3d at 343; *Banks*, 977 F.2d at 1090. The Five-Year Rule, in particular, serves only to delineate how long student-athletes may play, thereby ensuring that once student-athletes exhaust their allotted eligibility, new student-athletes are able to replace them.

Having now placed the Five-Year Rule in the appropriate context of the existing case law, and as set forth in more detail below, it is clear that the district court erred in concluding that Fourqurean is likely to succeed on his antitrust claim. This surely explains why the district court did **not** determine that the challenged Five-Year Rule likely violates the antitrust laws. Instead, it found that Fourqurean was likely to succeed because the court (wrongly) concluded that the NCAA lacked "meaningful exceptions" to the Five-Year Rule. (Order at 15.) The court's tortured ruling ends up

21

doing precisely what *Alston* told courts ***not*** to do – placing themselves in a position of micromanaging the affairs of the NCAA and its member schools under the guise of conducting a "less restrictive alternative" analysis. *Alston*, 594 U.S. at 102–03. (*See* discussion *infra* Section I(A)(5).)

2.    **The District Court Erred in Granting the Preliminary Injunction Despite Fourqurean's Failure to Define the "Relevant Market."**

The district court erred in applying a "borrowed" relevant market definition from *Alston* when the record here contains no evidence (or even allegations) of what the relevant market is. Defining – and proving – a relevant market is a threshold requirement for any Section 1 claim, for without a relevant market, there is nothing within which to "measure the defendant's ability to lessen . . . competition." *Ohio*, 585 U.S. at 543. This is a task that routinely requires expert assessment. *See Banks*, 977 F.2d at 1088 (citing *Hennessy Industries, Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir. 1985)); *accord Ohio*, 585 at 541; *see also Goldstein*, 2025 WL 662809 at *5 ("Defining the relative [*sic*] market requires almost necessarily an expert assessment.") (internal quotations omitted).

Here, Fourqurean failed to define or substantiate the relevant market with any economic testimony (expert or otherwise), but the court granted the preliminary injunction anyway—an abuse of discretion that itself warrants reversal. *See Agnew*, 683 F.3d at 347 (affirming dismissal of antitrust claim where complaint contained "nothing resembling a discussion of a relevant market"); *does v. United Center*, 126 F.3d 1003–1005 (7th Cir. 1997) (affirming dismissal of antitrust claim for failure to

define the relevant market and thus "failure to state a claim," and impliedly agreeing that without a relevant market, "all of the remaining antitrust theories collapse[].").

The district court justified its decision by, again, reading too much into *Alston*: "[The NCAA] criticizes plaintiff for not defining the relevant market, but [*Alston*] has already defined it," asserting that the Supreme Court "recognized that 'NCAA's Division I essentially *is* the relevant market for elite college football.'" (Order at 8.) But the Supreme Court defined no such market – it simply observed that the parties "d[id] not challenge the district court's definition of the relevant market" under the (compensation-focused) circumstances of that case. *Alston*, 594 U.S. at 86.

Worse, the district court did this in the face of the Supreme Court's explicit observation that the definition of a relevant market is one of the "most frequently debated" issues in an antitrust case, *id.*, and the district court knew it was in fact contested by the NCAA here – especially because Fourqurean submitted no expert testimony or assessment. Indeed, other courts have recently denied requests to enjoin the Five-Year Rule because student-athletes have failed to offer expert testimony or otherwise establish a relevant market. *Goldstein*, 2025 WL 662809 at *5 (denying preliminary injunction where student-athlete "provided nothing by way of expert testimony or evidence to define the relevant market").

While other courts have addressed cases involving other college football athletes, and made observations about market definition in those cases, the "relevant market" for Fourqurean's claim is particularly unclear and will be, as contemplated by the Court in *Alston,* hotly contested. It is not clear what market Fourqurean is

even claiming; the complaint makes passing references to markets for "college athletic services," "the performance and/or broadcast of college sports contests," and the "NIL marketplace available to Division I athletes," without any detail, evidence, or consistency.[10] (SA at 6–7, ¶¶ 33–34 & 37.)  What is more, Fourqurean's case involves unique facts, namely a student-athlete who had already been opted into the NFL draft.  As Fourqurean himself testified, had he not withdrawn from the NFL draft after obtaining the preliminary injunction, he would have likely been drafted in the "later rounds" or signed by an NFL team as an "un-drafted free agent."  (SA at 201, 45:16–22.)  Fourqurean's ability to sell his labor elsewhere casts further doubt on what the "relevant market" should be in this case, as explained by the NCAA's expert:

> [Fourqurean's] own experience indicates that some student-athletes at certain stages of their athletic career may substitute between Division II and Division I teams, while others may view NCAA Division I teams and playing within the NFL as viable substitutes. Understanding the way substitution by student-athletes across these choices may change in response to different eligibility rules is a key component of assessing potential anticompetitive or procompetitive effects of the rules.

---

[10] Notably, Fourqurean's complaint made **no** mention of the market that the district court "borrowed" from *Alston* – namely, a labor market limited to Division I football. (Order at 8.)

(SA at 128, ¶ 8.)[11]  This fact also belies the court's assumption that Fourqurean is somehow subject to the "monopsony power" of the NCAA, a concept that only has meaning in the context of the defined relevant market.  *See Alston*, 594 U.S. at 86.

Having failed to define the relevant market, the court should have determined that Fourqurean is unlikely to succeed on the merits of his antitrust claim (let alone survive a motion to dismiss).[12]  The court's holding otherwise was an abuse of discretion.  *See, e.g.*, *Agnew*, 683 F.3d at 347.

### 3. *The District Court Erred by Finding, in the Absence of Any Economic or Empirical Evidence, that Division I's Eligibility Rules Have a Substantial Adverse Effect on Competition.*

Even if Fourqurean had defined the relevant market, or if it were appropriate for the court to posit one on its own accord,[13] the court abused its discretion when it granted an injunction after analyzing Fourqurean's claim under a flawed rule of reason analysis.  For the record is devoid of any economic evidence or expert analysis showing that the Five-Year Rule "has a substantial anticompetitive effect that harms

---

[11] Dr. Matthew Backus is an economist in the field of industrial organization. He holds a Ph.D. in Economics from the University of Michigan, and currently serves as an associate professor at the University of California, Berkeley. He previously held full-time economics positions at Cornell University and Columbia University, as well as visiting faculty positions at New York University, Princeton University, the University of Pennsylvania, and Yale University. (*See* SA at 125, ¶ 1.)

[12] *See Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (standard that requires likelihood of success on the merits "is a decidedly far more searching inquiry than motion to dismiss").

[13] (Order at 8.)  *See Horne v. Electric Eel Mfg. Co.*, 987 F.3d 704, 727 (7th Cir. 2021) (under the "principle of party presentation, courts generally do not craft new arguments for a party, especially in civil cases and when the party is represented by counsel") (citing *Greenlaw v. United States*, 554 U.S. 237 (2008)).

consumers in the relevant market." *Ohio*, 585 U.S. at 541.  At best, Fourqurean has shown that *he personally* would suffer some potential financial loss by being forced to move on to professional football at the end of four college football years, losing out on another season of potential NIL compensation.  That "showing" is insufficient as a matter of black letter law.

The antitrust laws protect competition, not individual market participants. Stated differently, Congress did not enact Section 1 of the Sherman Act to maximize the projected compensation of an individual competitor, like Fourqurean. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (Section 1 violation requires plaintiff to "allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"); *Agnew*, 683 F.3d at 335 (an antitrust plaintiff must allege "not only an injury to himself, but an injury to the market as well"); *Banks*, 977 F.2d at 1088–89 (same).  In fact, the court agreed that Fourqurean must show "not only an injury to himself, but an injury to the market as well" and expressly recognized that Fourqurean "largely focuses on the harm the eligibility rules did ***to him***." (Order at 18 (emphasis added).)  Yet the court concluded that "given the substantial size of the market for Division I football players, it is reasonable to infer that defendant's apparent, wooden application of its eligibility rules and exceptions not only caused plaintiff injury but more likely than not impacted the larger market for like college football players."  (*Id.*)  Aside from the fact that this demonstrates precisely why the lack of an established "relevant market"[14] taints the entirety of the

---

[14] *See* discsusion *supra* Section I(A)(2).

court's rule of reason analysis, this finding constitutes a clear error of law and fact, for it is purely conjectural, unsupported by any evidence.

Because Fourqurean offered "no direct evidence" of a substantial anticompetitive effect, the court purported to look at "indirect evidence" of such effects, which includes "proof of market power plus some evidence that the challenged restraint harms competition." *See Ohio*, 585 U.S. at 542. But even an antitrust plaintiff who offers evidence of market power[15] as a proxy to show anticompetitive effects must still submit evidence of how the alleged restraint increases prices or decreases output or quality. *McDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 184 (2d Cir. 2016) (noting in practice that market power alone is not sufficient to prove a substantial harm to competition without showing increased prices, reduced output, or reduced quality in the relevant market). As Dr. Backus, the NCAA's expert, explained, "[a]nticompetitive harm has a precise economic meaning related to reductions in total welfare resulting from limitations on competitive behavior; it can be identified through increases in price above the competitive level, and reductions in output and quality below the competitive level." (SA at 132, ¶ 18.)

