## APPELLATE CASE NO. 25-1187

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

NYZIER FOURQUREAN,

Plaintiff-Appellee,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant-Appellant.

Appeal from an Order of the United States District Court for the
Western District of Wisconsin
The Honorable William M. Conley, District Judge

## RESPONSE BRIEF OF PLAINTIFF-APPELLEE
## NYZIER FOURQUREAN

VON BRIESEN & ROPER, s.c.
*Attorneys for Plaintiff, Nyzier Fourqurean*

By: <u>*Electronically signed by Michael P. Crooks*</u>
Michael P. Crooks, SBN 1008918
michael.crooks@vonbriesen.com
Megan L.W. Jerabek, SBN 1068921
megan.jerabek@vonbriesen.com
Maria del Pizzo Sanders, SBN 1031037
maria.sanders@vonbriesen.com
10 East Doty Street, Suite 900
Madison, WI 53703
608-287-3926

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National College Athletic Association

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff Nyzier Fourqurean

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

von Briesen & Roper, s.c.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/Michael P. Crooks      Date: February 13, 2025

Attorney's Printed Name: Michael P. Crooks

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✔]   No [ ]

Address: 10 East Doty Street Suite 900

Madison, WI 53703

Phone Number: 608-287-3926      Fax Number: 608-441-0301

E-Mail Address: michael.crooks@vonbriesen.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1187</u>

Short Caption: <u>Fourqurean v. National College Athletic Association</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Plaintiff Nyzier Fourqurean</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>von Briesen & Roper, s.c.</u>

(3)   If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

       <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Maria del Pizzo Sanders</u>      Date: <u>February 13, 2025</u>

Attorney's Printed Name: <u>Maria del Pizzo Sanders</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: <u>411 East Wisconsin Ave, Suite 1000</u>

        <u>Milwaukee, WI 53202</u>

Phone Number: <u>414-221-6652</u>      Fax Number: <u>414-249-2634</u>

E-Mail Address: <u>maria.sanders@vonbriesen.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1187

Short Caption: Fourqurean v. National College Athletic Association

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

| | **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.** |

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff Nyzier Fourqurean

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

von Briesen & Roper, s.c.

(3)  If the party, amicus or intervenor is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)  Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)  Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Megan L.W. Jerabek          Date: February 13, 2025

Attorney's Printed Name: Megan L.W. Jerabek

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: 10 East Doty Street Suite 900

Madison, WI  53703

Phone Number: 608-287-3926          Fax Number: 608-441-0301

E-Mail Address: megan.jerabek@vonbriesen.com

rev. 12/19 AK

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iii

JURISDICTIONAL STATEMENT .............................................. 1

STATEMENT OF THE ISSUES ................................................. 1

STATEMENT OF THE CASE ..................................................... 2

    A.    History of Fourqurean's Participation in College Sports ...................... 5

    B.    UW's Request for Waiver on Fourqurean's Behalf .............................. 7

SUMMARY OF ARGUMENT ................................................... 17

STANDARD OF REVIEW ........................................................ 19

ARGUMENT ............................................................................ 21

    A.    The District Court's Finding that Fourqurean Was Likely to Succeed on the Merits Was Supported by both Applicable Law and the Evidence Presented ................................................. 21

        1.    The District Court Properly Applied the Rule of Reason .......... 25

        2.    The District Court Properly Identified the Relevant Market ... 27

        3.    The District Court's Finding that the Eligibility Rules have a Substantial Adverse Effect on Competition Should be Affirmed ................................................. 28

        4.    The District Court Considered the NCAA's Arguments Regarding the Procompetive Justification of the Eligibility Rules and Correctly Rejected Most of Them ........................... 32

        5.    The District Court Properly Held Less Anticompetitive Means Could Achieve the NCAA's Procompetitive Efficiencies ................................................. 37

    B.    The District Court's Finding on Irreparable Harm Is Supported by the Evidence and Should be Affirmed ............................................. 42

CONCLUSION ........................................................................ 47

CERTIFICATE OF COMPLIANCE ............................................................ 50

CERTIFICATE OF SERVICE ................................................................... 51

CIRCUIT COURT RULE 30(D) STATEMENT ......................................... 52

APPENDIX CERTIFICATION ................................................................ 53

# TABLE OF AUTHORITIES

Cases

*American Needle, Inc. v. National Football League*, 560 U.S. 183, 130 S. Ct. 2201, 176 L.Ed.2d 947 (2010) ............................................................................. 25

*Arbolida v. NCAA,* 2025 WL 579830 ........................................................... 40

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009) ......................... 42

*Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-238, 2024 WL 4433307 (M.D.N.C. Oct. 7, 2024) ........................................................................... 23

*Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499 (M.D. Pa. 2022) ............. 42

*Certified Restoration Dry Cleaning Network, LLC. v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007) ...................................................................................... 20

*Ciulla-Hall v. NCAA,* 2025 WL 438707 ....................................................... 40

*Coley v. NCAA,* 2025 WL 750796 ............................................................... 41

*Gateway Eastern Rwy. Co. v. Terminal R.R. Assoc. of St. Louis,* 35 F.3d 1134 (7th Cir.1994) ...................................................................................... 19

*House v. NCAA,* 545 F. Supp. 3d 804 (N.D. Cal. 2021) ..................................... passim

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007) ......................................................................... 26

*Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983 (E.D. Mich. 2018) ..................... 43

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 (2d Cir. 2004) ...................................................................................... 42

*Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264 (M.D. Fla. Feb. 17, 2023) ..... 42

*NCAA v. Alston*, 594 U.S. 69, 141 S. Ct. 2141, 210 L. Ed. 2d 314 (2021) .......... passim

*NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) ............................................................................. 25

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) .............................................................. 26

*Ohio v. Nat'l Collegiate Athletic Assoc.*, 706 F. Supp. 3d 583 (N.D.W.Va. 2023)........................................................................................................... passim

*Ohio v. NCAA*, 920 N.E.2d 196 (Ohio 2008) .................................................. 17, 23, 27

*Pavia v. NCAA*, 2024 WL 5159888 at *6 ............................................................ passim

*Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834 (D. Min. 2019).......................... 42

*Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380 (7th Cir.1984) .................... 19

*S.A. v. Sioux Falls School Dist. 49-5*, 2023 WL 6794207 (D. S.D. Oct. 13, 2023) ..... 42

*Sanchez v. NCAA,* 2025 WL 684271 ............................................................................ 40

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019)...................................... 20

*Tennessee v. Nat'l Collegiate Athletic Assoc.*, 718 F. Supp. 3d 756 (E.D. Tenn. 2024)......................................................................................................... 21, 22, 27

*United States v. Baxter Healthcare Corp.*, 901 F.2d 1401 (7th Cir.1990)................. 19

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)....................................................... 20

*Wisconsin Music Network, Inc. v. Muzak Limited Partnership*, 5 F.3d 218 (7th Cir.1993)................................................................................................... 19

## Statutes

15 U.S.C. §§1-7.............................................................................................................. 1

28 U.S.C. § 1367 ............................................................................................................ 1

28 U.S.C. §1331.......................................................................................................... 1, 17

Rules

Fed. R. App. P. 32(a)(5) ................................................................. 50

Fed. R. App. P. 32(a)(6) ................................................................. 50

Fed. R. App. P. 32(a)(7)(B)(i) ....................................................... 50

Fed. R. App. P. 32(f) ...................................................................... 50

Fed. R. App. P. 32(g) ..................................................................... 50

Other Authorities

P. Areeda, The "Rule of Reason" in *Antitrust Analysis: General Issues 37–38*
    (Federal Judicial Center, June 1981) ..................................... 25

https://ncaaorg.s3.amazonaws.com/committees/d1/clr/D1CLR_Policiesand
    Procedures ............................................................................. 16

https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-
    likeness-policy.aspx ................................................................... 7

## JURISDICTIONAL STATEMENT

Plaintiff-Appellee Nyzier Fourqurean ("Fourqurean") takes no issue with the first paragraph of Defendant-Appellant National Collegiate Athletic Association's ("the NCAA") jurisdiction statement contained within its opening brief in that Fourqurean invoked the district court's jurisdiction under 28 U.S.C. §§1331 and 1367. Fourqurean asserted two federal antitrust claims under the Sherman Act, 15 U.S.C. §§1-7, and five state law claims to be determined pursuant to the court's ancillary jurisdiction. As Fourqurean did not invoke the court's diversity jurisdiction, the second paragraph of the NCAA's statement is meaningless. Fourqurean takes no issue with the remaining portions of the NCAA's jurisdictional statement.

## STATEMENT OF THE ISSUES

While the NCAA spends fifty (50) pages concentrating on the merits of the ultimate issues, forcing Fourqurean to respond thereto, this case is really about whether the district court abused its discretion in allowing Fourqurean to attempt to prove that the Sherman Act prohibits the NCAA's application of its bylaws limiting its exceptions to its eligibility rules. Fourqurean takes no issue with the NCAA's statement of the relevant issues for consideration by this Court: (1) whether the district court properly exercised its discretion in holding that Fourqurean established a likelihood of success on the merits of his antitrust challenge under Section 1 of the Sherman Act; and (2) whether the district court properly exercised its discretion in holding that Fourqurean established irreparable harm that could not be redressed by

an award of money damages. However, he does take issue with the NCAA's attempt to argue the entire merits of the underlying claims in its brief to this Court.