Fourqurean submitted **no** evidence that the Five-Year Rule lessens the total benefits that student-athletes throughout some market receive from schools,

---

[15] To be clear, the court's "finding" that the NCAA held "monopsony power" in a relevant market is flawed for the same reasons its relevant market findings are flawed, as it "borrowed" the finding from *Alston* without looking to what evidence had been presented (actually, not presented) in *this* case.

including tuition, room and board, or that the rules reduce the quality of intercollegiate competition opportunities or otherwise reduce opportunities for NIL compensation to eligible student-athletes. The court itself acknowledged this, recognizing that *"[P]laintiff has offered little proof that the Five-Year Rule in particular harms competition by limiting student-athletes to four seasons of eligibility[.]"* (Order at 9–10 (emphasis added); *see also* SA at 130, ¶ 15 ("Plaintiff asserts but offers no theory or evidence in support of antitrust harm at the market level . . . whether through suppressed athletic output, higher prices for fans of college athletics, or a reduction in total NIL for student-athletes . . . .").).

This should have ended the court's analysis, and the injunction should have been denied at that point. *See Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554 (7th Cir. 1980) (affirming dismissal of Sherman Act claim because "the absence of a sufficient allegation of anticompetitive effects in a Sherman Act complaint is fatal to the existence of the cause of action"); *see also Sanchez*, 2025 WL 684271, at *7 (denying preliminary injunction, and ending rule of reason analysis after concluding plaintiff failed to show NCAA rule "produce[d] substantial anticompetitive effects"); *Arbolida v. Nat'l Collegiate Athletic Ass'n*, No. 25-2079-JWB, 2025 WL 579830, at *3 (D. Kan. Feb. 21, 2025) (denying temporary restraining order because "Plaintiff has not provided facts beyond his individual circumstance which would allow the court to evaluate the market for purposes of an antitrust analysis and so the court is unable to evaluate the veracity of these harms"). Instead, on Fourqurean's behalf (again), the court developed its own theory of indirect anticompetitive harm based on its own

(incorrect) interpretation of *Alston*, concluding that the Five-Year Rule is "anticompetitive" because it "limit[s] who is eligible to play college football." (Order at 9–10 (*citing Alston*, 594 U.S. at 90).)  But that singular fact is a far cry from the quality of evidence needed to establish substantial anticompetitive effects, and it reflects another misapplication of *Alston* by the district court.

For, contrary to the court's suggestion, *Alston* did not "hold" that "any" and all NCAA rules harm competition. (*See* Order at 9); *see also Goldstein*, 2025 WL 662809 at *4 (explaining that *Alston* "didn't touch" the eligibility rules).  The Supreme Court's observation in *Alston* that "the NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition," in no way constituted a "holding" that ***all*** restraints of any kind are substantially anticompetitive. The Court was simply re-phrasing the NCAA's alleged concession below as to certain of its restraints, including the ***compensation-related*** restraints in that case. *See Alston*, 594 U.S. at 90 (citing lower court opinion).  As set forth above,[16] courts throughout this country, including this Court, have long recognized that ***true eligibility rules*** do not violate the antitrust laws.  *Alston* did not change this.  *See Goldstein*, 2025 WL 662809 at *4 (rejecting student-athlete's argument that *Alston* was "the proverbial nail in the coffin for the [NCAA's eligibility] bylaws").

This is because, unlike the compensation-related rules in *Alston*, eligibility rules like the Five-Year Rule simply define the set of student-athletes who are able

---

[16] *See* discussion *supra* Section I(A)(1).

to participate in Division I sports; they do not limit the benefits available to eligible student-athletes (including available NIL compensation), reduce the quality of opportunities available to student-athletes, or otherwise benefit NCAA member schools at the expense of student-athletes. (SA at 137–138, ¶ 28.)

Remarkably, the district court ***agreed*** with these points. (*See* Order at 10.) Yet, it erred by casting them aside because of its conclusion that "the competitive landscape is now changed" because "higher profile athletes like plaintiff [can] earn a rapidly growing pie of NIL compensation." (*Id.*) The court further reasoned that by allowing a student-athlete another season, he could earn a "life changing" amount of NIL and that the Five-Year Rule "likely depress[es] competition . . . by categorically excluding athletes after four seasons of competition when their marketability for NIL income is more likely than not to be at its apex." (Order at 10–11.) While these observations may assume that Fourqurean and some subset of student-athletes that have exhausted their eligibility have been "harmed," they do not reflect any anticompetitive effects at a market-level – much less ***substantial*** anticompetitive effects.[17] That is what the antitrust laws require, and there is nothing in the record

---

[17] In fact, the court's observation is really a non-sequitur. Student-athletes of all ages and seniority may, and already do, receive "life changing" amounts of NIL compensation, including many student-athletes in their first years of competition. The court's statement reflects its misunderstanding of how NIL operates; no one is guaranteed to earn NIL compensation. It depends on the student-athlete's marketability and the resources available to the parties wishing to compensate a student-athlete for the NIL associated with playing for their desired college. Disparities in NIL compensation will necessarily vary greatly – whether it be between student-athletes playing for a Division I or Division II school, or even between student-athletes playing on more successful or less successful programs within the same Division I conference. At bottom, the Five-Year Rule has no impact on the total NIL avialable to student-athletes. (*See* SA at 139, ¶ 31.)

to support such a finding. *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 24 CV 238, 2024 WL 4433307, at *6 (M.D. N.C. Oct. 7, 2024) (denying preliminary injunction against NCAA because alleged harm impacted only "a few elite" athletes); *Bewley*, 2024 WL 113971, at *3–4 (refusing to enjoin eligibility rules regarding acceptance of compensation for competing on a professional athletics team because plaintiffs failed to show the "bylaws are unreasonably anticompetitive or restrictive"); *see also Banks*, 977 F.2d at 1090 (recognizing absurdity that someone may someday "allege[] that only permitting a student five calendar years in which to participate in four seasons of intercollegiate athletics restrains trade").

With respect to NIL compensation in particular, the Five-Year Rule has no impact on how much NIL compensation is available and it produces a net ***zero*** effect on the total number of football players in NCAA football (including Divisions I, II, and III) who can earn it. (SA at 137–38, ¶ 28.)  Only so many student-athletes can be on the field or a roster at any given time. When one student-athlete's collegiate athletic career comes to an end, another assumes the spot and can begin enjoying the benefits associated with playing college sports.  Indeed, if the injunction stands and Fourqurean receives "another season [to] earn [] NIL compensation," (Order at 10), it will be at the expense of some other student-athlete.  (SA at 140, ¶ 34.)

In sum, Fourqurean did not show that he is likely to succeed on the merits of his argument that the eligibility rules substantially harm competition—an essential element of his rule-of-reason claim.  Not only did the district court abuse its discretion by arriving at the opposite conclusion with no evidentiary support, it also committed

a clear error of law in turning the first prong of the rule of reason analysis into an individualized fairness assessment. The rule of reason inquiry requires measurement of market-wide effects, not an individualized assessment by a court of whether the NCAA fairly applied its rules to a single student-athlete. Therefore, the court abused its discretion by granting the preliminary injunction. That is reason enough to reverse the injunction—there is no need to proceed to the next step of the analysis. *See Ohio*, 585 U.S. at 541–42 (explaining that plaintiff must show harm to competition before burden shifts to defendant to show procompetitive rational for the restraint).

### 4. The District Court Did Not Give Appropriate Weight to the Procompetitive Justifications of the Eligibility Rules.

Even if Fourqurean had met his burden of showing substantial anticompetitive effects to a discernible market, the challenged eligibility rules would still be redeemed by their undisputed (indeed, indisputable) procompetitive effects. *See Ohio*, 585 U.S. at 540–41 (explaining that a restraint may be justified under the Sherman Act if it has procompetitive effects and rationale). Indeed, some restraints – like the eligibility rules here – are necessary if the market for NCAA and collegiate athletics is to exist at all. Here the court agreed with some of the NCAA's proffered procompetitive justifications, but it erroneously rejected others. (Order at 11–12.)

The NCAA certainly finds no fault with the court's recognition that "linking a student-athlete's college athletic career to ordinary degree progression differentiates NCAA Division I football from professional football leagues like the NFL." (Order at 11.) In fact, it is entirely consistent with this Court's statement that "[m]ost—if not

all—eligibility rules . . . fall comfortably within the presumption of procompetitiveness" because they are "clearly necessary" to preserve the "student-athlete" aspect of college football, "and are therefore essential to the very existence of the product[.]" *Agnew*, 683 F.3d at 343. The court also properly found that a world without the Five-Year Rule would mean "a less differentiated product where athletes are older and less aligned with standard collegiate progression" and this "may reduce fan interest and ultimately resources invested in student-athletes." (Order at 11 (citing SA at 130–31, ¶ 16).) This, too, is consistent with this Court's statement in *Banks* that most NCAA bylaws "are procompetitive because they enhance public interest in intercollegiate athletics." *Banks*, 977 F.2d at 1089.

Yet the court abused its discretion by affording no weight to the NCAA's other arguments, which demonstrate that the eligibility rules **_increase_** output and enhance the quality of output for Division I football players.

Unlike sports that are untethered from the educational experience (like professional sports), Division I eligibility rules maintain the link to a standard degree progression, while also ensuring that once student-athletes exhaust their allotted period of eligibility, new student-athletes are admitted and replace them – thereby having their own opportunity to enjoy the benefits of obtaining an education while playing college sports, including the benefits and compensation attendant upon doing so. (SA at 145, ¶¶ 47–48.) This is important because, as explained above, Division I football opportunities are finite. As a result, if anything, the Five-Year Rule likely *increases* competition among those competing – and paying – for talented student-

33

athletes. *Arbolida*, 2025 WL 579830, at *4 (D. Kan. Feb. 21, 2025) (observing that "effect of the challenged rules is to increase competition, at least as between schools competing for talent in the student athlete labor market"). (*See also* SA at 134–35, 142–43, 147, ¶¶ 22, 40–41 & 51.)