## STATEMENT OF THE CASE

While the NCAA makes a blanket assertion that this case "addresses the validity of eligibility rules that govern who can compete in college sports" (Dkt. 18, p. 3), this case is not about the validity of eligibility rules in general, as the district court found a procompetitive justification for such rules, but rather whether the NCAA's existing exceptions to such limitations can withstand antitrust scrutiny or, if instead, they allow the NCAA to arbitrarily limit the eligibility of a student-athlete to play Division I football without due consideration. After reviewing the totality of the circumstances applicable to Fourqurean and the evolving landscape of college athletics, the district court recognized the inequity of the NCAA's waiver process in this case and narrowly tailored its decision to allow Fourqurean an opportunity to right the wrongs occasioned by the NCAA's denial of UW's waiver request submitted on his behalf.

The district court's ruling under consideration in this appeal focused on whether the NCAA has and applies sufficient exceptions to its bylaws limiting Division I eligibility such that said eligibility bylaws can withstand antitrust scrutiny. Specifically, as noted by the NCAA, the court discerned a likelihood of success on the merits by Fourqurean due to the NCAA's "failure to adopt and apply meaningful exceptions to its Five-Year Rule." (*Id.*, p. 4)  The district court rightfully considered various factors in making its determination as to the likelihood of

Fourqurean's success, including the Unites States Supreme Court decision in *NCAA v. Alston*, 594 U.S. 69, 141 S. Ct. 2141, 210 L.Ed.2d 314 (2021) and subsequent cases, the NCAA's adoption of its interim policy allowing college athletes to earn compensation in the form of Name, Image and Likeness ("NIL"), the changes to the transfer portal, and the resulting fundamental shifts in the Division I collegiate athletics, which have redefined this marketplace.

While the NCAA spends a significant portion of its brief trying to differentiate between eligibility rules and compensation limitations, seemingly to sidestep the weight and precedential effect of the Supreme Court's decision in *Alston*, due in great part to the NCAA's shifting NIL policy and soon-to-be revenue sharing model proposed in the impending settlement of *House v. NCAA,* 545 F. Supp. 3d 804 (N.D. Cal. 2021), in practice, eligibility limitations are no longer separate and distinct from compensation limitations. Stated otherwise, the NCAA's eligibility rules now have a direct impact on a student-athlete's ability to earn significant compensation in a way they have never had in the past. Considering this, the NCAA's claim that "true eligibility rules, including the Five-Year Rule, define who may participate in college sports; they do not limit the compensation available to student-athletes" (*see*, Dkt. 18, pp. 3-4) is misleading, at best. Accepting the idea that these concepts remain fully independent of each other would require a blatant disregard of the transformative changes that have occurred in the Division I athletic marketplace in the past four years and would result in an inappropriate application of outdated concepts to a foundationally changed commercial marketplace.

In response to the district court's holding, the NCAA argues the court "upended" judicial taxonomy by rendering its determination on these issues, and that the court's finding that the NCAA failed to adopt any meaningful exceptions should be considered "judicial micromanagement." (*Id.* at p. 4)  To the contrary, the district court's decision in issuing the preliminary injunction on the facts presented by this case was, in fact, an important example of imperative judicial checks and balances over a monopolistic entity such as the NCAA, which indisputably has unilateral control over the applicable marketplace, to ensure it does not overstep legally permissible bounds in a manner that unfairly and unlawfully restricts trade, the foundation of antitrust law. Absent such judicial oversight, the NCAA would be able to operate, adopt, and enforce its bylaws unchecked and participants in this marketplace would have no meaningful path to exercising their rights.

Finally, while the NCAA argues the district court's decision has "already proven to be consequential" due to its claim that "other student-athletes have filed similar actions (or submitted pre-litigation waiver requests) seeking to invalidate the Five-Year Rule and other eligibility rules, and more cases are sure to come" (*Id.*), the NCAA has presented absolutely no evidence to support any such claim. Even to the district court, while claiming similar waivers have been filed, the NCAA offered no proof in support. *(See*, Cir. Ct. Dkt. 15, pp. 47-48)  If this fact is true, however, such a statement further supports the need for judicial oversight of the NCAA's process for denying eligibility, as that would mean Fourqurean is clearly not the only victim of the NCAA's overreaching and flawed waiver system.

4

**A.    History of Fourqurean's Participation in College Sports**

As noted in the circuit court's opinion, Fourqurean initially enrolled at Grand Valley State University ("GVSU") in Fall 2020. (RSA, pp. 1-2)  As a result of strict COVID-19 restrictions, GVSU's 2020-2021 football season was canceled, including all practices during the fall semester of 2020, and limited socially distanced practice opportunities during the spring semester of 2021. (*Id.* at p. 2)  For this reason, the 2020-2021 football season at GVSU was not counted as a year of eligibility under the NCAA's 5-year rule. (*Id.*)

In addition to the challenges of a global pandemic, Fourqurean's father tragically passed away in a car accident in the summer of 2021. This had a profound impact on every aspect of his life. (*See*, NFSA,[1] pp. 29-51)  As to his football season, this resulted in his missing important weeks of pre-season training, an inability to focus and concentrate, as well as a waning direction and desire. (*Id.*, pp. 37-38, ¶¶2-7)  Per his coaches, after his father died, Fourqurean was not the same player he had been when he came to them. (*Id.*, pp. 45-46, ¶¶3-5)  The loss of his father impacted his mental health and his performance. (*Id.*, p. 36, ¶11) This resulted in limited playing time during the 2021-2022 season, most of which was the result of a lack of depth in the roster. (*See*, RSA at 2; *see also*, NFSA, p. 46, ¶5)

Combining the setback in summer training/conditioning with the toll his father's death took on Fourqurean's mental and emotional health as he attempted to prepare for his first season of collegiate-level football and his first significant return

---

[1] "NFSA" refers to Appellant Nyzier Fourqurean's Separate Appendix of those portions of the record designated unnecessary by the NCAA and therefore were not included in its appendix.

to football since his senior year of high school, Fourqurean's 2021-2022 participation was far from meaningful and his season was largely disappointing. He only played spot minutes when the team lacked depth in certain games. (*Id.*, p. 38, ¶7) Specifically, he competed in only 155 total snaps/reps. (RSA, p. 2) Per his head coach, the team's roster was limited due to the effects of COVID, and Fourqurean was "forced into action in several games due to the injury of other players – even though he was not physically ready or in a great mental head space." (*Id.*, p. 36, ¶14) His coach specifically stated that "in a normal year … he would not have played." (*Id.* at ¶15) According to UW-Madison's ("UW") waiver calculations, his playing time that year was the equivalent of only three games worth of play. (RSA, p. 2*)* In addition to his limited opportunities on the field, during his time in Division II, Fourqurean had no opportunity to earn compensation for his name, image, and likeness. (*See*, NFSA pp. 32-33, ¶¶3, 5, 11)

After a full, normal off-season, Fourqurean was "back to his former self," improved as an athlete and competed in the 2022 season with great success, playing 515 snaps, and then transitioned to UW in May 2023 to play Division I football. (*See*, NFSA, p. 46, ¶6; *see also*, p. 38, ¶9; and RSA, p. 2) There, for the first time, Fourqurean played 25 total games and he was afforded the opportunities unique to Division I college athletes, including the ability to earn meaningful compensation for use of his name, image, and likenesses ("NIL Compensation"). (RSA, p. 2) Fourqurean received NIL compensation in both of his seasons at UW, the amount increasing eight-fold each year. (SA, p. 197, lines 5-12) If granted another year of

eligibility, Fourqurean is expected to receive NIL compensation of "several hundreds of thousands of dollars." (*Id.*, lines 14-19; *see also*, NFSA, p. 53, ¶5)

The path to compensation of this kind, something previously prohibited by the NCAA, was paved by the U.S. Supreme Court's decision in *Alston*, *supra*, which found certain long-standing NCAA restrictions on compensation in violation of the Sherman Act. As a result of this finding, and after numerous states took matters into their own hands to ensure student athletes could be fairly compensated for their name, image, and likeness, the NCAA quickly lifted its prohibition on NCAA athletes receiving NIL Compensation.     ([https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx](https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx)) Since then, the Division I athletics marketplace has fundamentally changed, a shift that has been further cemented by the ruling and subsequent settlement of the class action lawsuit in *House v. NCAA*, *supra*. After earning no NIL compensation at GVSU, Fourqurean received NIL compensation in each of his two years in Division I. (*See*, RSA, p. 2; *see also*, SA 196, lines 9-15 and SA 197, lines 5-12) If permitted to play another season at UW, Fourqurean will earn hundreds of thousands of dollars in NIL deals in 2025, exhibiting the now fundamental link between eligibility and compensation. (RSA, p. 2; *see also*, SA 197, lines 14-19)

**B.     UW's Request for Waiver on Fourqurean's Behalf**

Fourqurean completed his ninth semester at UW on December 15, 2024, earning a degree in Consumer Behavior and Marketplace Studies. (*See*, SA, p. 5 at ¶27) On December 6, 2024, UW submitted a request to the NCAA on Fourqurean's behalf for a waiver, seeking a determination that he be permitted to play another

season at UW. (RSA, p. 3)  The waiver specifically invoked certain NCAA bylaws: (1) Division I, Article 12.8.1 ("Five Year Rule"); (2) Division I, Article 12.8.1.7.1.1 (Circumstances Beyond Control); (3) Division I, Article 12.8.3.1.6 ("Division I Four Game Exception"); and (4) Division II, Article 14.4.3.4.1.7 ("Division II Three Game Exception"), and requested the NCAA consider the totality of the circumstances. (*Id.*)

The Five-Year Rule of 12.8 provides "a student athlete shall not engage in more than four seasons of intercollegiate competition in any one sport," and "a student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." (*Id.*) Article 12.8.1.7.1(b) allows for wavier of the Five-Year Rule if, among other circumstances, the "student-athlete is deprived of the opportunity to participate for more than one season in his or her sport within the five-year eligibility period for reasons that are beyond the control of the student-athlete or the institution. (*See* SA, p. 53) Article 12.8.1.7.1.1 sets forth certain limited circumstances that constitute circumstances beyond the control of the student-athlete or the institution, which the district court found to be applied inconsistently. *(Id)*