The court here found this argument "substantially less persuasive" because it felt that other Division I bylaws "already allow teams to fill roster spots with experienced, transfer players, crowding out younger athletes." (Order at 11–12.) Setting aside the fact that such transfer rules are not at issue in this case, this finding is simply incorrect. First, all student-athletes are equally permitted to transfer – not just "experienced" players. Second, and perhaps most significantly, it misunderstands the implication of student-athlete transfers because each transferee is still subject to the same eligibility rules permitting only four seasons of competition. The court's belief that transfers "crowd out" younger players is therefore speculative, at best. In fact, the court also failed to account for the fact that a transferred player necessarily opens up a roster spot on the team he transferred from, yielding a neutral effect on output. Conversely, to the extent any "crowding out" will occur, it will stem from the implications of the court's suggestion that student-athletes who have otherwise exhausted their eligibility should be granted additional seasons of competition owing to their remaining economic viability as a college player, "when their marketability for NIL income is more likely than not to be at its apex." (Order at 11.) Players who are afforded additional seasons of competition will get them at the expense – and compensation – of new student-athletes hoping to benefit instead.

34

All of the foregoing procompetitive justifications inform the next step of the rule of reason analysis.

> ### 5. The District Court Erroneously Held that the NCAA Failed to Adopt and Apply "Meaningful Exceptions" to the Eligibility Rules as a Less Restrictive Alternative to Achieving Procompetitive Benefits.

The court again erred when it crafted a so-called "less restrictive alternative" to the NCAA eligibility rule waivers already in place: requiring the NCAA to adopt "*meaningful* exceptions" to those rules "to avoid unfairness to student-athletes whose individual circumstances may justify a departure." (Order at 15 (emphasis in original).)

At this third stage of the rule of reason analysis, a plaintiff must show that "the efficiencies could be reasonably achieved through less anticompetitive means." *Ohio*, 585 U.S. at 542. As the Supreme Court explained in *Alston*, this inquiry must be approached with "a healthy dose of judicial humility" and that courts are not to "second-guess degrees of reasonable necessity" or engage in "micromanagement." *See Alston*, 594 U.S. at 98, 101, 107. Indeed, "antitrust courts must give wide berth to business judgments before finding liability," and no court should "impose a duty that it cannot explain or adequately and reasonably supervise." *Id.* at 102–03 (warning that judges must resist "the temptation to specify 'the proper price, quantity, and other terms of dealing'—cognizant that they are neither economic nor industry experts").

The district court nevertheless did precisely what the Supreme Court warned not to do in *Alston*. It disregarded the NCAA's existing, principled application of (and

35

exceptions to) the eligibility rules, announcing that the NCAA must provide "*meaningful* exceptions" to those rules. (Order at 15.) In the court's view, implementing "meaningful exceptions" would be "less restrictive" than the current waiver process and would not undermine the procompetitive benefits of the rules. This "meaningful exceptions" standard, however, constitutes not only forbidden judicial micromanagement, but also an abuse of discretion on multiple levels.

**First**, Fourqurean did not make any argument about "meaningful exceptions" below. (*See* SA at 10, ¶ 57 (pleading that a less restrictive alternative would be to allow eligibility clock to start upon enrolling at Division I institution); Order at 14 (rejecting Fourqurean's proposal that the NCAA toll the eligibility clock until student-athlete enrolls in a Division I school because it would "all but end any distinction between college and professional football" and render college football "nothing more than a minor league feeder system for the NFL")).  Instead, the court pulled the "meaningful exceptions" standard out of thin air and improperly advanced it on Fourqurean's behalf. *See Horne*, 987 F.3d at 727 (explaining that under the "principle of party presentation, courts generally do not craft new arguments for a party, especially in civil cases and when the party is represented by counsel") (citing *Greenlaw v. United States*, 554 U.S. 237 (2008)).

**Second**, the *antitrust* justifications for a "meaningful exceptions" standard are, to say the least, unclear. How does that standard protect *competition*? Providing a malleable exemption for any student-athlete "whose personal circumstances caused them to participate in a season of competition under difficult circumstances" might

36

seem magnanimous, (Order at 16–17), but treating market participants with magnanimity has no bearing on competition and is, accordingly, an invalid antitrust consideration. Sheer benevolence does not accord with the antitrust understanding of what it means to impose "less restrictive means." The court also, again on its own initiative, suggested that permitting student-athletes to file their own waiver requests would be a "less restrictive alternative" to the current system. (*See* Order at 17.) But the court did not explain (and there is no analysis or evidence in the record supporting) how the current system, whereby NCAA member schools submit waiver requests on behalf of their student-athletes, "restrict[s] [the student-athlete's] ability to market his services." (*See* Order at 16–17.)

Finally, the court abused its discretion in light of the fact that the NCAA *already provides and applies meaningful exceptions* to the eligibility rules.[18] Indeed, Fourqurean's waiver request provides an excellent demonstration of how carefully it reviews and considers such requests.

For instance, even though Fourqurean's waiver request only sought relief under Division I Bylaw 12.8.1.7.1.1 (circumstances beyond control potentially

---

[18] The system provides for a robust set of varying exceptions to both years of eligibility and seasons of competition. And any modifications to such rules are subjected to careful review through the membership schools' legislative process, which ensures that the rules reflect a broad consensus shaped by the diverse perspectives of the hundreds of member schools. (*See* SA at 22-23, ¶¶ 7-8.) Each year, Division I member representatives—who possess deep experience as sports administrators—review, refine, and adopt the rules outlined in the Division I Manual. (*See* SA at 23, ¶ 8). The Division I Manual, which includes eligibility rules, has been a foundational resource for over a century, evolving through ongoing deliberation and expertise to maintain its relevance and effectiveness. (*See* SA at 22, ¶ 7.).

qualifying for another season on *eligibility clock*) and Division II Bylaw 14.4.3.4.1.7 (season of competition exception for games played), the record – including the NCAA's denial – confirms that it considered whether other "legislated exceptions" or "extenuating circumstances" warranted relief. (SA at 20.)  In fact, the NCAA and UW were in regular communication while the waiver request was under consideration, and the NCAA stressed to UW and Fourqurean the need for objective and/or contemporaneous documentation, and the NCAA allowed them to supplement the waiver request with additional information. (SA at 88–91, ¶¶ 6–10, 12–15.)  For example, on January 8, a UW representative spoke with NCAA personnel and discussed the circumstances regarding the impact felt by Fourqurean after his father died, including whether Fourqurean "met with any counselors due to mental health" issues. (SA at 89, Ex. E at SA 111.)  Despite this conversation, UW did not submit any additional objective or contemporaneous documentation to demonstrate that Fourqurean participated in any such counseling or other mental health treatment during the 2021 season. (SA at 89, ¶¶ 9–10.)  Then, after UW told the NCAA on January 17 that Fourqurean planned to seek an injunction if the waiver request were denied, NCAA in-house counsel spoke to Fourqurean's counsel and reiterated that the NCAA would still review and consider additional materials in support of the waiver request, including any objective or contemporaneous documentation regarding Fourqurean's mental health. (SA at 90, ¶¶ 12–13.) UW and Fourqurean submitted nothing. (*Id.*, ¶¶ 14–15, Ex. H at 123.)

Without such information, Fourqurean did not meet any of the established criteria for an additional season of competition. Under Division II Bylaw 14.4.3.4.1.7, even if it were to apply,[19] Fourqurean did not qualify because he participated in more than "three contests" during the 2021 season – having participated in 11 of the 12. That he played in only "155 snaps" across those 11 games did not change the waiver criteria – the bylaws consider the number of games, not snaps.  (SA at 32, ¶ 39.) Fourqurean also failed to qualify for an additional year of eligibility under Division I Bylaw 12.8.1.7.1 – or other potential grounds for an additional season of competition under Division I Bylaws 12.8.4 (hardship waiver) or 12.8.6 (season-of-competition waiver) – because the waiver request did not include objective or contemporaneous documentation to establish any of the "extenuating circumstances which would enable staff to provide relief consistent with intent of legislation."  (SA at 20; SA at 32, ¶ 40.)

For example, he did not qualify for a hardship waiver under Division I Bylaw 12.8.4 because he "participated in more than three contests" during the 2021 season, and the waiver request did not provide the requisite "contemporaneous or other appropriate medical documentation" required for a hardship waiver. (*See* SA at 58– 59, DI Bylaws 12.8.4 & 12.8.4.2.2.) He likewise failed to qualify for a season-of-competition waiver under Division I Bylaw 12.8.6, not only because the waiver request did not provide the requisite "contemporaneous medical documentation," but

---

[19] Division II Bylaw 14.4.3.4.1.7 was not adopted until January 14, 2023. (SA at 29, ¶ 26.)

because he played in 11 of 12 games (including the post-season), and therefore did not "fail to complete the entire season of competition" in 2021, as required to justify a season-of-competition waiver based on "extenuating circumstances." (*See* SA at 60–61, DI Bylaws 12.8.6 & 12.8.6.2.)  Moreover, the Division II bylaws also provided student-athletes like Fourqurean with equivalent "hardship waivers" and "season-of-competition" waivers that permit exceptions even where the student-athlete played in several games during a season,[20] which refutes the court's erroneous finding that he "did not have the option of playing a limited number of games while preserving a year of eligibility." (Order at 17; *see also* SA at 199, 43:7–24 (Fourqurean's testimony that he lost his eligibility "as soon as [he] stepped on the field at the Division II level" as a justification for "play[ing] the rest of the season").)