Under Division II Bylaw 14.4.3.4.1.7, a football student-athlete representing a Division II institution, in his initial year of collegiate enrollment may "participate in up to three contests in a season without using a season of competition." (RSA, pp. 3-4*)* Stated otherwise, although NCAA Division II had no exception for limited participation in a given season while Fourqurean was at GVSU, beginning January

2023, this provision permitted a student-athlete representing a Division II institution, in his initial year of collegiate enrollment to participate in up to three contests in a season without using a season of competition. (*Id.* at p. 4)  This bylaw, in effect regarding what activity constituted participation for football at the time Fourqurean played was, in fact, different for Division I and Division II.  For instance, as noted by the district court, Division I, Article 12.8.3.1.6 permits a Division I football student-athlete to participate in four games without using a season of competition. (*Id.*, p. 4) Also, the NCAA recently issued a blanket waiver excepting Division I post-season competition (i.e. conference championship, bowl, and college football playoff games) from counting towards a player's four-game limit. (RSA, p. 15)  Under Division II Bylaw 14.4.3.4.1.7, on the other hand, Division II athletes are allowed to participate in only "three contests without using a season of competition" and there is no such waiver for post-season competition. (*Id.*)  The "blatant inequity" of these rules was specifically noted by the district court. (RSA, p. 15)  This inequity was even greater during Fourqurean's time in Division II, at which point the NCAA had no exception for limited participation in a given season for Division II football athletes. At the time, Division II athletes were considered to have participated for purposes of the eligibility clock the second they stepped on the field. The current Division II three game participation exception bylaw was not adopted until 2023, which Division I had many years prior. (*Id.*) This is an important distinction in Fourqurean's case, and for players like him, and was one basis for the UW's waiver request. There is no doubt that had the three-game exception existed while

9

Fourqurean was at GVSU, his coaches would have handled the situation differently. (NFSA, p. 46, ¶5 and p. 38, ¶8)  Merely two seasons later, the rules changed.

In support of the waiver, UW represented that Fourqurean's 2021 snap count equated to three full contests or less; his initial year of enrollment was really the 2021 season as a result of COVID-19; and his personal circumstances, including the cancelled 2020 season, lack of roster depth forcing him to play and the impact of his father's death, supported granting him a waiver. (RSA, p. 4; *see also*, NFSA, pp. 2-12) The crux of this case is whether what occurred, or in actuality what did not occur, in response to the waiver request and how the NCAA applies its Five-Year Rule and exceptions thereto, violated the law.

Specifically, as noted by the district court, "on January 29, 2025, the NCAA summarily denied the waiver application" in one paragraph of explanation. (RSA, p. 5)  That one paragraph read:

> Requirements of the legislation are not satisfied: Specifically, staff noted legislation as established by the Division II membership, specifically identifies circumstances that support relief from use of a season of competition following participation in competition.  Staff noted SA competed in 11 contests, two of which occurred during post season, which exceed legislated limit, and institution was unable to provide objective documentation satisfying any of the legislated exceptions or other extenuating circumstances which would enable staff to provide relief consistent with intent of legislation.

(*Id.*, see also, NFSA, p. 1)

While the NCAA claims it "engaged in several conversations with representatives of UW" concerning the waiver, no such evidence was presented to the court. Specifically, during the hearing, the court noted:

. . . there's still the exceptions that are recognized in the rules that were cited by UW that could have been applied here and were not for reasons that aren't very clear and I don't - - if there's some greater record – if there's - - or decisions or explanations of how the NCAA came to the one-page rational for finding the requirements of legislation not satisfied, I would welcome it, and I would encourage you file that as soon as possible.

(SA, p. 185, lines 22-25, and p. 186, lines 1-5)  After the hearing on the temporary injunction motion, the NCAA provided its full record of the waiver process, which did not, in fact, contain evidence of a careful or through consideration of his waiver request as the NCAA represented to the district court. In fact, the waiver record submitted, which included only five total staff entries from two staff members, Tianna Hill and Maison Hubbard, comprised of a few sentences summarizing those members' initial impressions and limited discussions with the UW in response to its inquiries regarding the waiver. (*See*, SA, p. 107)  The record shows that UW requested an opportunity to submit additional information in support of the waiver, to which the NCAA representative said they would check into and get back to him. (*See*, SA, pp. 107, 110, 113-122)  The UW submitted an additional statement by Fourqurean on January 3, 2025. (SA, p. 110)  The evidence also documented numerous requests by UW, and specifically Mr. Joel Ott, to discuss the waiver and/or seek an update on the NCAA's progress on the consideration of the waiver request. (*See*, SA, p. 107)  However, there is no evidence of further internal discussion, consideration or investigation by the NCAA. (SA, pp. 107-109, 111-112, 123)  In fact, there was no evidence that any further action was taken on this request by the NCAA's staff until the NCAA's denial of the request more than seven weeks later on January 29, 2025. (*See*, SA, pp. 107-108; *see also*, NFSA, p. 1)

Despite the NCAA's suggestion, it was not until Fourqurean's attorney reached out to NCAA's legal department to request a status update regarding the waiver processing and to advise the NCAA of the pending injunction filing that the waiver request received any further activity. (*See*, SA, p. 107) At that time the activity amounted to NCAA's counsel simply allowing, at the request of Fourqurean's counsel, the submission of additional supporting declarations if Fourqurean thought it would help and then a brief denial of the waiver request by the NCAA. (*See*, SA, pp. 110, 113-122; NFSA, p. 1)  No other explanation or rationale was ever provided to the court by the NCAA in support of the waiver denial, nor does the record contain any additional evidence of such. (*See*, RSA, p. 6)

In fact, despite the NCAA's claim that the NCAA evaluated the waiver under these alternative bylaws because the bylaws that UW relied on could not have provided Fourqurean an additional season of competition (Dkt. 18, p. 7), nowhere in any of the NCAA's submissions is there any analysis of what evidence, if any, or which particular additional bylaws, if any, it considered in denying the waiver. Moreover, there was no evidence presented that any representatives of the NCAA ever contacted Fourqurean himself, or any of his coaches or other contacts who submitted statements regarding Fourqurean's 2021 season, or did any other inquiry or follow through to determine the accuracy of the claims included in the waiver request prior to issuing a denial of the waiver. Instead, the NCAA now argues the lack of "medical documentation" concerning the effect the death of Fourqurean's father had on him in 2021, was paramount in its determination to deny the waiver. (*See*, Dkt. 18, p. 7)

This is the exact "wooden" application of the NCAA bylaws that the district court found to be unlawful. (RSA, p. 15)

While contemporaneous medical documentation may be helpful in certain circumstances when considering whether a hardship truly existed, making such documentation a dispositive requirement is contrary to the need for meaningful exceptions to the eligibility restrictions, especially in cases such as this when the hardship at issue is the undeniably tragic death of an athlete's parent and the resulting significant and traumatic impact on the athlete's mental health and ability to meaningfully participate as a teammate in 2021.[2] There are many types of supporting evidence that can credibly support such a hardship. Here, for example, such support came in the form of Fourqurean's statements and numerous declarations submitted on behalf of Fourqurean by his coach Matt Mitchell and others who watched the struggle. (*See*, NFSA pp. 35-51) These declarations, written by numerous individuals with firsthand knowledge of Fourqurean's experience that year, credibly demonstrate the profound impact his father's death had on Fourqurean and his ability to play football during the 2021-2022 season. (*Id*.) However, there is no indication the NCAA even considered these declarations in its denial of the waiver request. They were not referenced in any of the staff entries, nor in the denial. In fact, the NCAA has failed to provide any evidence of the factors it considered in denying

---

[2] The NCAA also fails to consider the possibility that Fourqurean lacked the financial means to seek professional mental health counseling, or whether he even had access to mental healthcare services at the time.

the waiver request other than the entries regarding the number of games and snaps played.

Quite simply, as noted by the district court, the NCAA "still must have *meaningful* exceptions to its Five-Year Rule to avoid unfairness to student-athletes whose individual circumstances may justify a departure without in any way undermining the procompetitive reason for the eligibility rule, overall." (*See*, RSA, p. 15) "The NCAA's summary denial of the UW's waiver application . . . underscores that there needs to be more meaningful exceptions to the Five-Year Rule to avoid unnecessary antitrust injury without an arguable procompetitive justification." (*Id.*, p. 17)

While the NCAA makes note in its argument that Fourqurean had no NIL contracts in place at the time of the evidentiary hearings, as the NCAA is well aware, it was not possible for him to have actual contracts in place at that time, as he was technically no longer a student and the NCAA failed to grant his waiver request. However, at the evidentiary hearing, Fourqurean testified the amount he expected to earn in NIL compensation should the waiver be granted would likely be in the hundreds of thousands of dollars. (SA, p. 197, lines 14-19) His testimony was supported by the declaration of Mr. Marcus Sedberry, who testified the Opendorse Report (*see*, NFSA, pp. 13-28) is an accurate representation of the annual expected earnings that someone with Fourqurean's skill and experience could reasonable expect to earn based upon current market data. (*See*, NFSA, p. 53, ¶4)

Finally, while the NCAA takes issue with the fact that neither UW nor Fourqurean appealed the waiver denial prior to filing this action (Dkt. 18, p. 8, FN 3), the NCAA is well aware that its own lack of diligence in timely processing the initial waiver request created the need for urgent judicial intervention, and that appealing through its process rather than seeking judicial intervention would have caused additional irreparable harm to Fourqurean. Specifically, if Fourqurean was to be able to play another year at UW, he would have to withdraw from eligibility for the NFL draft by February 7, 2025, or he would be rendered ineligible to play college football moving forward. (See, RSA, p. 18)  Despite having the waiver request since December 6, 2024, and having received multiple requests from the UW and Fourqurean's legal counsel for a status update in light of the NFL draft deadline, the NCAA did not deny the waiver until January 29, 2025, and only after being informed that its lack of action was forcing Fourqurean to seek judicial relief. (*See*, SA, pp. 107-108)  Prior to being informed of such, the NCAA refused to give the UW or Fourqurean any estimate of its expected timing, leaving him no choice but to seek additional assistance once the deadline approached. (*Id*.)  Waiting to issue this decision until nine days before the NFL draft deadline put Fourqurean in an impossible position and made an appeal through the NCAA process impractical at the very least.