In short, just because the NCAA determined that no exceptions applied to Fourqurean does not gut the exceptions of "meaning," as the court erroneously concluded. Exceptions are "exceptions" precisely because they do not apply to everyone. Often, exceptions will not apply to those who want them the most. That does not render the exceptions "meaningless," much less anticompetitive.  In fact, the court (and Fourqurean) also ignored the NCAA appeals process, which expressly allows for an appeal of any waiver denial to be reviewed by a committee comprised exclusively of representatives from member schools and conferences, rather than NCAA staff.  There is simply nothing arbitrary – or "wooden" (Order at 18) – about

---

[20] (SA at 82-83 & 85-86, DII Bylaws 14.4.3.5, 14.4.3.5.2 (hardship waiver) & 14.4.3.7, 14.4.3.7.1.3 (season-of-competition waiver).)

the waiver adjudication process, both generally and with respect to Fourqurean specifically.

By overriding the NCAA's application of the current eligibility exceptions and deferring to its own more "meaningful" application of those exceptions, the court abused its discretion and ignored the Supreme Court's mandate to approach antitrust challenges with "a healthy dose of judicial humility." *See Alston*, 594 at 197. The practical effect of the court's ruling, moreover, is to give exactly **one** student-athlete an additional season to play Division I college football. That result clashes with the Supreme Court's warning in *Alston*:

> [C]ourts should not second-guess "degrees of reasonable necessity" so that "the lawfulness of conduct turn[s] upon judgments of degrees of efficiency." [] That would be a recipe for disaster, for a "skilled lawyer" will "have little difficulty imagining possible less restrictive alternatives to most joint arrangements." [] And judicial acceptance of such imaginings would risk interfering "with the legitimate objectives at issue" without "adding that much to competition."

*Alston*, 594 U.S. at 98 (internal citations omitted).

If the injunction is permitted to stand, other district courts will be tempted to make themselves the final arbiters of whether a given student-athlete is permitted to play an additional season of college football – or, indeed, any college sport. The effects of the court's decision are already becoming evident in courts throughout the country, and with ongoing waiver requests that have yet to reach litigation. *See, e.g.*, *Sanchez*, 2025 WL 684271 (denying preliminary injunction filed by student-athlete seeking additional year of eligibility to play baseball); *Goldstein*, 2025 WL 662809

(same); *Arbolida*, 2025 WL 579830 (same, denying temporary restraining order); *Ciulla-Hall v. Nat'l Collegiate Athletic Ass'n*, No. 25-CV-10271-DJC, 2025 WL 438707 (D. Mass. Feb. 7, 2025) (same, denying temporary restraining order); *Coley v. Nat'l Collegiate Athletic Ass'n*, No. 5:25-CV-00098-D, Dkt. 1 (E.D.N.C. Feb. 21, 2025) (antitrust complaint filed by student-athlete on February 21, 2025 seeking to play additional season of college football).

The Sherman Act is quickly becoming the *de facto* mechanism for student-athletes to appeal waiver denials straight to federal district courts. The injunction thus "presages a future filled with judicial micromanagement" of the NCAA's eligibility bylaws. *See Alston*, 594 U.S. at 101. This Court should quash that possibility by vacating the injunction before it does more harm.

## B. As the District Court Acknowledged, Fourqurean's State-Law Claims Are Not Likely to Succeed.

Except for a single sentence in a footnote, the court made no mention of the merits of Fourqurean's state-law claims. (Order at 18 n.9.) This Court therefore need not (and ought not) even address those arguments here. *State Wholesale Groc. v. Great Atl. Pac. Tea*, 258 F.2d 831, 839 (7th Cir. 1958) ("It is elementary that this court . . . will not pass upon a question as to which the district court . . . failed to make a decision."). Even if the Court were to consider the state law claims, the district court's footnote correctly finds that they are "largely underdeveloped" and "do not have a substantial likelihood of success on the merits." (Order at 18 n.9.) That "holding" is correct and should be undisturbed.

\*     \*     \*

That Fourqurean is unlikely to succeed on the merits of **any** of his claims is dispositive of this appeal, and the Court could end its analysis here. *Lukaszczyk*, 47 F.4th at 598.   Nevertheless, because the court erred in holding that, absent a preliminary injunction, Fourqurean would suffer irreparable harm incapable of being redressed by legal remedies, this Court has an alternative basis for reversing the injunction; the NCAA makes these arguments next.

## II.   THE DISTRICT COURT ERRED IN HOLDING THAT FOURQUREAN'S SPECULATIVE, FINANCIAL HARM WOULD BE IRREPARABLE AND AN EVENTUAL AWARD OF DAMAGES WOULD NOT REMEDY IT.

"Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is **likely** in the absence of an injunction." *D. U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016) (emphasis added).   Where there is only the "possibility" of such harm, an injunction may not issue.   *See Winter*, 555 U.S. at 22; *see also Mays*, 974 F.3d at 822 (discussing the Supreme Court's clarification in *Winter* that irreparable injury must be "likely," rather than a mere "possibility").   Harm is considered "irreparable" only if it "cannot be prevented or fully rectified by the final judgment after trial." *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 (7th Cir. 2001).   Harm, by definition, is not irreparable if it is compensable by money (i.e., an adequate, traditional legal remedy).   *See, e.g.*, *Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc.*, 841 F.2d 163, 164–65 (7th Cir. 1988) ("An injury compensable in money is not 'irreparable', so an injunction is not available.").   The court's order erred in three key respects.

4916-2252-0864

*First*, and most notably, the order relies on the fact that Fourqurean's supposed harm is *speculative* to determine that the harm is therefore irreparable. Specifically, the court concluded that "[g]iven the uncertainties in predicting the outcome of plaintiff's return to UW for another football season, therefore, the court agrees that at least a portion of the harm caused would be too speculative to assign a monetary value and is, therefore, likely to be an irreparable harm." (Order at 20.) In support of this conclusion, the court relies on the following findings: (1) "there is at least some evidence[21] that plaintiff may earn hundreds of thousands of dollars in NIL money next season if he is allowed to continue playing college football for another season"; (ii) "there is some evidentiary weight behind his assertion that another year of playing college football would allow him to keep building his brand"; and (iii) "though more speculative, it is not unrealistic to expect his draft stock to climb over the course of another year of eligibility from undrafted free agent to a draft choice and a higher NFL salary." (Order at 19–20.)

This ignores the fact that ***all*** of the harm is tied to supposed financial harm that is capable of being compensated by money damages (the traditional legal remedy). To the extent that Fourqurean's potential injury (financial or otherwise) is too speculative, that should have counseled ***against*** granting a preliminary injunction – not in favor of one, as the court concluded.

For example, in *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705–06 (7th Cir. 2005), this Court explained that there is

---

[21] Fourqurean himself is the only source of this "evidence." (*See* SA at 197, 41:14-19.)

a difference between harm that makes monetary damages difficult to calculate because they cannot be quantified and those that are difficult to calculate because the harm is, itself, speculative. Under certain facts, the former (damages that cannot be quantified) may warrant a preliminary injunction, but the latter – speculative damages – do not. *See id.* at 705 (finding no irreparable harm because "the harm plaintiff points to … eludes calculation because it is ***speculative***, not because, if it occurred, it could not be quantified") (emphasis added).

The court therefore erred in basing its irreparable harm finding on injury that is both speculative and, even if it occurred, quantifiable. With respect to *potential* (i.e., speculative) NIL compensation that Fourqurean may stand to miss if the preliminary injunction were lifted, he testified that he would earn "hundreds of thousands of dollars."[22] Just because he did not quantify such compensation with precision at the preliminary injunction stage does not mean it could not be quantified by competent evidence at trial, and it is therefore not irreparable harm. *See East St. Louis Laborers' Local 100*, 414 F.3d at 706 (recognizing that, before discovery, there will often be issues of fact regarding damages, but that is insufficient for preliminary injunction because a "rule that permitted injunctive relief solely because of this uncertainty would give litigants a perverse incentive to avoid doing their homework"). The other bases for the court's holding – that Fourqurean may be able to "keep building his brand" and possibly raise his "draft stock" from "undrafted free agent to a draft choice and a higher NFL salary" – are facially ***speculative*** and cannot justify

---

[22] (SA at 197, 41:14-19.)

preliminary injunctive relief.  Indeed, the mere "chance" that Fourqurean would make "one throw, one catch, one shot, or one block" to become a "household name across the nation" is simply not enough.  (Order at 19.)  As the Supreme Court has held, "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.  And, even if they weren't too speculative, the underlying harm – a higher NFL salary associated with his draft position – is something that could be reasonably quantified after a trial on the merits, given the structure of NFL salaries for rookie contracts.

*Second*, Fourqurean's supposed harm is *not* irreparable for the alternative reason that if he ultimately prevails in this lawsuit, he will be able to again play at the collegiate level for UW – either for the 2025 or 2026 season, depending on the outcome of this case.  In that scenario, he would enjoy all the accompanying benefits of playing another season of college football, including NIL compensation and the possibility of increasing his draft stock for the next available NFL draft.  This demonstrates that his potential harms are *not* irreparable and are instead capable of being "prevented or fully rectified by the final judgment after trial," and injunctive relief is inappropriate. *Roland*, 749 F.2d at 386 (no irreparable harm when plaintiff "can easily wait till the end of trial to get that relief").  The record consists of no facts or evidence suggesting otherwise, yet the court ignored this argument entirely.