Furthermore, the NCAA has given Fourqurean no reason to believe it would conduct a more meaningful review process on appeal, making taking a second run through a broken system nothing more than a meaningless exercise. The NCAA has repeatedly represented to the district court and to this Court that Fourqurean's

waiver request was properly handled and carefully considered the first time. As such, for it to argue the only permissible way to dispute this is to go back through its own self-prescribed and unpoliced appeal system is a glaring example of its desire to exercise unfettered monopolistic control over student athletes.

Furthermore, the NCAA's statement that no appeal was in fact taken is factually incomplete. The NCAA's own bylaws authorize a path to retain appeal rights in circumstances such as these and such rights have, in fact, been specifically retained here. As stated in the NCAA Division I Committee on Legislative Relief Policies and Procedures:

> Once an institution, conference or NCAA committee (or any of its subcommittees) has received notice of the legislative relief staff's decision by way of RSRO, the institution has 30 calendar days to accept the decision through RSRO. If the decision is accepted prior to 30 calendar days, the institution waives its right to appeal the decision. Exceptions to this policy may be granted by the Committee for Legislative Relief's chair when an institution is able to demonstrate in writing that exceptional circumstances caused the institution's appeal to be submitted beyond the 30-calendar day appeal period.

*(See*, https://ncaaorg.s3.amazonaws.com/committees/d1/clr/D1CLR_Policiesand Procedures)

Based thereon, UW informed the NCAA that it disagreed with the NCAA's denial of the waiver and reserved the right to appeal through the NCAA process upon resolution of this case if necessary, noting that the pending litigation constitutes exceptional circumstances that will have caused the institution's appeal to be submitted beyond the 30-calendar day appeal period.[3]

---

[3] While the letter submitted by the UW is not itself part of the record, the NCAA acknowledges the receipt of said letter and there is no dispute said letter was submitted to the NCAA by UW. (*See*, Dkt. 18, p. 8, FN 3)

16

Moreover, the law does not require exhaustion of administrative remedies in an action like the one at issue. *See, Ohio v. NCAA*, 920 N.E.2d 196, 201-202 (Ohio 2008).

## SUMMARY OF ARGUMENT

While the NCAA claims the district court should simply have followed past precedent with "an ordinary application of the NCAA's longstanding eligibility rules" (*see*, Dkt. 18, p. 11), the NCAA fails to recognize the significantly altered landscape in college sports since *Alston,* its own change to its NIL policies, and the pending *House* settlement. As discussed below, *Alston* set the precedent for the proper analysis of NCAA bylaws under the rule of reason, and that analysis was properly performed by the district court in this case, as it arrived at the conclusion that Fourqurean was likely to prevail on the merits of his Sherman Act claims.

The NCAA argues the district court erred in two respects: (1) that the court misapplied *Alston* because that case involved compensation rules rather than eligibility rules, and (2) Fourqurean failed to demonstrate irreparable, non-financial, injury. (Dkt. 18, pp. 11-13) On the first issue, as demonstrated below, the groundbreaking precedent set by *Alston* and other cases decided thereafter has broad and important implications on the application of NCAA bylaws regarding both eligibility and compensation for college athletes, and has directly led to sweeping changes in the marketplace that cannot be ignored. Specifically concerning the application of the rule of reason in cases involving the NCAA bylaws, contrary to the NCAA's dispute with the manner in which the district court conducted its analysis,

the *Alston* Court clearly stated that the three steps of the analysis do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis. *Id.*, 594 U.S. at 97. What is required to assess whether a challenged restraint harms competition can vary depending on the circumstances. *Id.* Moreover, as noted by the *Alston* Court, the decision of whether an antitrust violation exists necessarily depends on a careful analysis of market realities, and if those market realities change, so may the legal analysis. *Id.* at 93. Because of NIL, the entire Division I college football marketplace has changed and a new commercial marketplace for student-athletes has been created, making the eligibility rules more important and more directly linked to compensation and commerce than ever before in the current marketplace.

Furthermore, the NCAA argues the district court's ruling is "unmoored from the record, which shows that the NCAA does, in fact, recognize numerous exceptions to the Five-Year Rule that account for extenuating circumstances that may warrant departure from the Five-Year Rule" and that Fourqurean did not qualify for them. (Dkt. 18, p. 12)  This illustrates the district court's concern for the wooden application of the eligibility rules in light of the new Division I football market.  Moreover, neither this Court nor Fourqurean have any idea what evidence the NCAA did or did not consider in its analysis of the waiver request, nor what meaningful process the NCAA undertook to make such determination. The NCAA failed to present any such evidence to the district court, thereby supporting the district court's finding that Fourqurean is likely to succeed on the merits and that NCAA lacks meaningful

exceptions to the Five-Year Rule to avoid unfairness to student-athletes whose individual circumstances may justify a departure. (RSA, p. 15)

On the second issue, as demonstrated in detail below, in weighing irreparable harm, the district court properly considered the unique facts of this case, and weighed those facts against the NCAA's arguments to the contrary, and found sufficient evidence of irreparable harm. That finding, based upon the evidence submitted in support, was proper and should be affirmed.

## STANDARD OF REVIEW

The Court of Appeals reviews a decision denying or granting a preliminary injunction under the abuse of discretion standard. *Wisconsin Music Network, Inc. v. Muzak Limited Partnership*, 5 F.3d 218, 221 (7th Cir. 1993). In doing so, appellate courts are to give "substantial deference to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors." *Gateway Eastern Rwy. Co. v. Terminal R.R. Assoc. of St. Louis,* 35 F.3d 1134, 1137 (7th Cir.1994) (quoting *United States v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1407 (7th Cir.1990)). Therefore, the consideration for the appellate court is "whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes." *Wisconsin Music Network, Inc., supra*, 5 F.3d at 221 (*quoting Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 390 (7th Cir.1984)). While the NCAA appears to seek a *de novo* review of the district court's findings, this Court is bound

by precedent to consider only whether the district court abused its discretion in granting the injunction, while giving substantial deference to his decision.

In that regard, it cannot be disputed a plaintiff "is not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, LLC. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). While a plaintiff must do more than create a jury question, he or she need not conclusively establish success on the merits. *Id.* A likelihood of success is the standard. *Id.* Obviously, the district court found such a likelihood under the facts of this case.

Moreover, a plaintiff's likelihood of success on the merits is not the only factor relevant to a request for a preliminary injunction. Courts also balance whether the movant would suffer irreparable harm absent an injunction, whether an injunction would cause substantial harm to others, and whether an injunction would serve the public interest. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). The district court "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., supra,* 511 F.3d at 542 (6th Cir. 2007). Here, the irreparable harm and the complete lack of any evidence of meaningful consideration of exceptions to the Five-Year Rule warrant the court's granting of the injunction, providing Fourqurean the opportunity to further compete for his dream.

As the district court did not abuse its discretion, applied the proper legal analysis, and considered all of the evidence before it, the grant of the preliminary injunction should be affirmed. This Court should permit Fourqurean to prove his situation warrants an exception to the Five-Year Rule.

## ARGUMENT

### A. The District Court's Finding that Fourqurean Was Likely to Succeed on the Merits Was Supported by both Applicable Law and the Evidence Presented.

While the primary argument espoused by the NCAA is that this court "erred by misapprehending the Supreme Court's decision in *Alston*," and that *Alston* does not control the outcome of this case" because it involved compensation rules as opposed to eligibility rules (Dkt. 18, p. 16), that argument has little merit. In 2021, in response to the Supreme Court's decision in *Alsto*n, the NCAA drastically changed the rules of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness ("NIL"). *See Tennessee v. Nat'l Collegiate Athletic Assoc.*, 718 F. Supp. 3d 756, 759 (E.D. Tenn. 2024); *Ohio v. Nat'l Collegiate Athletic Assoc.*, 706 F. Supp. 3d 583 (N.D.W.Va. 2023). The NCAA did this despite the fact that *Alston* was not a case about NIL compensation. It did so in recognition of its broader implications on the NCAA restraints and the economic realities of the new era of college athletics, but now oddly argues that *Alston* should be given no weight beyond the exact compensation issue at hand in that case. In reality, however, because of the market changes implemented post-*Alston,* eligibility to play college athletics at the highest level is no longer a wholly separate matter from a student-athlete's ability to earn compensation for playing. Instead, Division I eligibility is now

a gateway to the ability for a student athlete to earn substantial NIL compensation during his or her college playing career, something that was never on the table prior to, or even at the time of, *Alston*. As such, the cases cited by the NCAA from 1975 and the 1990's on this issue are no longer relevant. Since those cases were decided, the marketplace has changed and the line between true eligibility rules and compensation rules has blurred substantially and irrevocably, essentially destroying what the NCAA claims is a "clear demarcation between the treatment of NCAA 'compensation' rules and 'true eligibility' rules under the antitrust law." (Dkt., 18, p. 17)  This required shift in legal analysis is the exact type of shift predicted in *Alston*, wherein the Court noted that when market realities change, so must the legal analysis related thereto. *See, Alston, supra*, 594 U.S. at 93.