(*Compare* Order at 18–21 (regarding irreparable harm and legal remedies) *with* Dkt. 15 (NCAA's Opp. Br.) at 44–45.)

**Finally**, that Fourqurean waited **years** to seek a waiver or bring legal action undermines the court's finding that he will be irreparably harmed without a preliminary injunction. The court unduly minimized the significance of this fact. Indeed, it is well-settled that parties seeking a preliminary injunction must show "reasonable diligence." *Bensiek v. Lamone*, 585 U.S. 155, 159 (2018). "A lengthy, unexplained delay in seeking relief calls into question 'how urgent the need for [preliminary] equitable relief really is.'" *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) (*quoting Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011)).

Here, Fourqurean's waiver request was based on the circumstances surrounding his **2021** season – his first season of competition under the Five-Year Rule, more than four years ago. (Order at 2.) Yet, he did nothing to address the concerns regarding his eligibility until December 6, 2024 – only after completing his fourth season of competition and less than two months before the date to withdraw from the NFL draft. (*Id.* at 3.) This is the antithesis of the reasonable diligence that is required for injunctive relief.

Despite recognizing that his "last-minute preliminary injunction" was "troubling," the court cast those concerns aside seemingly because waiver requests must be submitted by a member school on behalf of a student-athlete, rather than by a student-athlete directly. (*See* Order at 19.) But that is simply the logical product

of the fact that the NCAA is a voluntary association of **member schools** – there is no privity with student-athletes. And, more importantly, it does nothing to address whether Fourqurean was **diligent** in seeking relief, as the law requires. For example, there is nothing in the record indicating that he asked either of his schools (GVSU from 2021–2022 or UW from 2023–2024) to submit a waiver request on his behalf and that they refused or delayed doing so.[23] This lack of diligence outweighs the "no harm, no foul" view espoused by the court, which observed that there is no evidence that the NCAA was "lulled into a false sense of security" or acted "in reliance" on Fourqurean's delay. (Order at 20.) Setting aside whether such evidence is properly considered on a preliminary injunction,[24] the court placed too much weight on this consideration. The NCAA is charged with applying its membership's rules to more than 180,000 student-athletes, and it does so thoughtfully and consistently. (SA at 23, ¶ 8.) It has fielded many waiver requests concerning the Five-Year Rule and has rendered those decisions under the belief that doing so raised no antitrust

---

[23] Fourqurean's lack of diligence is compounded by the fact that he had the same coach, Matt Mitchell, during his entire playing career. Mitchell was his head coach at GVSU and he began as an assistant coach at UW the same year Fourqurean transferred there. (Dkt. 18, ¶ 2 & Dkt. 18–1 (Ex. A).) This continuity makes it even more problematic that Fourqurean did not seek an exception to the Five-Year Rule sooner.

[24] District courts in this circuit have questioned whether such evidence should be of any significance when analyzing whether a movant is likely to suffer irreparable harm. *See Praefke Auto Elec. & Battery Co. v. Tecumseh Products Co.*, 123 F. Supp. 2d 470, 478 n.8 (E.D. Wis. 2000) (questioning whether decisions supporting this analysis "mistakenly conflate the equitable defense of laches with the evidentiary issue of what the plaintiff's delay indicates about the urgency of the harm it faces"); *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) (observing that decision analyzing such evidence "incorrectly conflated the laches and irreparable harm standards in holding that the delay did not defeat irreparable harm given that the defendant could not prove detrimental reliance").

concerns.  In this way, of course the NCAA "relied" on Fourqurean's delay to its detriment in light of the court's erroneous order.

For all these reasons, Fourqurean's speculative, purely financial harm is not irreparable.  At worst, it is precisely the kind of harm that can be rectified after trial and that is compensable with money damages.  The preliminary injunction should be reversed for this reason, too.

## CONCLUSION

The district court's order and preliminary injunction should be vacated.

March 19, 2025.                    Respectfully submitted,

*s/ Kate E. Gehl*

Thomas L. Shriner, Jr.
Kate E. Gehl (Counsel of Record)
Max S. Meckstroth
David J. Wenthold
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.297.5601 (TLS)
414.297.5279 (KEG)
414.319.7022 (MSM)
414.297.4985 (DJW)
tshriner@foley.com
kgehl@foley.com
mmeckstroth@foley.com
dwenthold@foley.com

Rakesh Kilaru
Tamarra Matthews Johnson
Wilkinson Stekloff LLP
2001 M Street N.W., 10th Floor
Washington, DC 20036
202.847.4046 (RK)
202.847.4020 (TMJ)
rkilaru@wilkinsonstekloff.com

tmatthewsjohnson@wilkinsonstekloff.com

*Counsel for Defendant-Appellant National
Collegiate Athletic Association*

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g), I hereby certify:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Cir. R. 32(c) because it contains 13,338, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word-count feature of Microsoft Word Professional Plus 2016 in preparing this certificate.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2016 in 12-point Century Schoolbook font (for text) and 11-point Century Schoolbook font (for footnotes).

Dated: March 19, 2025

_s/ Kate E. Gehl_
Kate E. Gehl

4916-2252-0864

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: March 19, 2025

*s/ Kate E. Gehl*
Kate E. Gehl

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), the undersigned hereby certifies that all material required by Circuit Rule 30(a) is included in the Required Short Appendix bound with this brief. I further certify that all material required by Circuit Rule 30(b) is included in the Separate Appendix filed with this brief.

Dated: March 19, 2025

*s/* Kate E. Gehl
Kate E. Gehl

# REQUIRED SHORT APPENDIX

# INDEX

**District Court Order and Opinion, Feb. 6, 2025** (Dkt. 39)    **RSA 1**

**Preliminary Injunction, Feb. 26, 2025** (Dkt. 40)    **RSA 23**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NYZIER FOURQUREAN,

                          Plaintiff,                    OPINION AND ORDER

    v.                                                      25-cv-68-wmc

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

                          Defendant.

Plaintiff Nyzier Fourqurean seeks a preliminary injunction enjoining defendant National Collegiate Athletic Association ("NCAA") from enforcing the so-called "Five-Year Rule,"[1] Article 12.8, that prevents him from competing in a fifth season of college football. Specifically, he asserts that the NCAA's bylaws violate § 1 of the Sherman Act and a host of Wisconsin state laws. Because plaintiff is likely to succeed on his Sherman Act claim on the current record, and would suffer irreparable injury without injunctive relief, the court will grant a preliminary injunction for the reasons explained below.

UNDISPUTED FACTS[2]

For the last two years, Fourqurean has been a student-athlete on the University of Wisconsin-Madison's ("UW") football team who most recently played for UW during the 2024 football season. (Pl. Ex. G (dkt. #4-7).) Fourqurean initially enrolled at an NCAA

---

[1] The Five-Year-Rule is really a misnomer in this case, where defendant is not claiming plaintiff's additional year of eligibility violates the Five-Year Rule but rather a subpart of that rule, limiting student-athletes to "*four seasons* of intercollegiate competition in any one sport."

[2] Except as noted, this factual summary relies principally on defendant's responses to plaintiff's proposed findings of fact ("RPFF").

Division II program, Grand Valley State University ("GVSU") in fall 2020.  (RPFF ¶ 4.)

However, GVSU's 2020-2021 football season was cancelled due to COVID-19 (RPFF ¶ 5),

and the NCAA approved a "season-of-competition waiver" for that season, provided that

the student-athlete met certain criteria.  *DII approves season-of-competition, eligibility relief for*

*2020-21*, *NCAA* https://www.ncaa.org/news/2020/7/22/dii-approves-season-of-

competition-eligibility-relief-for-2020-21.aspx (last visited Feb. 4, 2025).  Fourqurean

apparently qualified for that waiver.

In the summer of 2021, Fourqurean's father passed away, causing him mental health

challenges and loss of weeks of off-season training, as well as loss of concentration and

commitment during most of that season.  (RPFF ¶ 6; Fourqurean Decl. (dkt. #26) ¶ 5.)

During GVSU's 2021 football season, Fourqurean played in 11 games, but with only 155

total snaps/reps, representing roughly three, full games.  (RPFF ¶¶ 8-9; Pl. Ex. A (dkt. #4-

1) 5.)[3]  In contrast, during the 2022 GVSU football season, he played in 13 games with

515 total snaps/reps.  (Pl. Ex. A (dkt. #4-1) 12.)  Fourqurean also earned no name, image,

and likeness ("NIL") money while he was at GVSU.  (RPFF ¶ 8.)  He then transferred to

UW where he played in the 2023 and 2024 football seasons, playing in 25 total games.