On the issue of the commercial nature of eligibility rules, the NCAA's argument that "eligibility rules are not subject to antitrust scrutiny" because they are not commercial in nature (Dkt. 18, p. 17), is also outdated. When the NCAA lifted the restriction on NIL compensation, rules regulating who can play college athletics – i.e., who can enter the labor market for NCAA Division I football – became "commercial in nature." *See, Pavia v. NCAA*, 2024 WL 5159888 at *6. That finding was supported by recent case law. Specifically, in *Tennessee v. NCAA*, 718 F. Supp. 3d 756 (2024), the court held "[a]greements between NIL collectives and student-athletes are undoubtedly commercial transactions, and that it necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature." *Id.*, 718 F. Supp. 3d at 762.  Similarly, another court has noted

that it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is *per se* commercial in nature. *See, Ohio v. NCAA, supra*, 706 F. Supp. 3d at 591 (restrictions on a student-athlete's ability to play are a restraint on trade and subject to the Sherman Act); *see also, Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) (finding the NCAA's argument that rules prohibiting student-athletes from accepting prize money are non-commercial eligibility requirements that are not subject to the Sherman Act was "unlikely to be successful"). This line will become even clearer upon adoption of the pending settlement in the *House* case.

Despite arguments to the contrary, the NCAA can no longer rely upon outdated case law that was decided long before student-athletes were granted the ability to receive NIL compensation and the commercial nature of a student-athlete's participation in college athletics shifted. Under the current landscape of college sports, eligibility rules have undeniably become commercial in nature and are subject to antitrust scrutiny. Such scrutiny was correctly recognized and applied by the district court in this case.

The NCAA's argument that applying an antitrust analysis to eligibility rules would somehow negate the preservation of the concept of amateurism in college sports (Dkt. 18, pp. 18-19) has already been rejected by recent courts when raised by the NCAA. Specifically, the *Pavia* court disagreed with that argument and noted it would simply mean the NCAA's eligibility rules are subject to the Sherman Act. *Id.*, 2024 WL 5159888, *7. Stated otherwise, with support from recent case law, the *Pavia*

court noted applying antitrust analysis to eligibility rules does not mean the NCAA cannot impose eligibility rules. Instead, it simply means that those rules will be subject to further scrutiny to determine whether they are an undue restraint on trade. *Id*. As the Supreme Court noted in *Alston*, "the 'statutory policy' of the Act is one of competition and it 'precludes inquiry into the question of whether competition is good or bad,'" and that "The Sherman Act is predicated on one assumption alone – 'competition is the best method of allocating resources' in the Nation's economy." *Id*. at 96. An ability to lawfully preserve amateurism in college sports is not at issue here. What is at issue is the need to ensure that a monopolistic power cannot and does not impose or apply rules that unduly restrain trade.

Finally, as noted above, despite the NCAA's arguments to the contrary, the district court was not improperly "micromanaging the affairs of the NCAA." (Dkt. 18, p. 21) Utilizing the proper analysis under the rule of reason, the district court's decision was more akin to imperative judicial checks and balances over an entity such as the NCAA, which indisputably has monopolistic power. The court noted the need to ensure the NCAA does not overstep legally permissible bounds in a manner that unfairly and unlawfully restricts trade, which is the foundation of antitrust law. As noted by the district court, it was not vacating the NCAA's Five-year Rule. Instead, the decision leaves the rule in place but requires the NCAA to demonstrate it recognizes and, most importantly here, applies meaningful exceptions to this limit on eligibility that allow for consideration of the totality of the circumstances and due

consideration to waiver requests which, in this case, the NCAA was unable to demonstrate.

1. <u>The District Court Properly Applied the Rule of Reason</u>.

Following the Supreme Court's landmark decision in *Alston*, the NCAA's restraints on trade are reviewed under the rule of reason. *Id.*, 594 U.S. at 96-97. As noted in *Alston*, most restraints challenged under the Sherman Act are subject to the rule of reason, which the Court has described as "a fact-specific assessment of market power and market structure" aimed at assessing the challenged restraint's "actual effect on competition." *Id.* at 88. As noted by the Court, the amount of work needed to conduct a fair assessment of these questions can vary, and the Court has suggested that sometimes it can determine the competitive effects of a challenged restraint in the "twinkling of an eye." *Id.*; *see also, NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 110, n. 39, 104 S. Ct. 2948, 82 L. Ed. 2d 70 (1984) (quoting P. Areeda, The "Rule of Reason" in *Antitrust Analysis: General Issues 37–38* (Federal Judicial Center, June 1981)); and *American Needle, Inc. v. National Football League*, 560 U.S. 183, 203, 130 S. Ct. 2201, 176 L. Ed. 2d 947 (2010).

The rule of reason analysis consists of three steps. First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect." *Alston,* 594 U.S. at 96-97. Second, once substantial anticompetitive effects are shown, the defendant must "show a procompetitive rationale for the restraint." *Id.* Third, if a procompetitive rationale is demonstrated, the burden shifts back to the plaintiff, who must "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 97. However, contrary to NCAA's

arguments, the Court acknowledged these three steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis. *Id.* What is required to assess whether a challenged restraint harms competition can vary depending on the circumstances. *Id.* The whole point of the rule of reason is to allow for "an inquiry for the case, looking to the circumstances, details, and logic of a restraint" to ensure that it unduly harms competition before a court declares it unlawful. *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 781, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999); *see also, e.g., Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007) ("The factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition").

The rule of reason's first step requires the plaintiff "to prove that the challenged restraint has a substantial anticompetitive effect." *Alston*, 594 U.S. at 69. Plaintiffs may prove substantial anticompetitive effects through direct or indirect evidence. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Relevant here, indirect evidence of substantial anticompetitive effects requires "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* The "amount of work needed" to assess a challenged restraint's anticompetitive effects "can vary." *Alston*, 594 U.S. at 88. Here the market power of the NCAA is obvious as is the restraint. The NCAA singularly controls who can enter the Division I football marketplace and for how long they can participate, thereby controlling the level of

competition within it. This has an anticompetitive impact on anyone, like Fourqurean, who is impermissibly prohibited from participating in the marketplace.

2.    The District Court Properly Identified the Relevant Market.

On the issue of anticompetitive effect, while the NCAA is critical of Fourqurean for allegedly failing to identify the "relevant market" (Dkt. 18, p. 22), the holding in *Alston* and its progeny is clear. The *Alston* Court initially noted that the NCAA accepts that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition. *Id.,* 594 U.S. at 90. The Court also noted that the lower court had found, and the NCAA did not contest, that student-athletes have nowhere else to sell their labor. *Id.*

A similar argument was raised by the NCAA in *Ohio v. NCAA* and was met with failure. The *Ohio* Court, in discussing transfer eligibility rules and the relevant market under an antitrust analysis, recognized the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate rules and regulations for participation in Division I athletics. *Id.,* 706 F.Supp.3d at 592. Other courts considering antitrust challenges to NCAA eligibility rules have found that the labor market for college athletes, in this case college football, to be relevant labor markets. *See e.g., Alston,* 594 U.S. at 90 ("market for student athlete services"); *Tennessee,* 718 F. Supp. 3d at 761-62 ("market for Division I athletics").

Based thereon, there is little question under the current landscape that the labor markets within NCAA Division I college athletics in the United States are the relevant antitrust markets, and any effort by the NCAA to argue otherwise in this

case is disingenuous. In fact, the district court spent little time on that argument, holding the relevant market, as noted by established precedent from both the U.S. Supreme Court and other lower courts, was NCAA Division I college athletics. (*See*, RSA, pp. 8-9) Because the relevant market has been identified by the courts, the NCAA's argument on this issue fails.

      3.    <u>The District Court's Finding that the Eligibility Rules have a Substantial Adverse Effect on Competition Should be Affirmed</u>.

Next, the NCAA argues the district court abused its discretion when it granted the injunction absent a showing that the Five-Year Rule has a substantial anticompetitive effect that harms consumers in the relevant market. (Dkt. 18, pp. 25-26) Again, the NCAA has made a similar argument in recent cases decided after the new landscape of college athletics, and those arguments have been rejected and should be rejected in this case as well.

In *Ohio v. NCAA*, 706 F. Supp. 3d at 594, the court found the NCAA rule barring students from competition until they fulfilled an academic year of residence reduced competition among NCAA schools for transfer athletes. This resulted in harm to the Division I student-athletes who were directly impacted by the rule and to consumers of college athletics because the value of the college athletics product and the competitiveness of teams was diminished by the absence of skilled transfer players. *Id.*

Similarly, in *Pavia v. NCAA*, the court held eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions might be in their best interest. *Id*. at *9. On that basis,

the court held the rule harms student athletes when they are making decisions on whether to attend an NCAA institution or a different institution. *Id*. The *Pavia* court also noted the effects on the labor market cause downstream effects for consumers of collegiate athletics because the restriction on the eligibility of college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level. *Id*.