(Pl. Ex. A (dkt. #4-1) 12.)  At UW, he *did* earn NIL money in each of his two seasons:

$5,000 in 2023 and $45,000 in 2024.  Based on discussions to date, Fourqurean expects

---

[3] Although defendant objects to the three-game calculation, asserting that plaintiff has cited to no
admissible evidence, there is admissible evidence that UW represented Fourqurean's 155 snaps amounted to 3 games of play in its waiver application on his behalf.  (Pl. Ex. A (dkt. #4-1) 5.)  Even
if this were admissible evidence, defendant further asserts that UW's calculation is wrong because
he actually played in 11 games, but that argument does not actually rebut UW's conclusion as to
how many games 155 snaps equates.

to earn hundreds of thousands of dollars in NIL deals in 2025 if he is allowed to continue playing football at UW, though he has not yet signed a contract with UW.[4]

In December 2024, UW applied for a waiver on Fourqurean's behalf, asserting that his father's death impacted his experience at GVSU.  (RPFF ¶ 12; Pl. Ex. A (dkt. #4-1) 2.) Specifically, UW asserted that relief was appropriate under NCAA Division I Article 12.8.1.7.1.1 (Five-Year Rule waiver) and NCAA Division II Article 14.4.3.4.1.7 (three-game exception).  (Pl. Ex. A (dkt. #4-1) 6.)  According to the Five-Year Rule, Article 12.8, "A student-athlete shall not engage in more than *four seasons of intercollegiate competition* in any one sport," and "A student-athlete shall complete the student-athlete's seasons of participation *within five calendar years* from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution."  (Dkt. #16-1, at 17 (emphases added).)  Article 12.8.1.7.1.1 allows for waiver of the Five-Year Rule if, among other circumstances, the "student-athlete is *deprived of the opportunity to participate for more than one season* in his or her sport within the five-year period of eligibility *for reasons that are beyond the control* of the student-athlete or the institution."  (*Id.* at 19 (emphases added).)  Although NCAA Division II had no exception for limited participation in a given season while Fourqurean was at GVSU, beginning in January 2023, that division's Article 14.4.3.4.1.7 allowed a football student-athlete "representing a Division II institution, in their initial year of collegiate

---

[4] More specifically, Christopher Overton, a sports marketing consultant, estimates that Fourqurean could earn between $250,000 and $500,000 in NIL next season (Overton Decl. (dkt. #30) ¶ 3), but because Overton's declaration was provided uninvited only after the preliminary injunction hearing, the court does not specifically rely on this declaration.

enrollment," to "participate in up to three contests in a season without using a season of competition." (Dkt. #16-2, at 14); *DII adopts football proposals providing more season-of-competition flexibility, spring scrimmage, NCAA* https://www.ncaa.org/news/2023/1/14/media-center-dii-adopts-football-proposals-providing-more-season-of-competition-flexibility-spring-scrimmage-opportunities.aspx (last visited Feb. 5, 2025).

In contrast, Division I Article 12.8.3.1.6 allows a Division I football student-athlete to participate in *four* games without using a season of competition. (RPFF ¶ 10; Dkt. #16-1, at 21.) Also, the NCAA recently issued a blanket waiver excepting Division I post-season competition (conference championship, bowl, and College Football Playoff games) from counting towards a player's four-game limit. *REPORT OF THE NCAA DIVISION I FOOTBALL BOWL SUBDIVISION OVERSIGHT COMMITTEE AUGUST 22, 2024, NCAA* https://ncaaorg.s3.amazonaws.com/committees/d1/fbsfboc/Aug2024D1F BSOC_Report.pdf (last visited Feb. 4, 2025).

In support of its application for a waiver of the Five-Year Rule on Fourqurean's behalf, the UW represented to the NCAA that: (1) Fourqurean's 2021 snap count equated to three full contests or less; (2) his initial year of enrollment was really the 2021 season due to the canceled 2020 season; and (3) his personal circumstances (2020 canceled season, lack of roster depth, team injuries, blow out victories, and the impacts of his father's death) supported granting him a waiver. (Pl. Ex. A (dkt. #4-1) 5.) While there is some dispute as to whether UW asked for a hardship waiver *specifically*, it certainly asserted that there were circumstances beyond Fourqurean's control under Article 12.8.1.7.1.1 and under the "totality of circumstances" more generally. (*Id.*)

On January 29, 2025, the NCAA summarily denied the waiver application explaining:

> Requirements of the legislation are not satisfied: Specifically, staff noted legislation as established by the Division II membership, specifically identifies circumstances that support relief from use of a season of competition following participation in competition.  Staff noted SA competed in 11 contests, two of which occurred during post season, which exceed legislated limit, and institution was unable to provide objective documentation satisfying any of the legislated exceptions or other extenuating circumstances which would enable staff to provide relief consistent with intent of legislation[.]

(Pl. Ex. A (dkt. #4-1) 1.)[5]

The NCAA has also filed contemporaneous communications from the time that UW's waiver application on Fourqurean's behalf was pending.  (Dkts. ##37 to 37-8.)  UW representative Joel Ott contacted NCAA staff about the waiver request shortly after it was filed.  (Dkt. #37-2, at 1.)  In an internal triage form, an NCAA staffer wrote on December 11, "I think we're looking at 21-22 when [student-athlete] competed in 11 [games], including 2 during postseason?"  What is mitigation?  That's basically the entire season.  I think they are asserting the number of snaps he took but that's [not] how the legislation is looked at."  (Dkt. #37-6.)  About a week after the application had been submitted, Ott contacted NCAA staff, asking if he could provide new information in support of the waiver request.  (Dkt. #37-3.)  The NCAA told Ott that he could, and he provided an additional statement from Fourqurean on January 3, 2025.  An NCAA staffer spoke with Ott again

---

[5] Following the preliminary injunction hearing, the NCAA was allowed to file contemporaneous communications from the time that the UW's waiver application on Fourqurean's behalf was pending.

on January 8, 2025, discussing whether Fourqurean had met with a counselor after his father died.  (Dkt. #37-5.)  Jerry Vaughn, the Director of Academic and Membership Affairs at the NCAA, represents that neither UW nor Fourqurean submitted documentation that he met with a counselor or mental health professional.  (Vaughn Decl. (dkt. #37) ¶ 10.)  On January 17, Ott informed the NCAA that Fourqurean planned to request a preliminary injunction.  (Dkt. #37-2, at 1.)  Vaughn represents that NCAA in-house legal counsel then spoke with Fourqurean's counsel, explaining that it would be willing to review any objective or contemporaneous documentation regarding his mental health, and Fourqurean submitted additional statements from friends, teammates, and coaches.  (Vaughn Decl. (dkt. #37) ¶¶ 13-14; Dkt. #37-7.)

The UW has until Friday, February 28, 2025, to appeal the NCAA's decision, and Fourqurean's attorney explains that he wants to stay at UW to take advantage of NIL opportunities and participate in revenue sharing.  (RPFF ¶ 3.)[6]

## OPINION

To obtain a preliminary injunction, Fourqurean must show that: (1) he is "likely to succeed on the merits"; (2) traditional legal remedies would be inadequate; and (3) he will suffer irreparable harm without the relief.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023).  If he passes these thresholds, the court proceeds to balance the equities, weighing the harm that plaintiff would suffer absent a preliminary injunction against the harm defendant would suffer were a

---

[6] The NCAA disputes whether revenue sharing is possible under *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

preliminary injunction issued, as well as considering whether an injunction is in the public interest.  *Finch*, 82 F.4th at 578; *United States v. Town of Lac du Flambeau*, No. 23-CV-355-WMC, 2024 WL 4297671, at *4 (W.D. Wis. Sept. 26, 2024).  A party seeking a preliminary injunction "must make a *strong showing* that [it] is likely to succeed on the merits," while "a mere possibility of success" is not enough to show a likelihood of success on the merits.  *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (emphasis added).

## I.  Sherman Act Claim is Likely to Succeed

Given the trend in the law since *Alston*, plaintiff has made a strong showing of likelihood of success on his claim under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, which prohibits agreements that *unduly* restrain trade.  594 U.S. at 81 ("the phrase 'restraint of trade' is best read to mean 'undue restraint'" (quoting *Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018)).  To state a claim under § 1, a plaintiff must show three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury."  *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (quotation marks omitted).

Since *Alston*, no one can reasonably dispute that the NCAA and its members (like other associations of competitors) amount to a "combination, contract, or conspiracy."  *See Alston*, 594 U.S. at 85, 107 (affirming district court's entry of a permanent injunction against the NCAA in a case brought under the Sherman Act).  Instead, whether plaintiff has a likelihood of success hinges on whether the NCAA unreasonably restrained trade and

caused a market injury.  As to the former, *Alston* indicates that courts should apply a three-step, "rule-of-reason" framework in analyzing anticompetitive effects.  *Alston*, 594 U.S. at 87-96 (rejecting NCAA's arguments that district court erred by applying the rule of reason).  At step one of the rule of reason framework, plaintiff must show that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio*, 585 U.S. at 541.  If plaintiff meets his burden, then the case proceeds to step two where "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.*  Finally, if defendant shows a procompetitive rationale, then "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

## A. Defendant Unreasonably Restrained Trade

As an initial matter, defendant criticizes plaintiff for not defining the relevant market (dkt. #15, at 30-32), but the U.S. Supreme Court has already defined it.  Indeed, the Supreme Court recognized that "NCAA's Division I essentially *is* the relevant market for elite college football." *Alston*, 594 U.S. at 81 (emphasis original).  In fact, with the growing impact of NIL money at elite college football programs already topping $1 billion last year (Pl. Ex. E (dkt. #4-5) 3), the relevant market is rapidly narrowing to Football Bowl Subdivision teams, or even arguably to the Power Four conference teams (Big Ten, Big 12, Atlantic Coast Conference, and Southeastern Conference) and a few, independent programs.  Regardless, "the NCAA and its member schools have the power to restrain" student-athlete eligibility "in any way and at any time they wish, without any meaningful risk of diminishing their market dominance" for college sports. *See id.* at 81-82.  Therefore,

the NCAA and its members enjoy monopsony power over student-athletes who effectively have no other market to sell their labor, turning professional (and even then, only after being out of high school for at least three years and using up their college eligibility or receiving approval from the National Football League ("NFL") to enter the draft early). *The Rules of the Draft*, NFL https://operations.nfl.com/journey-to-the-nfl/the-nfl-draft/the-rules-of-the-draft/ (last visited Feb. 6, 2025).