In this case, the district court, following applicable precedent, held Fourqurean's burden was to submit "indirect evidence of market power plus some evidence that the challenged restraint harms competition." (RSA, p. 9) As stated above, the district court, following *Alston* and other recent applicable precedent, took little effort to determine that the NCAA has the requisite market power over student-athletes. *Id*. There is simply nowhere but the NCAA Division I programs for these student-athletes to sell their labor. Furthermore, the court noted that the NCAA acknowledged its power in establishing eligibility by promulgating exceptions to the Five-Year Rule, such as the "Circumstances Beyond Control," which waive application of the rule in certain circumstances, though the court was ultimately not persuaded that such exceptions were applied appropriately to withstand scrutiny. (*See*, RSA, p. 10)

Next, on the issue of whether the challenged restraint harms competition, the district court, like the courts in *Pavia*, *Ohio* and *Alston*, held that the eligibility rules at issue had an anticompetitive effect on the market for student-athletes by limiting who is eligible to play college football. (RSA, p. 10)  In fact, the court noted the NCAA

29

acknowledged its power in establishing eligibility by promulgating exceptions to those rules, which waive application of the rules in certain circumstances. *Id.*

Again, even the district court takes note that in its arguments, the NCAA continues to ignore the change in the competitive landscape once it allowed higher profile athletes like Fourqurean to earn a rapidly growing piece of the pie of NIL compensation. (RSA, p. 10)  An athlete who is permitted another season of play could earn substantial NIL compensation, which may be life-changing (*see*, RSA, p. 10), and any denial of that athlete's ability to play based upon an inequitable application of the waiver rules undoubtedly harms competition. Based thereon, the NCAA's contention that "eligibility rules like the Five-Year Rule simply define the set of student-athletes who are able to participate in Division I sports; they do not limit the benefits available to eligible student-athletes" (Dkt. 18, p. 30) is simply an antiquated, outdated concept that no longer applies post-*Alston* because of NIL compensation.

Despite the clear principles of law established above, the NCAA goes on to argue, as it did in *Pavia*, that if there is harm caused by its eligibility restraints, Fourqurean only demonstrates harm to himself as opposed to the market. Again, the NCAA's argument fails. As noted by the district court, any restraint by the NCAA on student-athlete eligibility harms competition. Therefore, such restraints do not just harm Fourqurean, but instead anyone like him whose circumstances have not been given meaningful consideration, as well as the marketplace as a whole. The restraints also harm the end product on the field.

The idea that competition for a limited number of spots is not enhanced by allowing experienced student-athletes like Fourqurean, who the UW clearly wants to play, a waiver to do so, makes no sense. Circumstances beyond his control made one year of his college experience much less meaningful to him and his team. By allowing student-athletes in his position to make up for what should be considered a wasted year improves the entire product of Division I football. This is further supported by the fact that in many instances, the waiver requests come from the NCAA member institutions themselves. If the institution felt that it could find the same or better options in the marketplace, there would be no reason to seek a waiver for Fourqurean or any other athlete for whom a waiver is sought. The fact is, it does not. The institutions feel that the athletes for whom waivers are sought are needed to put out the best college athletic product.

While the NCAA spends a large amount of ink arguing that its limits on eligibility do not harm competition but merely open spaces for other athletes, this argument too has been made before and dismissed by courts. *Pavia*, *10. Specifically, the court found the NCAA's assertion that restrictions on the length of eligibility have a net neutral affect ignores the new economic reality in the age of NIL compensation. *Id*. Even if it is true that the challenged rules do not affect the total number of athletes competing in Division I football in a given year, restrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects. *Id*.

Following this rationale, the district court in this action correctly held the eligibility rules under consideration depress competition for roster spots and NIL compensation, by categorically excluding certain athletes after four seasons of competition when their marketability for NIL income is more likely than not at its apex. (RSA, p. 11) As the court's reasoning is in line with *Alston* and its progeny, the NCAA's arguments on this issue fail.

4.     The District Court Considered the NCAA's Arguments Regarding the Procompetive Justification of the Eligibility Rules and Correctly Rejected Them.

Pursuant to the rule of reason, because Fourqurean was successful in demonstrating the anticompetitive effects of the Five-Year Rule and any meaningful exceptions thereto, the burden shifted to the NCAA to show a procompetitive rationale for the restraint. On this issue, although the NCAA complains on appeal that the district court did not agree with all of its arguments, there is no question the district court found that the NCAA offered at least some procompetitive rationales for the Five-Year Rule generally, and therefore continued the rule of reason analysis by shifting the burden back to Fourqurean to demonstrate less competitive means.

In its brief, while finding no fault with the district court's recognition that student-athlete's college athletic career and ordinary degree progression differentiate NCAA Division I football from professional football leagues like the NFL, and that a world without the Five-Year Rule would mean a "less differentiated product where athletes are older and less aligned with standard collegiate progression" (Dkt. 18, pp. 32-33), the NCAA argues the court failed to give **any** weight to its other arguments that the eligibility rules increase output and enhance the quality of output for

Division I football players. *Id.* Specifically, the NCAA argues "the court agreed with some of the NCAA's proferred procompetitive justifications, but it erroneously rejected others." (*Id.* at p. 32)

A cursory reading of the district court's decision and the NCAA's own brief confirms the court did give the NCAA's arguments consideration -- in exercising its discretion, it just was not persuaded by them. The district court found the argument about ensuring young athletes an opportunity to Division I football less persuasive because the NCAA's own rules permitting Division I teams to fill roster space with experienced, transfer players, crowding out younger athletes are directly contrary to this argument. (RSA, p. 12) As noted in *Pavia*, Division I programs use the transfer portal to fill roster spots for the next season, and those transfers, which are permitted by the NCAA, take a spot that might otherwise go to an incoming freshman player. Accordingly, the NCAA's own eligibility rule can have the same effect – a school opting for a more experienced player. *Id.* at *11. In response to the NCAA's argument that the eligibility rules promote amateurism, as noted by the district court and numerous other courts, this argument rings increasingly hollow in light of increasing coaches' salaries and NIL compensation skyrocketing in college athletics. (RSA, p. 12)

In fact, these same two arguments -- degree progression and promoting amateurism -- were raised by the NCAA in *Ohio v. NCAA* and were similarly rejected as pretextual. *Id.*, 706 F. Supp. 3d at 595. On the first issue, the *Ohio* court held:

> While the NCAA maintains the Transfer Eligibility Rule is intended to help student-athletes progress towards a college degree, the Rule, in practicality, does very little to help facilitate this goal. The Transfer Eligibility Rule only prevents college athletes from competing with their team in NCAA athletic events; it does not prohibit participation in practices or other team activities,

nor does it prescribe a certain number of hours that college athletes must spend on their studies during the academic year of residence when they are ineligible for competition. Sitting out an entire year of practices, workouts, and other team events is not an option for student-athletes who want to maintain their standing as an NCAA Division I competitor in NCAA's gigantic, hyper-competitive sports business. Thus, in reality, student-athletes subject to the Transfer Eligibility Rule devote the same amount of their time, if not more, to athletics as their teammates save for a few hours of actual competition on gameday.  And the NCAA's argument that the point of the rule is based in academic performance is totally belied by the fact that no bylaw prevents freshman student-athletes, or first-year transfer student-athletes, from competing despite the challenges experienced by high school athletes and first-year student-athlete transfers in college academics and athletics.

*Id.* at 595-596.

Regarding the argument that eligibility rules preserve the amateurism model

of the NCAA, the *Ohio* Court, citing *Alston*, held:

> In the past, the NCAA has asserted that these restrictions help it "widen consumer choice by providing a unique product–amateur college sports as distinct from professional sports." However, this Court is unpersuaded by the NCAA's arguments related to its purported attempt to preserve "amateurism." As noted by the district court in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, the NCAA has not even defined the nature of "amateurism," nor is it meaningfully defined within the organization's own constitution. Like the California district court, this Court cannot ascertain "any coherent definition" of this term, and apparently, it is not alone in this exercise. (noting the testimony of a former SEC commissioner stating that he has "never been clear on ... what is really meant by amateurism") (internal citations omitted).

*Id.* at 595. Based on these same principles, the district court rejected these arguments

by the NCAA, as no longer constituting rational arguments.

Moreover, any argument by the NCAA that limiting eligibility somehow

increases competition is senseless.  By way of example, if there are 105 available spots

on a football team (which may become the norm following the settlement of *House v.*

*NCAA, supra)*, the more athletes vying for those spots, the more competition there

will be. Limiting those spots to only unproven, younger athletes over older, more

experienced players renders the playing field less competitive, as the most qualified players will be removed from the available pool of players, and it is those more qualified players NCAA teams seek. In fact, this is the reason why NCAA member teams are considering increasing eligibility to five seasons.

This same consideration was noted by the *Pavia* court. Much like in *Ohio v. NCAA* discussed above, the *Pavia* court held that the NCAA's goal of maintaining a "natural and standard degree progression" appeared pretextual, particularly considering that the NCAA's rules concerning the duration of eligibility have evolved over time, which suggests that strict adherence to the eligibility timeframe does not have the alleged procompetitive benefits. *Id*. at *11. The *Pavia* court noted:

> For example, when freshmen were not allowed to play varsity football, student-athletes had only three seasons of varsity eligibility. Then, the freshman play rule was eliminated and the limit on eligibility was later increased to four seasons within five calendar years. The Rules were amended again to allow NCAA Division I football players (but not other Division I athletes) another half season (or potentially more) of play through the Redshirt Rule (NCAA Bylaw 12.8.3.1.6), which allows football players to play up to four games per season without losing a year of eligibility. Then, in August of this year, the NCAA again expanded the amount of playing time when it passed Bylaw 17.11.6.2.1, which excluded all post-season competition from the Redshirt Rule. This resulted in an increase in the number of games that can be played in an exempt season from four games to a potential of nine games. Even now, the NCAA is discussing potential changes to the four seasons of competition and five-year rule. See, https://theyellowjacket.org/the-ncaa-begins-discussions-to-give-all-student-athletes-the-chance-for-a-fifth-year-option/ (last visited Nov. 7, 2024)).

> Moreover, the NCAA has recently made changes to its rules that do not appear to support the stated goal of maintaining "natural and standard degree progression." Recently, the NCAA changed its rules to allow student-athletes unlimited transfers between schools. The Court finds it highly implausible that frequent transfers, even those within NCAA institutions, benefit an athlete's academic career and promote "natural and standard degree progression." As Plaintiff points out, institutions are not guaranteed to accept transfer credits from another institution whether it be another NCAA institution or a junior college. The NCAA's reliance on the goal of maintaining "standard degree progression" when it is convenient and eschewing it when it is not leads the

> Court to conclude that the stated goal is a mere pretext to justify applying the
> eligibility timeframe to junior college athletes even when it is clear that junior
> college does not provide an academic or athletic experience equivalent to that
> of Division I institutions.