The real issue is whether plaintiff has offered proof of "substantial anticompetitive effect" based on the NCAA's denial of an additional year of college eligibility. A plaintiff can demonstrate a substantial anticompetitive effect directly or indirectly. *Ohio*, 585 U.S. at 542. Direct evidence of anticompetitive effect is "proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (alteration adopted and citation and quotation marks omitted). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." *Id.*

Here, plaintiff has provided no direct evidence of detrimental effects on competition, so the court applies the indirect method. As the Supreme Court explained, defendant undoubtedly has market power; indeed, "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition." *Alston*, 594 U.S. at 90 (emphasis original). Arguably, therefore, *Alston* holds that any restraints by defendant on student-athlete eligibility harms competition. In any event, while plaintiff has offered little proof that the Five-Year Rule in particular  harms competition by limiting student-athletes

9

to four seasons of eligibility, it is still apparent that rule has an anticompetitive effect on the market for student-athletes by limiting who is eligible to play college football.[7] Moreover, defendant itself has acknowledged its power in establishing eligibility by promulgating exceptions to the Five-Year Rule, like the "Circumstances Beyond [student-athlete's and institution's] Control," which waive application of the rule in certain circumstances.

Still, defendant rightly points out that the Five-Year Rule does not necessarily "reduce the number of roster spots available to potential participants," since plaintiff's spot will no doubt be filled by another eager applicant were he excluded, and thereby asserting plaintiff cannot show that the Five-Year Rule lessens the total benefits athletes as a whole receive in tuition and cost of attendance. However, defendant ignores that the competitive landscape is now changed because it has allowed higher profile athletes like plaintiff to earn a rapidly growing pie of NIL compensation. *See Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-01336, 2024 WL 5159888, at *1 (M.D. Tenn. Dec. 18, 2024) ("the NCAA drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their [NIL]"). To that point, an athlete who is allowed another season could earn additional NIL compensation, which may be life changing for at least some student-athletes. For example, in this case, plaintiff has represented that he is set to make hundreds of thousands of dollars if he is permitted another year of eligibility to play

---

[7] In fairness, plaintiff would also attack other eligibility rules, like Article 14.3.3, which limits a student who transfers to a Division I member institution to three seasons of Division I competition (dkt. #16-1, at 32), but as discussed at oral argument, no other rule appears to block plaintiff from another year of eligibility, so the court does not address them here.

football at UW. Moreover, defendant's eligibility rules likely depress competition for roster spots, and thus, player NIL earnings, by categorically excluding athletes after four seasons of competition when their marketability for NIL income is more likely than not to be at its apex. Accordingly, plaintiff has shown that the Five-Year Rule has an anticompetitive effect.

## B. Defendant Has Offered Procompetitive Rationales for the Restraint

Having concluded that the challenged eligibility rule is anticompetitive, the question then is whether defendant has articulated a procompetitive rationale for the restraint. Defendant argues that the Five-Year Rule is procompetitive because it tethers athletic competition to amateurism and college education, distinguishing it from other sports leagues that have no related arguable amateur component or educational experience. Defendant also argues that, by limiting opportunities to play Division I football through its eligibility rules, it ensures that new cycles of young student-athletes are allowed to participate. Finally, defendant also asserts that, if the Five-Year Rule were changed and student-athletes became older overall, consumer demand for college athletics may decline, especially as its distinction from far more popular, professional football diminishes.

The court agrees that linking a student-athlete's college athletic career to ordinary degree progression differentiates NCAA Division I football from professional football leagues like the NFL. As defendant's economic expert explained, "a less differentiated athletic product where athletes are older and less aligned with standard collegiate progression may reduce fan interest and ultimately resources invested in student-athletes." (Backus Decl. (dkt. #20) 8.) Defendant's argument about ensuring young athletes have

11

an opportunity to Division I football is substantially less persuasive, however, because the NCAA's own rules already allow Division I football teams to fill roster spots with experienced, transfer players, crowding out younger athletes. *Pavia*, 2024 WL 5159888, at *11. So, too, is any argument for these rules promoting amateurism, which rings increasingly hollow with elite college football coaches' salaries, television ratings, and now NIL money for athletes skyrocketing. *Cf. Alston*, 594 U.S. at 110-11 (Kavanaugh, J., concurring). Thus, although the court does not agree with all of defendant's asserted procompetitive effects of the Five-Year Rule, the court concludes that defendant has offered a legitimate, procompetitive rationale for its eligibility restraints on competition being tied to academic progress.

### C. Less Anticompetitive Means Could Achieve Procompetitive Efficiencies

Having found defendant's Five-Year Rule anticompetitive but subject to at least one remaining, legitimate procompetitive rationale, the final question in a rule-of-reason analysis is whether these procompetitive benefits could be accomplished with less anticompetitive means. Before considering whether there are less anticompetitive means to differentiate NCAA Division I football from professional football leagues, the court notes some background principles that guide its analysis. As the Supreme Court explained in *Alston*, judges must be wary "of the temptation to specify the proper price, quantity, and other terms of dealing—cognizant that they are neither economic nor industry experts." 594 U.S. at 102. The Court further explained that "[j]udges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives." *Id.* at 106.

With those cautionary principles in mind, the court will *not* hold that defendant must achieve its procompetitive interest in differentiating college football from professional football by uniformly allowing student-athletes more eligibility, at least not on the record before this court. Although four seasons of total playing time or five years from beginning one's collegiate athletic endeavors does strike the court as somewhat arbitrary, tying eligibility to an ordinary track of academic progress makes sense if the goal of the NCAA and its members is to offer a product of *student*-athletes competing for titles as its primary differentiating feature. However, the court will require that defendant have *meaningful* exceptions to its generally applicable four- and five-year rules.

In particular, the reasonableness of four seasons of eligibility is underscored by data from the UW showing that about 75 percent of college students (although not student-athletes in particular) graduate college in about four years.[8] To be sure, there is at least some reason to believe that *five seasons* of competition would be less restrictive while still differentiating defendant's product, and recent news reports suggest that defendant is considering allowing five seasons of competition. *College sports leaders mulling '5-in-5' rule to eliminate redshirts, waivers and other exemptions*, yahoo! sports https://sports.yahoo.com/college-sports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html (last visited Feb. 5, 2025). However, even if a rule allowing for five seasons of competition might be *less* restrictive than a rule allowing four seasons, that is

---

[8] *From graduation rates to degrees conferred, records fall at UW–Madison*, University of Wisconsin-Madison News https://news.wisc.edu/from-graduation-rates-to-degrees-conferred-records-fall-at-uw-madison/#:~:text=UW%E2%80%93Madison's%20four%2Dyear%20graduation,Academic%20Planning%20%26%20Institutional%20Research%20office. (last visited Feb. 5, 2025).

not necessarily what is required under the Sherman Act.  *Alston*, 594 U.S. at 102.  Thus, at this point, the court will resist the temptation to expand defendant's terms of dealing with a larger pool of student athletes.

Plaintiff also proposes *tolling* an athlete's eligibility clock until he registers for class at a Division I institution, but this proposal also seems a non-starter, since it would arguably all but end any distinction between college and professional football.  Indeed, at least hypothetically, an athlete could play football for four seasons at a Division III school, then spend the next four seasons at a Division II school, and finally transfer to a Division I school with four seasons of eligibility despite having already played college football for *eight years*.  Moreover, if the goal of an athlete were to ensure the highest NIL payoff possible, as plaintiff's counsel suggests, at least a few years at a lower NCAA division may make sense, despite the chance of catching on at the professional level diminishing in likelihood as the athlete grows older.  As a result, if plaintiff's rule was adopted, it is easy to imagine an 11-year college veteran playing out his final season of college eligibility at age 30, having spent *triple* the amount of time most students spend in college, and in the process largely destroying defendant's differentiated product to the point that college football programs would likely become nothing more than a minor league feeder system for the NFL where players develop for years (or even a decade) until they have optimized their chances of being drafted and sticking on an NFL roster.  As concerning is the prospect that Division II and Division III football programs would become nothing more than minor league teams for the most powerful Division I football programs.

14

Even though the court will not require defendant to scrap its Five-Year Rule, therefore, defendant still must have *meaningful* exceptions to its rule to avoid unfairness to student-athletes whose individual circumstances may justify a departure without in any way undermining the procompetitive reason for the eligibility rule overall.  Before considering the specifics of plaintiff's case, the court notes that there is blatant inequity in defendant's current exceptions to the Five-Year Rule that plainly favors the more powerful Division I programs over their Division II counterparts.  Specifically, a Division I football player is allowed to play in *four* games *plus* any additional post-season games without using up a season of eligibility.  Thus, football players would be more attracted to Division I programs to play in four regular season games, one conference championship game, and up to four College Football Playoff games -- a total of nine games at the very highest level of competition -- without it counting towards his four seasons of eligibility.  In contrast, a Division II football player cannot play in more than *three* games, apparently *including* playoff games, without the season counting towards his eligibility.  As importantly for players like plaintiff, that rule did not even take effect until January 2023, while Division I allowed four games of football competition since June 2018, some five years earlier. *Fairness*, *NCAA*  https://www.ncaa.org/sports/2021/2/10/fairness-and-integrity.aspx  (last visited Feb. 5, 2025).