*Id*. at **11-12.

Simply put, the fans of college football want the best teams that member schools can assemble and, in turn, the member teams want the best players to fill their spots. This only can happen if there are meaningful routes to eligibility. Absolutely no evidence has been presented by the NCAA that requiring the NCAA to grant meaningful exceptions to its eligibility rules will harm the sport, the market place, or an ability to delineate between college and professional sports. It is all just hollow, unsupported theory, as recognized by the district court.

Access to eligibility does not secure a player a spot on the team to the detriment of younger players as the NCAA would like us to believe, rather it simply permits a greater (though not completely unrestricted) base of athletes to compete for the spots. Creating a meaningful path to eligibility waivers that afford deserving athletes an additional year of play will not detract from the NCAA's stated goals but rather provides the required less restrictive means of accomplishing them. The district court gave the NCAA's arguments related to its procompetitive justification for its rules due consideration and then rightfully moved its analysis to whether less restrictive means could achieve the rationale of such justifications it found persuasive.

5. The District Court Properly Held Less Anticompetitive Means Could Achieve the NCAA's Procompetitive Efficiencies.

The district court's finding on whether less restrictive means could accomplish the NCAA's procompetitive efficiencies represents the crux of the ruling in favor of granting the injunction. On this issue, while the NCAA initially argues Fourqurean did not make any argument about "meaningful exceptions" (Dkt. 18, p. 36), that claim is not supported by the record. Specifically, during the motion hearing with the district court, counsel for Fourqurean argued the decision not to grant the waiver was an unfair and arbitrary decision, devoid of any principled, predictable application of exceptions to the eligibility rules. (See, SA p. 179, lines 7-13) Moreover, Fourqurean requested that the court allow him an additional year of eligibility because the first season at GVSU was not a meaningful experience, due to circumstances beyond his control.

Next, while the NCAA argues the court "disregarded the NCAA's existing, principled application of exceptions to the eligibility rules" (Dkt. 18, p. 36), nowhere in the court record does the NCAA demonstrate any such principled application of the exceptions to the Five-Year Rule. As noted above, although the district court invited the NCAA to supplement the record following the motion hearing by submitting documentation evidencing what, if anything, the NCAA reviewed and/or considered in denying Fourqurean's waiver request, the NCAA failed to present any dispositive evidence. In fact, neither this Court, nor Fourqurean, nor UW for that matter, have been given any explanation and/or justification for its denial of the requested waivers, rendering the waiver denial arbitrary and without meaningful

consideration. As noted by the district court, all that was provided by the NCAA during the motion hearing was the one-paragraph denial of the waiver which basically stated the rules did not permit it, although the rules actually do permit the granting of a waiver for exceptional circumstances and the record is devoid of any supporting analysis as to why this does not qualify as such. (*See*, SA p. 180, lines 16-18) Moreover, although the NCAA claims it submitted a declaration providing a similar explanation, the court noted that declaration in no way explained how the waiver request submitted on behalf of Fourqurean was determined to be insufficient. (*Id*. at p. 180, lines 23-25 and p. 181, line 1) In fact, the district court commented that the NCAA "is a little behind the eight-ball in its application of these rules." (*Id*., p. 181, lines 2-4)

During the motion hearing, the NCAA again argued that in applying its eligibility rules, the totality of the circumstances must be considered, and the NCAA will look at objective documentation and contemporaneous evidence that is supplied by the applicant requesting the waiver. (*See*, SA p. 187, lines 3-6) However, as again recognized by the district court, the NCAA was not disputing the 2020 season was cancelled because of a national pandemic; was not disputing Fourqurean suffered from mental health issues the following year as a result of his father's tragic passing; and was not disputing Fourqurean had limited experience or playing time during that year. (*Id*. at lines 7-12) Notwithstanding those concessions, the most the NCAA offered in its brief and at the motion hearing was its statement that Fourqurean "failed to provide objective documentation satisfying any of the legislative exceptions

or other extenuating circumstances," without demonstrating how that determination was rendered; who was involved in the determination; and/or what documentation was considered in rendering that determination. (*See, Id*. at lines 15-20) Simply stating the NCAA "already provides and applies meaningful exceptions to the eligibility rules," is not enough. The NCAA was requested to provide the court with evidence and/or documentation of the manner in which this particular request was denied, and it was unable to do so, thereby undercutting any argument that any meaningful exception was considered and applied. Moreover, the characterization by the NCAA that it was in "regular communication" with UW while the waiver request was under consideration is misleading, at best, as discussed above. While the NCAA offers a number of justifications on appeal as to why the waiver was denied, it offered no documentation or evidence to the court below, to UW or to Fourqurean to support any of those alleged justifications. It should not get to supplement its record now.

In addition, the NCAA's argument that the court, UW and Fourqurean ignored the appeals process is not only inaccurate but inapposite to the issues currently under consideration. As noted above, UW has reserved its right to appeal the NCAA finding, but noted in its communication to the NCAA that the pending litigation constitutes "exceptional circumstances" that will have caused the institution's appeal to be submitted beyond the 30-calendar day appeal period. Moreover, any appeal would have been useless under the circumstances presented herein, as the deadline for Fourqurean to decide whether to enter the draft was on or before February 7, 2025; the waiver was requested on his behalf on December 6, 2024, and

the NCAA did not issue its decision on the waiver until the day this case was filed, January 29, 2025.

Finally, the NCAA argues affirming the injunction will tempt other district courts to make themselves the final arbiters of whether a student-athlete is permitted to play an additional season of football, and that the effects of the court's decision have already become evident in other courts and through other waiver requests. The NCAA again fails to present any evidence whatsoever of either. As it has so many times throughout the NCAA's brief, this Court is asked to simply take the NCAA's word for it, as the NCAA has not provided any evidence of other waiver requests filed after the district court issued the preliminary injunction, or other cases that have since relied on the district court's analysis. In fact, the opposite appears to be true.

By way of example, in the *Sanchez* cases cited by the NCAA, the waiver request was submitted to the NCAA on February 3, 2025, three days ***before*** the district court issued the preliminary injunction in this case. *See*, 2025 WL 684271 at *2. Despite several attempts to reach NCAA representatives, his counsel had not yet received a response as of February 11, 2025, and therefore plaintiff moved for a temporary restraining order on February 12, 2025. *Id.* Similarly, in *Arbolida*, the plaintiff submitted his first waiver request in June of 2024 and a second in January 2025. 2025 WL 579830 at *1. Not having received a response from the NCAA, suit was filed on February 14, 2025. *Id*. at *2. The waiver request in *Ciulla-Hall* was submitted to the NCAA on November 12, 2024, which was denied in writing in

December 2024 and his appeal was denied in January 2024. *See*, 2025 WL 438707 at *2. Finally, the waiver in *Coley* was submitted on his behalf in December 2024, long before the decision in this case was rendered, and was not denied by the NCAA until February 6, 2025. *See*, 2025 WL 750796 at ¶¶43, 48. The facts of these cases demonstrate none of them could have been the result of the decision issued by the district court in this case, and the argument by the NCAA that this case will open the floodgates of waiver requests and litigation is simply unfounded. Instead, it is more than likely athletes, including Fourqurean, are utilizing the courts because they failed to receive fair treatment by the NCAA and are therefore left with no other option but to seek judicial redress from arbitrary decisions made by an entity with monopolistic power. Such judicial redress provides the necessary checks and balances of an entity otherwise unchecked, as the NCAA holds the future of student college athletes in its hands and therefore must be held to certain meaningful legal standards to avoid abuse.

For all of these reasons, the district court rightfully held that Fourqurean was likely to succeed on the merits of this case. Any statement by the NCAA that such holding was not legally sound or justified ignores the court's authority, the factual record, and the proper exercise of the district court's discretion.

**B.**    **The District Court's Finding on Irreparable Harm Is Supported by the Evidence and Should be Affirmed.[4]**

Despite the NCAA's final argument that Fourqurean failed to demonstrate irreparable harm and that any claimed harm to Fourqurean is speculative, the evidence and applicable case law demonstrates otherwise. Again, relying upon outdated case law and/or case law unrelated to eligibility, the NCAA argues the irreparable harm in this case is speculative, at best.

The NCAA again ignores relevant precedent wherein courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." *S.A. v. Sioux Falls School Dist. 49-5*, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023) (*quoting Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 868 (D. Min. 2019)); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264, at *16–17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate in sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist.*, 643 F. Supp. 3d 499, 510 (M.D. Pa. 2022); *Mayerova v. E. Mich. Univ.*, 346

---

[4] While the NCAA includes a paragraph in its brief about the state law claims asserted on behalf of Fourqurean, and acknowledges the court made no mention of the merits of those claims (Dkt. 18, p. 42), it is undisputed those claims remain pending in the district court; have not been dismissed by the court; and will be developed as the litigation in the district court progresses.

F. Supp. 3d 983, 997 (E.D. Mich. 2018). In this case, there is no dispute if the district court had denied the request for an injunction, or if this Court reverses the findings of the district court, Fourqurean will be denied the opportunity to continue his collegiate athletic career. That, in and of itself, constitutes irreparable harm sufficient to support the issuance of the injunction and, despite the NCAA's arguments to the contrary, is not tied only to financial harm. Once denied, Fourqurean will never be able to get his year of playing time back.