The current differentiation between Division I and II rules -- allowing for different, limited participation without using a year of eligibility -- are not squarely implicated in this case because plaintiff played in *11* games in 2021, albeit briefly in most.  Nevertheless, these ongoing inequities help frame plaintiff's request for an additional season of eligibility,

especially since plaintiff and his coaches were operating under the assumption that he had burned a year of his college eligibility the moment he played a *single* snap at GVSU in 2021 -- presumably encouraging plaintiff and his coaches to continue to play snaps, however meaningless, given his mental state and limited participation at practices.  In fact, Matt Mitchell, plaintiff's coach at GVSU, avers that he would not have played in 2021 at all, but for his being forced into action in several games due to injuries to other players despite not being physically ready or in a good mental head space.  (Mitchell Decl. (dkt. #28) ¶¶ 14-15.)

Next, in its waiver application on plaintiff's behalf, UW relied on Article 12.8.1.7.1.1, the "Circumstances Beyond Control" exception (Pl. Ex. A (dkt. #4-1) 6), but that exception does not appear to apply in this case, because it requires circumstances that render a college athlete unable to participate in competition, and as stated above, it is undisputed that plaintiff participated in the 2021 football season.  Moreover, even if this narrowing of the exception were justified by some unarticulated, procompetitive reason, that rule should not have proved fatal to plaintiff's case for two reasons.  *First*, the waiver process itself appears problematic given plaintiff's counsel's representation that only the UW, and not plaintiff himself, could apply for a waiver, functionally requiring an NCAA-member institution to sponsor a student-athlete before he can apply for a waiver, further restricting his ability to market his services.  *Second*, even if plaintiff's circumstances do not neatly fit into any *current* exception, requiring a meaningful exception for individuals like plaintiff, whose personal circumstances caused them to participate in a season of competition under difficult circumstances, impacting their performance and playing time

16

under unequal eligibility rules, would be a less restrictive means while still allowing for a robust differentiation between college and professional football products.

In plaintiff's case in particular, several factors suggest that it would be appropriate to exempt his 2021 season from counting as a season of competition under the Five-Year Rule: (1) his father passed away before the season, causing him to miss camp and struggle mentally as attested to by his coach and former teammates (*e.g.*, Second Mitchell Decl. (dkt. #29) ¶¶ 1-8; Jaylon Tillman Decl. (dkt. #31) ¶¶ 4-5); (2) his coach at GVSU represented that he was forced into playing despite being unready (Mitchell Decl. (dkt. #28) ¶ 14); and (3) his relatively low total snap count.  These issues are compounded by the fact that, because plaintiff initially attended a Division II school, he did not have the option of playing in a limited number of games while preserving a year of eligibility. Finally, the NCAA's summary denial of the UW's waiver application for plaintiff, albeit after allowing the UW and plaintiff to submit additional evidence, underscores that there needs to be more meaningful exceptions to the Five-Year Rule to avoid unnecessary antitrust injury without an arguable procompetitive justification.

In sum, with less restrictive means for defendant to limit student-athlete eligibility and differentiate its product from professional football, defendant's failure to adopt and apply *meaningful* exceptions to the Five-Year Rule does not account for competitor's individual circumstances or provide a process that allows a student-athlete to initiate the waiver process himself.

### D. Antitrust Injury

Defendant also asserts that plaintiff only alleges an *individual* injury based on his personal circumstances, which is not enough to support an antitrust injury. Certainly, to allege an antitrust injury, plaintiff must allege "not only an injury to himself, but an injury to the market as well," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quotation marks omitted), and plaintiff largely focuses on the harm the eligibility rules did to him. The court recognizes that there would be a *much* stronger case for an antitrust injury had plaintiff provided other examples of similarly-situated student-athletes who were denied waivers. Nevertheless, given the substantial size of the market for Division I football players, it is reasonable to infer that defendant's apparent, wooden application of its eligibility rules and exceptions not only caused plaintiff injury but more likely than not impacted the larger market for like college football players.[9]

### II. Plaintiff Faces Likely Irreparable Harm Absent a Preliminary Injunction

Plaintiff asserts that he faces irreparable harm if no injunction is granted before tomorrow -- Friday, February 7, 2025 -- because without the possibility of returning to UW for another season, he must declare for the NFL draft by that date, which would separately render him ineligible for college football going forward. Plaintiff adds that he will then also

---

[9] At this point, plaintiff's state law claims are largely underdeveloped, and therefore, do not have a substantial likelihood of success, although the court need not reach his claim of an arbitrary and capricious denial of an exception, which seems to have legs for the same reason as his antitrust claim.

miss out on significant NIL opportunities, as well as the opportunity to increase his "exposure" and to develop his "personal brand" by playing college football.[10]

There are at least two troubling aspects to plaintiff's seeking a last-minute preliminary injunction from this court. First, as defendant points out, the issue of counting his "throwaway" year at GVSU has been present for plaintiff since 2022, and certainly throughout his time at UW over the last two plus years, undermining his claim for urgent relief, although since defendant's rules contemplate an application for exception be submitted by a member of the NCAA (in this case, the UW), and not the impacted athlete, perhaps most of this delay is understandable. Second, and at least equally troubling, the effectiveness of the court's entry of a preliminary injunction so close to his draft declaration date is only meaningful if defendant agrees to be bound by it for the next year of eligibility. Otherwise, plaintiff remains, as counsel conceded at oral argument, in an uncertain limbo that this court cannot cure. Even so, the court will consider plaintiff's showing of irreparable harm without an injunction allowing him to continue playing college football.

Certainly, there is at least some evidence that plaintiff may earn hundreds of thousands of dollars in NIL money next season if he is allowed to continue playing college football for another season. Moreover, there is some evidentiary weight behind his assertion that another year of playing college football will allow him to keep building his brand, as "[i]t takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation." *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d

---

[10] Plaintiff may also be taken higher in the 2026 NFL draft if he is allowed to compete again in college football, but that is speculative given the risk of underperformance or injury.

583, 594 (N.D.W. Va. 2023) ("college students suffer irreparable harm when they are denied the opportunity to play sports") (quotation marks omitted and alteration adopted). Finally, though more speculative, it is not unrealistic to expect his draft stock to climb over the course of another year of eligibility from undrafted free agent to a draft choice and a higher NFL salary.

Defendant responds that any harm is negated by this opportunity to play in the NFL, but that argument is speculative especially when, by plaintiff's own admission, it is debatable whether he will be drafted at all without another season as UW's starting cornerback. Similarly, as noted, defendant also asserts that plaintiff's delay in bringing this lawsuit undercuts his claimed irreparable harm, but delay is only one factor in deciding whether plaintiff has shown irreparable harm. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001). ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."). Plus, there is no evidence here that "defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay." *Id.* (quotation marks omitted). Given the uncertainties in predicting the outcome of plaintiff's return to UW for another football season, therefore, the court agrees that at least a portion of the harm caused would be too speculative to assign a monetary value and is, therefore, likely to be an irreparable harm.[11]

---

[11] Of course, the court acknowledges that, when it comes to damages, the parties' positions on this question will flip entirely.

## III. Traditional Legal Remedies Would Be Inadequate

For much the same reason, although money damages may adequately compensate plaintiff for some missed NIL opportunities, money damages would likely be insufficient (or too speculative) to adequately compensate him for the denial of the opportunity to play college football, continue building his brand, and go higher in the NFL draft. *Ohio*, 706 F. Supp. 3d at 594.

## IV. The Balance of Equities and Public Interest Favor Plaintiff

Finally, in light of the narrow scope of the injunction sought, the balance of equities and public interest weigh in favor of granting plaintiff's requested injunction. While defendant frets that the court's decision will open the floodgates of litigation by encouraging every student-athlete dissatisfied with defendant's waiver denial to come to court, the injunction entered here does *not* enjoin defendant's Five-Year Rule altogether; instead, it narrowly enjoins defendant from applying the Five-Year Rule against this plaintiff without demonstrating that his unique circumstances should not give rise to an exception.

ORDER

IT IS ORDERED that:

1) Plaintiff Nyzier Fourqurean's motion for a preliminary injunction (dkt. #2) is
GRANTED.

2) Defendant National Collegiate Athletic Association is hereby PRELIMINARILY
ENJOINED from enforcing the Five-Year Rule (Article 12.8) as to plaintiff
absent a more meaningful demonstration that exceptions to that rule should not
apply to plaintiff's requested, additional season of eligibility given the unique
circumstances surrounding his 2021-2022 season at Division II GVSU.

3) Defendant's motion to strike (dkt. #36) is GRANTED.

Entered this 6th day of February, 2025.


BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

22

RSA 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NYZIER FOURQUREAN,

                        Plaintiff,                    PRELIMINARY
                                                      INJUNCTION

        v.                                            25-cv-68-wmc

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

                        Defendant.

        The court issues this separate, written preliminary injunction in keeping with its

Opinion and Order entered today.

        IT IS ORDERED that the National Collegiate Athletic Association is hereby

PRELIMINARILY ENJOINED from enforcing the Five-Year Rule (Article 12.8) as to

plaintiff absent a more meaningful demonstration that exceptions to that rule should not

apply to plaintiff's requested, additional season of eligibility given the unique

circumstances surrounding his 2021-2022 season at Division II Grand Valley State

University.

        Entered this 6th day of February, 2025.

                                        BY THE COURT:

                                        /s/
                                        _____
                                        WILLIAM M. CONLEY
                                        District Judge

RSA 23