As rightfully considered and outlined be the district court, the opportunity to play college sports at this level provides an athlete with not only a significant and possibly life changing economic opportunity that would be lost without the granting of an injunction, but also the ability for the athlete to build his brand both on and off the field and potentially earn a higher spot in the NFL draft. (RSA, p. 19) Given the uncertainties in predicting the outcomes of Fourqurean's return to UW for another football season and what impact being granted another year to develop his skills as an athlete will have on his ability to play football professionally, at least a portion of the harm caused by the denial of the waiver would be too speculative to assign a monetary value. (See, RSA p. 20)  What is not disputed, however, is that the granting of the injunction will afford him a unique opportunity to build his brand in the college football marketplace, which is an opportunity not available through other means.

On the issue of Fourqurean's alleged delay in seeking relief, pursuant to applicable NCAA rules, the decision to seek a waiver on Fourqurean's behalf was that of the UW. (See, RSA, p. 19) As Fourqurean explained during his testimony at the

motion hearing, the UW approached him about filing a waiver shortly before the 2024-2025 season ended, and specifically in December 2024. (SA, p. 198, lines 2-3) Fourqurean was unaware of his COVID status because of his time playing in Division II, and discussed with UW the loss of opportunity in his first season at GVSU. (*Id.*, lines 3-4, 15-17) He discussed the mental impact of losing his father and the fact that when he returned to GVSU after his death, he just was not the same. (*Id.*, lines 20-24) He lost physical development, he missed team training, and going into fall camp, he simply could not commit mentally and was not the same type of player during that entire season. (*Id.*, lines 7-12)

His coach, Matthew Mitchell, submitted testimony that Fourqurean was basically forced into action during the 2021-2022 season at GVSU due to injury of other players and other effects of COVID, even though he was aware Fourqurean was not physically ready or in a great mental space to do so. (*See*, NFSA, p. 36, ¶14) If it had been a "normal" season, Coach Mitchell would not have played him at all due to his mental status. (*Id.*, ¶15) Once Fourqurean discussed these issues with the UW, it was the UW's decision to file a waiver request on his behalf, seeking an additional year of eligibility due to the lost opportunities caused by the 2021-2022 season. At the time, and prior to the availability of NIL compensation, neither Fourqurean nor anyone else could appreciate the impact of his COVID year and his missed opportunity year would have on Fourqurean both on and off the field. Moreover, as noted by the district court, delay is only one factor in deciding whether a plaintiff has

44

shown irreparable harm; the NCAA has in no way been lulled into a false sense of security or has acted in reliance on plaintiff's alleged delay.

What is interesting is that while the NCAA claims Fourqurean should be denied relief because he did not act in a timely fashion, the record does not support a finding that the NCAA applies those same principles to its own actions, as it had the waiver request from the UW since December 6, 2024, and failed to act upon it in any meaningful timeframe. Finally, while the UW, as an NCAA member school, was entitled to a thoughtful and consistent examination of the waiver request filed on behalf of Fourqurean, the NCAA sat on that request for nearly two months, but now seeks expedited review of a situation that could have been resolved pre-suit. The NCAA should have given prompt attention and thoughtfully considered all documentation submitted in support of the waiver and considered the totality of the circumstances, and issued a decision on the waiver that sufficiently and properly identified what it relied upon to deny the request, providing its reasoning behind the decision.

Additionally, the uncertainties in predicting the outcome of Fourqurean's return to UW for another football season, at least a portion of the harm caused by the denial of the waiver, would be too speculative to assign a monetary value, thereby rendering traditional legal remedies (i.e. monetary damages) inadequate. (See, RSA, pp. 20-21) What is not disputed, however, is that now Fourqurean will be able to continue to build his brand, if he is allowed the chance to prove his case in the district court.

The district court narrowed the scope of the preliminary injunction, and did not invalidate the Five-Year Rule. Rather, it enjoined the NCAA from applying that Rule against Fourqurean without demonstrating that his unique circumstances should not give rise to an exception. Additionally, the NCAA failed to support its claim that the court's decision will open "the floodgates of litigation." Considering all of the above factors, the district court held that the balance of equities and the public interest favor Fourqurean, and those findings are supported by the record and should be affirmed.

Undoubtedly, Fourqurean would have suffered irreparable harm had the injunction been denied. The compressed timeframe caused by the NCAA's refusal to act until litigation was threatened, put Fourqurean in an impossible position of entering the draft too soon, or relying upon the NCAA and the court system to fairly and equitably apply its rules. Now Fourqurean finds himself in an even more precarious situation, having decided to rely upon the district court's decision that he was likely to succeed on the merits of his argument that the NCAA's handling of UW's waiver request on his behalf violated the Sherman Act. If this Court were to reverse the district court's grant of the preliminary injunction, Fourqurean will find himself without an opportunity to prove what the district court believed he could prove -- namely irreparable harm as a result of the NCAA's arbitrary waiver process. All Fourqurean seeks is an opportunity to prove the alleged Sherman Act violations by the NCAA.

## CONCLUSION

This Court's only task at this juncture is to decide whether the district court abused its discretion in granting the preliminary injunction. Given the detailed and complicated analysis undertaken by the district court, it should be readily apparent that the court did not abuse its discretion.

As noted above, this case does not concern the ability of the NCAA to establish eligibility rules, but rather the need for such restraints to fall within the bounds of the Sherman Act such that they do not unduly restrain trade. Since *Alston* and its progeny, the issues of eligibility and compensation are now irrevocably intertwined. For that reason, the district court appropriately examined the justification for the necessity of the Five-Year Rule and its exceptions in light of the waiver request submitted on behalf of Fourqurean by UW pursuant to the parameters set forth in the Sherman Act. The rule of reason analysis under the Sherman Act was thoughtfully and logically applied by the district court, in an attempt to preserve competition and balance it with the newly recognized tie between eligibility and compensation at the Division I level. By failing to apply meaningful exceptions to the Five-Year Rule without real justification or examination, the NCAA does, in fact, impair the ability of student athletes, like Fourqurean, whose individual circumstances may justify a departure from the eligibility restrictions, to compete in the Division I football labor market and earn significant money under the new NIL landscape. As noted by Justice Gorsuch, the NCAA cannot claim a "judicially

ordained immunity" from antitrust laws simply because it operates within the realm of higher education, sports, and money. *See, Alston*, 594 U.S. at 94.

Throughout its arguments to the court, the NCAA ignores the undisputed fact that the competitive landscape of Division I sports has changed as a result of the ability for higher profile athletes like Fourqurean to earn a rapidly growing piece of NIL compensation, and relies upon outdated case law issued long before this market shift. Importantly, the district court did not strike down the Five-Year Rule. Rather, it issued a very narrow preliminary injunction against the NCAA prohibiting the application of that rule to Fourqurean, unless and until the NCAA can provide evidence of a more meaningful demonstration that exceptions to that rule should not apply to Fourqurean's request give his unique circumstances, which the NCAA has failed to do to date. As a result of the waiver denial, which the district court determined was a likely violation of the Sherman Act, if the preliminary injunction is not affirmed, Fourqurean will be irreparably harmed by the loss of his ability to play another year of Division I football. Consequently, Plaintiff-Appellee, Nyzier Fourqurean, respectfully requests this Court affirm the district court's order granting his motion for preliminary injunction.

Dated at Madison, Wisconsin this 18th day of April, 2025.

VON BRIESEN & ROPER, s.c.
*Attorneys for Plaintiff, Nyzier Fourqurean*

By:  *s/ Michael P. Crooks*
Michael P. Crooks
State Bar No. 1008918
michael.crooks@vonbriesen.com
Megan L.W. Jerabek
State Bar No. 1068921
megan.jerabek@vonbriesen.com
Maria del Pizzo Sanders
State Bar No. 1031037
maria.sanders@vonbriesen.com

P.O. ADDRESS:
10 East Doty Street
Suite 900
Madison, WI  53703
608-287-3926

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Plaintiff-Appellee Nyzier Fourqurean, furnishes the following in compliance with F.R.A.P. Rule 32(g):

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Cir. R. 32(c) because it contains 13,386 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word-count feature of Microsoft Word in preparing this certificate.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Century-Schoolbook font (for text) and 11-point Century Schoolbook font for footnotes.

Dated this 18ʰ day of April, 2025.

By: *s/ Michael P. Crooks*
       Michael P. Crooks, SBN 1008918

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2025, I electronically filed the foregoing with the Clerk of the Untied States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated this 18ʰ day of April, 2025.

By:  *s/ Michael P. Crooks*
Michael P. Crooks, SBN 1008918

## CIRCUIT COURT RULE 30(d) STATEMENT

Pursuant to Circuit Court Rule 30(d), the undersigned hereby certifies that all material required by Circuit Court Rule 30(a) is included in the separate Appendix to this brief.

Dated this 18ʰ day of April, 2025.

By:    *s/ Michael P. Crooks*
        Michael P. Crooks, SBN 1008918

## APPENDIX CERTIFICATION

I hereby certify that filed with this brief, either as a separate document or as a part of this brief, is an appendix that complies with s. 809.19(2)(a) and that contains, at a minimum: (1) a table of contents; (2) the findings or opinion of the circuit court; and (3) portions of the record essential to an understanding of the issues raised, including oral or written rulings or decisions showing the circuit court's reasoning regarding those issues.

I further certify that if this appeal is taken from a circuit court order or judgment entered in a judicial review of an administrative decision, the appendix contains the findings of fact and conclusions of law, if any, and final decision of the administrative agency.

I further certify that if the record is required by law to be confidential, the portions of the record included in the appendix are reproduced using first names and last initials instead of full names of persons, specifically including juveniles and parents of juveniles, with a notation that the portions of the record have been so reproduced to preserve confidentiality and with appropriate references to the record.

Dated this 18ʰ day of April, 2025.

By: _____*s/ Michael P. Crooks*_____
    Michael P. Crooks, SBN 1008918