No. 25-1187

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————————

NYZIER FOURQUREAN,

*Plaintiff–Appellee*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant–Appellant.*

———————————————

Appeal from an Order of the United States District Court for the
Western District of Wisconsin
Honorable William M. Conley, District Judge

———————————————

## REPLY BRIEF OF DEFENDANT-APPELLANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION

Rakesh Kilaru
Tamarra Matthews Johnson
Wilkinson Stekloff LLP
2001 M Street, N.W., 10th Floor
Washington, DC 20036
202.847.4046 (RK)
202.847.4020 (TMJ)
rkilaru@wilkinsonstekloff.com
tmatthewsjohnson@wilkinsonstekloff.com

Thomas L. Shriner, Jr.
Kate E. Gehl (Counsel of Record)
Max S. Meckstroth
David J. Wenthold
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.297.5601 (TLS)
414.297.5279 (KEG)
414.319.7022 (MSM)
414.297.4985 (DJW)
tshriner@foley.com
kgehl@foley.com
mmeckstroth@foley.com
dwenthold@foley.com

*Counsel for Defendant-Appellant*
*National Collegiate Athletic Association*

May 2, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 2

I.     FOURQUREAN'S RESPONSE MISSTATES THE STANDARDS FOR
BOTH A PRELIMINARY INJUNCTION AND APPELLATE REVIEW. ........ 2

II.    THE DISTRICT COURT'S ANTITRUST ANALYSIS RESULTED
FROM ITS MISAPPLICATION OF *ALSTON*; FOURQUREAN'S
RESPONSE ADOPTS THOSE FLAWS AND IGNORES THE NCAA'S
ARGUMENTS. ................................................................................... 5

III.   THE DISTRICT COURT'S RULE OF REASON ANALYSIS IS
FLAWED AT EACH STEP. .................................................................. 9

IV.   THE DISTRICT COURT'S IRREPARABLE HARM ANALYSIS IS
INDEFENSIBLE. .............................................................................. 23

CONCLUSION ............................................................................................. 27

CERTIFICATE OF COMPLIANCE ............................................................. 28

CERTIFICATE OF SERVICE ...................................................................... 29

4925-3798-5083

# TABLE OF AUTHORITIES

**Federal Cases**                                                          **Page(s)**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
    683 F.3d 328 (7th Cir. 2012) .................................................................... *passim*

*Arbolida v. Nat'l Collegiate Athletic Ass'n,*
    No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025)................................ 25

*Banks v. Nat'l Collegiate Athletic Ass'n,*
    977 F.2d 1081 (7th Cir. 1992) ...........................................................5, 7, 16

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ............................................................................... 25

*Brzovic v. Nat'l Collegiate Athletic Ass'n,*
    2:25-cv-02885 (D. S.C. Apr. 6, 2025)....................................................... 22

*Curtis v. Thompson,*
    840 F.2d 1291 (7th Cir. 1988) .................................................................. 5

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.,*
    414 F.3d 700 (7th Cir. 2005) .................................................................. 24

*Elad v. Nat'l Collegiate Athletic Ass'n,*
    No. CV 25-1981, 2025 WL 1202014 (D.N.J. Apr. 25, 2025).................................... 6

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,*
    35 F.3d 1134 (7th Cir. 1994) .................................................................. 4

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,*
    549 F.3d 1079 (7th Cir. 2008) .............................................................. 3, 5

*Goldstein v. Nat'l Collegiate Athletic Ass'n,*
    No. 3:25-CV-00027-TES, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025) ................. 6, 7

*Illinois Republican Party v. Pritzker,*
    973 F.3d 760 (7th Cir. 2020) .................................................................. 4

*Johnson v. Nat'l Collegiate Athletic Ass'n,*
    9:25-cv-00060 (D. Mont. Apr. 25, 2025)................................................... 22

*Lukaszczyk v. Cook County,*
    47 F.4th 587 (7th Cir. 2022)................................................................... 4

ii

*Mayerova v. Eastern Michigan University*,
   346 F. Supp. 3d 983 (E.D. Mich. 2018).................................................. 26

*Mays v. Dart*,
   974 F.3d 810 (7th Cir. 2020) ..................................................................... 3

*Michigan v. U.S. Army Corps of Engineers*,
   667 F.3d 765 (7th Cir. 2011) ................................................................... 24

*Nat'l Collegiate Athletic Ass'n v. Alston*,
   594 U.S. 69 (2021) ......................................................................... *passim*

*Nw. Wholesale Stationers v. Pacific Stationery & Printing Co.*,
   472 U.S. 284 (1985) ................................................................................ 13

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998) ................................................................................ 13

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
   802 F.3d 1049 (9th Cir. 2015) ................................................................... 7

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ................................................................. 9, 10, 14, 16

*Ohio v. Nat'l Collegiate Athletic Ass'n*,
   706 F. Supp. 3d 583 (N.D. W.Va. 2023)............................................. 10, 15

*Pavia v. Nat'l Collegiate Athletic Ass'n*,
   No. 3:24-CV-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024).................. 6, 15

*S.A.* v. *Sioux Falls Sch. Dist.*,
   4:23-CV-04139-CBK, 2023 WL 6794207 (D.S.D. Oct. 13, 2023) ........................... 26

*Sanchez v. Nat'l Collegiate Athletic Ass'n*,
   No. 3:25-CV-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025)................................. 6

*Tennessee v. Nat'l Collegiate Athletic Ass'n*,
   718 F. Supp. 3d 756 (E.D. Tenn. 2024)................................................... 10

*United States v. Farris*,
   532 F.3d 615 (7th Cir. 2008) ................................................................... 23

*United States v. McGhee*,
   98 F.4th 816 (7th Cir. 2024)...................................................................... 9

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ...................................................................................... 3

4925-3798-5083

*Wisconsin Music Network, Inc. v. Muzak Ltd. P'ship,*
   5 F.3d 218 (7th Cir. 1993) ........................................................................... 4

## State Cases

*Halter v. Wisconsin Interscholastic Athletic Ass'n,*
   2025 WI 10 ................................................................................................... 19

*Jones v. Nat'l Collegiate Athletic Ass'n,*
   No. 25-CV003492-310 (N.C., Durham Cty. Super. Ct., Apr. 24, 2025)........6, 24, 25

*Smith v. Nat'l Collegiate Athletic Ass'n,*
   No. 25-CV003480-310 (N.C., Durham Cty. Super. Ct., Apr. 24, 2025)........6, 24, 25

## Federal Rules

Fed. R. App. P. 32(a)(5) ................................................................................ 28

Fed. R. App. P. 32(a)(6) ................................................................................ 28

Fed. R. App. P. 32(a)(7)(B)(ii) ..................................................................... 28

Fed. R. App. P. 32(f) ..................................................................................... 28

Fed. R. App. P. 32(g) .................................................................................... 28

4925-3798-5083

## INTRODUCTION

Fourqurean's response is stunning. He chides the NCAA for addressing the merits of his antitrust claim, asserting that "this case is really about whether the district court abused its discretion in allowing Fourqurean to attempt to prove" his claims. (Resp. 1.)[1] That is simply wrong.

This is an appeal from the district court's entry of a ***preliminary injunction*** that changed the status quo rather than preserving it – not from the grant of a dispositive motion. If the court had denied Fourqurean's motion, he would still have had an opportunity to prove his claims in the regular course of litigation (and still will on remand).

Fourqurean's attempt to distort applicable law and minimize the merits of his antitrust claim is telling for at least two reasons. First, it indicates how weak his claims are on the merits. Second, it confirms that the district court abused its discretion by granting the injunction, because even Fourqurean cannot defend the court's analysis on its own terms. The preliminary injunction standard is high, and unequivocally required he demonstrate that he is ***likely to succeed on the merits*** of his claims. A careful examination of the merits is, therefore, necessary. That examination should lead to vacating the injunction.

---

[1] "NCAA __" and "Resp. __" refer to the NCAA's opening brief and Fouqurean's response brief, respectively. "RSA __" and "SA __" refer to the Required Short Appendix and the Separate Appendix, respectively. "Order __" refers to the district court's Order, located at RSA 1–22. "Dkt. __" refers to the district court docket.

1

The NCAA explained in its opening brief why granting the injunction was an abuse of discretion. The district court's decision reflects a fundamental misapprehension of *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021), which led to the court's flawed rule of reason analysis and ultimately led to a flawed conclusion that Fourqurean is likely to succeed on the merits because (the court believed) the NCAA "fail[ed] to adopt and apply meaningful exceptions" to the Five-Year Rule. Rather than consider **market-wide effects** of the challenged rule, the court transformed the rule of reason analysis into something quite different – an individualized fairness assessment.

This abuse of discretion regarding the proper legal analysis led to a conclusion with no support in the record. That alone requires reversal. Yet the court also abused its discretion in holding that Fourqurean would suffer irreparable harm without the injunction, for the decision relies exclusively on Fourqurean's alleged **speculative financial** injury – which does not support an injunction.

Fourqurean's response rarely addresses the NCAA's arguments, much less refutes them. Instead, he ignores or misstates controlling law and relies on evidence that is insufficient to warrant the injunctive relief that the court granted. For both these reasons, this Court should vacate the injunction.

## ARGUMENT

## I.  FOURQUREAN'S RESPONSE MISSTATES THE STANDARDS FOR BOTH A PRELIMINARY INJUNCTION AND APPELLATE REVIEW.

<u>Preliminary Injunction Standard</u>. Fourqurean attempts to soften the showing required for issuance of a preliminary injunction. (*See* Resp. 19–21.) As this Court

2

has recognized, the Supreme Court "retired" the "better than negligible" approach to preliminary injunctions. *Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020). The "higher standard" now in effect has two phases: a threshold phase and a balancing phase. The movant's threshold phase requires showing that he is "***likely*** to succeed on the merits," that he is "***likely***" to suffer irreparable harm absent an injunction, and that traditional legal remedies would be inadequate. *Id.* at 822 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20, 22 (2008)) (emphasis in original). "***If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction.***" *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (emphasis added). Only after those requirements are met does the district court proceed to balance the equities. *Mays*, 974 F.3d at 818.

Fourqurean conflates the "threshold" phase with the subsequent, distinct "balancing phase." (Resp. 20 (arguing that a "likelihood of success on the merits is not the only factor," that courts also "balance whether the movant would suffer irreparable harm absent an injunction, whether an injunction would cause substantial harm to others, and whether an injunction would serve the public interest," and that courts need not address all factors if "fewer factors are dispositive"). He is wrong.

This Court has made clear that the balancing of harms phase does not absolve the movant from needing to show that he will likely succeed on the merits and suffer irreparable harm. *Mays*, 974 F.3d at 818 (holding that "if a plaintiff makes" the

3

threshold showing, then "the court proceeds to a balancing analysis"); *Wisconsin Music Network, Inc. v. Muzak Ltd. P'ship*, 5 F.3d 218, 221 (7th Cir. 1993) (if movant "has no case on the merits, the injunction should be refused regardless of the balance of harms").

Accordingly, while Fourqurean need not show that he will "definitely win the case," the exacting standard for a preliminary injunction still requires a careful analysis of his claims and "demonstration of how the applicant proposes to prove the key elements of its case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). The NCAA's opening brief demonstrates why Fourqurean failed to meet this standard. (NCAA 15 –42.)

<u>This Court's Standard of Review</u>. Fourqurean's response also misstates the standard of review. While acknowledging that this Court reviews the grant of a preliminary injunction for abuse of discretion, his assertion that the court's decision is to be given "substantial deference" is a gross oversimplification. (Resp. 19.) "A district court abuses its discretion when it commits a clear error of fact or an error of law." *Lukaszczyk v. Cook County*, 47 F.4th 587, 598 (7th Cir. 2022) (citations and quotations omitted). Thus, the Court "considers the district court's legal conclusions *de novo* and its findings of fact for clear error." *Id.* Even when Fourqurean cites this Court's case law, he selectively omits those aspects of the decisions. *See, e.g.*, *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1137 (7th Cir. 1994) ("[T]he more purely legal conclusions made by a district court in granting a preliminary injunction are subject to *de novo* review.") (quotations omitted).

To be sure, on this appeal, "a factual or legal error may alone be sufficient to establish that the court abused its discretion in making its final determination." *Girl Scouts*, 549 F.3d at 1086 (internal quotations omitted). Here, the court's flawed rule of reason analysis is therefore subject to *de novo* review. *See, e.g., Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988).

## II.    THE DISTRICT COURT'S ANTITRUST ANALYSIS RESULTED FROM ITS MISAPPLICATION OF *ALSTON*; FOURQUREAN'S RESPONSE ADOPTS THOSE FLAWS AND IGNORES THE NCAA'S ARGUMENTS.

The district court based its antitrust analysis upon what it called a "trend" in the law since *Alston*. (Order at 7 ("Given the trend in the law since *Alston*, plaintiff has made a strong showing of likelihood of success on his claim[.]").) The NCAA's opening brief carefully explains why this was erroneous, and why the court's reading of *Alston* tainted the rest of its rule of reason analysis, ignoring the demarcation between the treatment of NCAA "compensation" rules and "true eligibility" rules under antitrust law. (NCAA 16–22.)

Fourqurean's response doubles down on the notion that, since *Alston*, "the marketplace has changed and the line between true eligibility rules and compensation rules has blurred substantially and irrevocably." (Resp. 22.) Thus, Fourqurean, like the court, casts aside decades of case law – including decisions from this Court. (*See generally* Resp. (no discussion of *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012) or *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081 (7th Cir. 1992)).) He also ignores a slew of recent decisions from courts around the country that have denied similar injunction motions, declining to extend

*Alston* to challenges of the Five-Year Rule – at least at the preliminary injunction stage. *See, e.g.*, *Sanchez v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-CV-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025) (denying preliminary injunction of Five-Year Rule, disagreeing with *Pavia* decision); *Goldstein v. Nat'l Collegiate Athletic Ass'n,* No. 3:25-CV-00027-TES, 2025 WL 662809, *4 (M.D. Ga. Feb. 28, 2025) (explaining that *Alston* "didn't touch" eligibility rules); *see also Jones v. Nat'l Collegiate Athletic Ass'n*, No. 25-CV003492-310 (N.C., Durham Cty. Super. Ct., Apr. 24, 2025) (denying request to enjoin Five-Year Rule under state antitrust laws); *Smith v. Nat'l Collegiate Athletic Ass'n*, No. 25-CV003480-310 (N.C., Durham Cty. Super. Ct., Apr. 24, 2025) (same); *but see Elad v. Nat'l Collegiate Athletic Ass'n*, No. CV 25-1981, 2025 WL 1202014 (D.N.J. Apr. 25, 2025) (granting preliminary injunction, but noting "[i]t is readily apparent that guidance from the courts of appeals, and possibly the Supreme Court, is needed"). Plainly, there has been no "blurring" between compensation rules and true eligibility rules.[2]

*Alston* analyzed rules that limited or "capped" the education-related benefits schools could offer as **compensation** to student-athletes and concluded (based on a robust record after a bench trial and permanent injunction) that student-athletes could obtain higher compensation if there were no such limits in place. *Alston*, 594 U.S. at 82. Stated differently, *Alston* addressed concerns about artificially depressing

---

[2] Fourqurean relies heavily (Resp. 22–24) on the Middle District of Tennesse's decision in *Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024), but that decision was incorrectly decided and is on appeal in the Sixth Circuit. *See Pavia v. NCAA*, Appeal No. 25-6153 (6th Cir.).

compensation available to student-athletes through rules that expressly restricted certain kinds of compensation.

That has nothing to do with this case. There is a fundamental difference between rules expressly limiting the compensation student-athletes may receive while playing college sports and rules that merely define how many years a student-athlete will be eligible to play those sports. The latter do not limit what student-athletes may earn – including NIL compensation – within their years of eligibility.[3] Rather, their effect is simple: at some point, the student-athlete will have exhausted his eligibility and must move on from college sports and the compensation attendant on such participation.

This is why this Court and others have long recognized that eligibility rules are necessary for college football to exist, as a product differentiated from professional football, and are therefore "presumptively procompetitive." *Agnew*, 683 F.3d at 340; *Banks*, 977 F.2d at 1089–90; *see also O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1066 (9th Cir. 2015) (defining true eligibility rules, contrasted with compensation rules, as "akin to the rules limiting the number of years that student-athletes may play collegiate sports"); *cf. Goldstein,* 2025 WL 662809 at *3 (holding that Five-Year Rule is "non-commercial" and "not subject to the Sherman Act"). This

---

[3] Fourqurean continues to misrepresent that he "had no opportunity to earn [NIL] compensation" while playing Division II football from 2021-2022. (Resp. 6). That is not true; NIL became available in 2021 for all NCAA divisions (Dkt. 18-2) – there simply was no one interested in compensating Fourqurean for *his* NIL, apparently.

is also why courts have held that eligibility rules withstand antitrust scrutiny.[4] (NCAA 18–19 (citing cases).)

*Alston* has not changed any of this; it had nothing to do with the propriety of **eligibility** rules – focusing exclusively on **compensation** rules. Nevertheless, the district court, claiming to rely on *Alston*, improperly issued an order that inserts itself into the management of the NCAA's affairs under the guise of conducting (and imposing) a less restrictive alternative analysis. Specifically, the court held that the NCAA "fail[ed] to adopt and apply *meaningful* exceptions to the Five-Year Rule" and enjoined the NCAA from enforcing the rule against Fourqurean "absent a more meaningful demonstration that exceptions to the rule should not apply to [his] requested, additional season of eligibility given his unique circumstances[.]" (Order at 17 & 22; *see also* RSA at 23.) This is precisely what the Supreme Court instructed courts **not** to do. *See Alston*, 594 U.S. at 98, 101–03, 107 (urging courts to exercise "judicial humility" and not to "second-guess degrees of reasonable necessity" or engage in "micromanagement").

---

[4] Fourqurean's response erects several unavailing straw man attacks. <u>First</u>, he says the NCAA argued that eligibility rules are not subject to antitrust scrutiny at all. (Resp. 22–23.) While the NCAA maintains that position is correct, in this Court it expressly acknowledged this Court's previous observation that the "Sherman Act applies to the NCAA bylaws generally," and presented a thorough rule of reason argument to show that they do not violate the law. (NCAA 17–18 & 22–42.) <u>Second</u>, Fouqurean suggests that the NCAA's arguments were premised on the concept of "amateurism," which he argues has been rejected. (Resp. 23–24.) This ignores the NCAA's actual argument, which explained that although there has been a "tempering of 'amateurism' as a compelling justification for certain NCAA bylaws, there is little dispute that the linking of a student-athlete's college athletic career to ordinary degree progression is important to maintaining the differentiated product of NCAA sports." (NCAA 19.) Fourqurean ignores this in his response brief, thereby conceding the point here.

Fourqurean attempts to salvage the court's legally and factually untenable order by recasting its micromanagement as necessary "checks and balances" on the NCAA because of its alleged "monopolistic power." (*See* Resp. 24; *see also* Resp. 4, 41.) This "argument" should be disregarded as undeveloped and unsupported by any law. *United States v. McGhee*, 98 F.4th 816, 825 (7th Cir. 2024) ("perfunctory and undeveloped" arguments are waived). Even if the Court were to consider the argument, it should reject it. Fourqurean effectively argues that any party previously found to have violated the Sherman Act must thereafter have everything it does subjected to heightened scrutiny – and, as here, micromanagement – whenever a plaintiff claims a Sherman Act violation. (Resp. 24.) That is not the law. There is no basis to distort the rule of reason analysis in evaluating the Five-Year Rule. This Court should vacate the injunction that seeks to enforce such a regime.

## III.   THE DISTRICT COURT'S RULE OF REASON ANALYSIS IS FLAWED AT EACH STEP.

The parties agree that the rule of reason analysis applies to Fourqurean's claim, to the extent the Five-Year Rule is subject to antitrust scrutiny. (*Compare* NCAA 15 *with* Resp. 25.)[5] This means courts are to employ the following three-step, burden-shifting analysis: First, the plaintiff has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market," and, if satisfied, "the burden shifts to the defendant to show a procompetitive rationale." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). If

---

[5] Fourqurean nevertheless unnecessarily raises the specter of a "twinkling of an eye" review, also known as the "quick look" doctrine, which is inapplicable. (Resp. 25.)

that showing is made, "then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

This is a demanding, fact-intensive analysis. For, as explained in *Alston*, at bottom, "[t]he whole point of the rule of reason analysis is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it ***unduly*** harms competition before a court declares it unlawful." *Alston*, 594 U.S. at 97 (emphasis added). This analysis is missing from the district court's order. Instead, the order reflects the court's repeated contortion of *Alston* to arrive at the erroneous conclusion that Fourqurean is likely to succeed on his antitrust claim. The court abused its discretion at each step; the injunction should therefore be vacated.

**<u>Relevant Market</u>.**

As a threshold matter, any rule of reason claim requires "a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition" in a relevant market. *Alston*, 594 U.S. at 81. The court erred by short-circuiting that analysis, instead applying a "borrowed" relevant market definition from *Alston* when the record contained no evidence (or even allegations) demonstrating that a student-athlete labor market is the proper market for assessing Fourqurean's claims. His response insists that this was appropriate, pointing to two district court decisions[6] where the courts supposedly did the same.

---

[6] *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583 (N.D. W.Va. 2023); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756 (E.D. Tenn. 2024).

While it may be that *those* courts agreed that the plaintiffs there had adequately alleged a relevant labor market, Fourqurean himself has not done so here. Even his pleadings are markedly different from those cases. There, the plaintiffs attempted to provide clear descriptions of the relevant markets at issue and outline their boundaries. Unlike them, Fourqurean proffered **no** expert testimony and made only scattered references to varying, undescribed markets,[7] arguing that the relevant market is a given, based on his reading of *Alston* and, now, the opinions of district courts outside the Seventh Circuit.

Regardless of how other cases have decided this issue, the court below was obliged to assess Fourqurean's allegations and (nonexistent) evidence of a relevant market before diving into the necessarily case-by-case factual inquiry concerning anticompetitive effects on that market. *Agnew* got this right. This Court there noted that a "proper identification of a labor market for student-athletes" would satisfy "plaintiffs' burden of describing a cognizable market under the Sherman Act," but it did not accept that market on appeal because "nothing resembling a discussion of a relevant market for student-athlete labor" was in the complaint. *Agnew*, 683 F.3d at 346–47.

The same deficiencies in *Agnew* plague Fourqurean's pleading, only magnified. Fourqurean's complaint includes allegations that make it facially implausible that

---

[7] Fourqurean's complaint makes passing references to markets for "college athletic services," "the performance and/or broadcast of college sports contests," and the "NIL marketplace available to Division I athletes," without any detail, evidence, or consistency. (SA at 6–7, ¶¶ 33-34 & 37.)

the relevant market is limited to a labor market for *student-athlete* services. Contrary to his insistence that he (and others like him) have nowhere else to sell their services, he testified that playing professional football is a realistic alternative for him. (SA at 201, 45:16-22). Like him, the district court failed to account for this distinctive fact and its disqualifying effect on student-athlete services being the relevant market.

For these reasons, the court erred in positing that the relevant market in this case is a labor market for student-athlete services. This error cascades throughout the rest of the rule of reason analysis and cannot sustain his preferred market.

**Substantial Anticompetitive Effect.**

The court next erred in finding, in the absence of any economic or empirical evidence, that the Five-Year Rule produces substantial anticompetitive effects. Fourqurean merely parrots the court's flawed analysis and compounds it by making various assertions about the effects of the rule, and waivers of it, without any substantiating evidence.

The crux of the court's rationale finding that the Five-Year Rule causes substantial anticompetitive effects is what Fourqurean calls the "new landscape of college athletics" since *Alston*, including the fact that NIL compensation is now available. (Resp. 28; Order at 9–11). Despite these sweeping claims, neither Fourqurean nor the court backs them up with any evidence other than his unsubstantiated testimony that he will likely be deprived of hundreds of thousands of dollars if he is not allowed to play a fifth season. (*See* Order at 10; Resp. 30). But foreclosing a single student-athlete from additional NIL compensation because the

12

NCAA did not grant him a waiver for a fifth season says nothing about the market-wide effects of this eligibility rule. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (antitrust plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"); *Agnew*, 683 F.3d at 335 ("[T]he [antitrust] plaintiff must allege, not only an injury to himself, but an injury to the market as well.").

To divert attention from this evidentiary shortcoming, Fourqurean's response shifts focus to competition between student-athletes for roster spots and how granting an athlete like him a waiver to play another year will enhance competition for those spots. (Resp. 31). Setting aside the lack of evidentiary support, this says nothing about competition between member institutions for student-athlete talent, which is what would matter in the market he claims to invoke.

Dissecting the court's analysis reveals that it is unmoored from economic analysis and hornbook antitrust law. First, Fourqurean applauds the court's reliance on *Alston* for the proposition that any rules affecting eligibility harm competition because they restrict who is eligible to play college football. (Resp. 29–30.) Not only does this misapprehend *Alston*'s holding (which did not involve eligibility rules), but it is neither revelatory nor dispositive. As the Supreme Court routinely recognizes, every commercial agreement restrains trade at some level, but the key is whether the restraint is unreasonable – because it causes **substantial** anticompetitive effects. *See, e.g., Nw. Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). Indeed, *Alston* recognized that attempts to prove substantial,

13

anticompetitive effects are often unsuccessful for this very reason. *Alston*, 594 U.S. at 97 (observing that this is "no slight burden" and that "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect").

Thus, it is stunning that the district court, having subjected the Five-Year Rule to the Sherman Act, found Fourqurean carried his burden at this early stage in the proceedings based on an incredibly thin record with no expert economic analysis.[8] (*See* Order at 11 (holding that "plaintiff has shown that the Five-Year Rule has an anticompetitive effect").)

Without any competent proof of actual detrimental effects, such as reduction of output or increased prices, the court relied on the NCAA's purported monopsony power in the labor market for student-athlete services to infer substantial anticompetitive effects indirectly. Even if it were proper to borrow this finding from the *Alston* district court (without Fourqurean actually pleading and proving these elements), a showing of the NCAA's market power, while necessary to show adverse effects indirectly, is not sufficient. *See Am. Express*, 585 U.S. at 542 (requiring "proof of market power plus some evidence that the challenged restraint harms competition"). In other words, it is a giant leap from any finding that the NCAA is a monopsonist in a labor market to the conclusion that any restraint it imposes on student-athlete eligibility is an antitrust violation. The court needed to connect the

---

[8] While the court does not expressly hold that Fourqurean showed the eligibility rule had a ***substantial*** anticompetitive effect, the NCAA presumes that was what it intended to say – otherwise it should not have proceeded to the next phase of the rule of reason analysis.

dots with economic evidence of market-wide effects, not unsupported conclusions, and certainly not based on the denial of a single student-athlete's eligibility-rule waiver.

Fourqurean's only retort points to two district court decisions – *Ohio* and *Pavia*.[9]  Neither decision saves the day.  *Pavia* is currently on appeal and has been disagreed with by a number of courts, including another Tennessee district court. (NCAA 16 (discussing cases).)  *Ohio* is a single district court decision that is readily distinguished.  For example, the *Ohio* plaintiffs at least purported to explain the specific alleged anticompetitive effects that the NCAA's Transfer Eligibility Rule had on the named "relevant market" and also submitted declarations from many other athletes in the alleged market to show (in the court's view) "the harm the Transfer Eligibility Rule has caused[.]" *Ohio*, 706 F. Supp. 3d at 593–94.

Fourqurean reversed these analytical steps, using the harm he will supposedly incur without a fifth season of eligibility to carry his entire burden to show substantial anticompetitive effects on the market. (*Cf.* Order at 18 (noting that Fourqurean "largely focuses on the harm the eligibility rules did to him")).) And he did this while alleging only minimally – with no evidence – how those effects affected the market as a whole.

### **Procompetitive Benefits.**

If Fourqurean had met his burden of showing that the Five-Year Rule has substantial anticompetitive effects on a discernible market (he has not), the rule

---

[9] *Ohio*, 706 F. Supp. 3d 583 (N.D. W.Va. 2023); *Pavia*, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024).

would still be redeemed by its procompetitive effects.  *See Am. Express*, 585 U.S. at 540–41.

Fourqurean concedes that, as the court held, the rule is procompetitive for at least two reasons: (1) "linking a student-athlete's college athletic career to ordinary degree progression differentiates NCAA Division I football from professional football leagues"; and (2) a world without the Five-Year Rule would mean "a less differentiated product where athletes are older and less aligned with standard collegiate progression," which may "reduce fan interest and ultimately resources invested in student-athletes."  (Order at 11 (citing and agreeing with NCAA expert, SA at 130–31, ¶ 16); Resp. 32 (same).)  Both these findings implicitly adhere to *Agnew* and *Banks* and therefore undermine Fourqurean's assertion that those cases are no longer relevant.  (*See* Resp. 22.)  *See Agnew*, 683 F.3d at 343 ("[m]ost—if not all— eligibility rules … fall comfortably within the presumption of procompetitiveness" because they are "clearly necessary" to preserve the "student-athlete" aspect of college football, "and are therefore essential to the very existence of the product"); *Banks*, 977 F.2d at 1089 (most NCAA bylaws are "procompetitive because they enhance public interest in intercollegiate athletics").

The parties disagree, however, about whether the court failed to afford sufficient weight to the NCAA's arguments – supported by expert testimony – that the Five-Year Rule also ***increases*** output and ***enhances*** its quality for Division I football players. (NCAA 33 (explaining why it increases competition among those competing – and paying – for student-athlete services).)  Rather than engage the NCAA's argument,

16

Fourqurean repeats the district court's flawed analysis, reiterating its unsupported finding that the "NCAA's own rules [permit] Division I teams to fill roster space with experienced, transfer players, crowding out younger athletes." (Resp. 33.) Like the court, he fails to grasp the realities of student-athlete transfers. There can be, by definition, no "crowding out" of younger players for two reasons: (1) any student-athlete transferring necessarily means he has not exhausted his eligibility, so he would be playing somewhere regardless; and (2) a transferring student-athlete necessarily opens up a roster spot for a *new* player on the team he left – yielding a neutral effect on competition from an antitrust perspective. It is **Fourqurean's** rule that would crowd out younger athletes; whenever a student-athlete receives an additional season of competition, that comes at the expense of (and compensation to) a new student-athlete who would otherwise benefit from his departure. Eligibility rules, like the Five-Year Rule, strike the appropriate balance by ensuring that student-athletes across all Division I sports may excel on and off the field, secure a degree, and then move on to the next phase of their lives, making room for the next wave of student-athletes to experience those same life-changing opportunities.

Fourqurean's argument that eligibility rules limit roster spots to "unproven, younger athletes over older, more experienced players" rendering "the playing field less competitive" is specious. (Resp. 34–36.) It also conflates the concept of increasing the quality of competition on the field with the competition among those vying for – and compensating – student-athletes to play for certain member institutions. The latter

competition is what is relevant in Fourqurean's alleged market, and it is enhanced by the finite duration of eligibility.  (*See* NCAA 33–34.)

The court should have recognized these procompetitive effects as it considered whether substantially less restrictive alternatives could achieve the same ends.  *See Alston*, 594 U.S. at 100.

**<u>Less Restrictive Alternative</u>**.

The district court's so-called "less restrictive alternative analysis" removed any doubt whether its rule of reason analysis was an abuse of discretion.  Rather than concern itself with ***market-wide*** effects on competition – as antitrust law requires – it focused explicitly on notions of individual fairness to Fourqurean, holding that the NCAA must provide "*meaningful* exceptions" to its eligibility rules.  (Order at 15.) This is an error of both law and fact.

Fourqurean's response seeks to obscure that the court conjured the notion of "meaningful exceptions" out of thin air by insisting that he raised it during the hearing.  (Resp. 37.)  This is misleading.  Fourqurean's argument that the waiver denial was "an unfair decision under the facts and circumstances" (SA at 178, 14:25 & 179, 1:16) underpinned his "undeveloped" state-law claim that the NCAA "arbitrarily, capriciously and selectively" enforced its bylaws when it denied his waiver request.  (SA at 16–17, ¶¶ 113–130.)  This was, as his counsel stated, his "fallback argument."[10]  (SA at 179, 16.)  The court nevertheless seized on notions of

---

[10] Critically, the court held that Fourqurean was likely to succeed on his antitrust claim, but ***not*** his arbitrary and capricious claim, although it cryptically suggested this claim might grow "legs" from his antitrust claim.  (*See* Order at 18 n.9.)  That is even ***less*** likely today than it was then, as the Wisconsin Supreme Court has summarily rejected attempts to

fairness to Fourqurean and injected them into its less restrictive alternative analysis under antitrust law.  (Order at 17.)  That was legally improper and epitomizes the type of judicial micromanagement of individual decisions that *Alston* condemned.

The holding is also factually baseless.  Fourqurean wrongly asserts that the NCAA has failed to "give[] any explanation and/or justification for its denial of the requested waivers, rendering the waiver denial arbitrary and without meaningful consideration."  (Resp. 37–38.) This ignores the detailed argument in the NCAA's opening brief, supported by evidence in the ***record***, explaining the careful attention and consideration that the waiver request received. (NCAA 37–41.)  This included regular communication between the NCAA and UW, during which the NCAA stressed that UW/Fourqurean needed to submit objective or contemporaneous documentation to qualify for a waiver:

- <u>12/10/2024</u>:  Two business days after UW submitted the waiver request, UW spoke with the NCAA regarding its status because UW wanted to know whether it needed to sign a new cornerback to replace Fourqurean.  (SA at 88–89, ¶ 6.)

- <u>12/13/2024</u>:  UW asked the NCAA whether "new information could be considered" and submitted as part of the request.  (*Id.* at 89, ¶ 7.) The NCAA confirmed it could. (*Id.* ¶¶ 7–8.)

---

second-guess a voluntary association's reasonable interpretation and enforcement of its bylaws against students.  *See Halter v. Wisconsin Interscholastic Athletic Ass'n*, 2025 WI 10, ¶ 37.

4925-3798-5083

- <u>1/3/2025</u>: UW submitted an additional statement from Fourqurean. (*Id.* ¶ 8.) It did not provide objective or contemporaneous documentation; it described the circumstances of Fourqurean's 2021 season and his desire to "leverage" an additional season to grow "athletically and academically, while also being able to capitalize on NIL opportunities[.]" (*Id.* ¶ 8, Ex. D at SA 110.)

- <u>1/8/2025</u>: UW and the NCAA discussed the circumstances regarding the impact Fourqurean felt after his father died, including whether he "met with any counselor's due to mental health" issues. (*Id.* ¶ 9, Ex. E at SA 111.) Despite this conversation, UW did not submit any additional objective or contemporaneous documentation to demonstrate that he participated in any such counseling or meetings. (*Id.* ¶¶ 9–10.)

- <u>1/17/2025</u>: After UW advised the NCAA that day that Fourqurean planned to seek an injunction if the request were denied, NCAA in-house counsel spoke to Fourqurean's counsel and reiterated that the NCAA would still review and consider additional materials, including any objective or contemporaneous documentation about Fourqurean's mental health after his father's death. (*Id.* at 90, ¶¶ 12–13.)

- <u>1/27/2025</u>: Rather than submit such documentation, UW submitted more written statements from Fourqurean's friends, teammates,

and coaches. (*Id.* ¶ 14, Ex. G at SA 112.)

As the NCAA attested to, it considered ***all*** these materials before issuing its denial on January 29 (SA at 91, ¶ 16), which specifically explained that UW "was unable to provide objective documentation satisfying any of the legislated exceptions or other extenuating circumstances which would enable staff to provide relief consistent with intent of legislation." (SA at 20.)

Undeterred, Fourqurean's response still asserts that the "record is devoid of any supporting analysis as to why this does not qualify" for a legislated exception, further claiming that the NCAA does not specify "what documentation was considered in rendering" its determination. (Resp. 38–39.) The stated evidence belies this, explaining that the request simply did not qualify for any exception that would allow Fourqurean to play a fifth year – even after the NCAA considered his circumstances and waiver submission under alternative rules that were not relied upon in the request. (NCAA 37–41.) At bottom, he did not meet the criteria for any exception because he played in too many games (11 of 12 during the year in question) and he failed to submit any objective or contemporaneous documentation (e.g., medical documentation) of his alleged mental hardship and related circumstances.[11] (NCAA 39–40.) ***The NCAA should not be faulted for not considering documentation never submitted for consideration***. To call this a "wooden" application of the rules makes no sense. (Order at 18; Resp. 18.) What Fourqurean

---

[11] Despite Fourqurean's assertion that the "district court found" that the NCAA applied its exceptions "inconsistently" (Resp. 8), the court made no such finding. (*See generally* Order.)

(and apparently the court) wants is some set of exceptions to the legislated exceptions themselves. This sort of micromanagement and second-guessing can play **no** part in the rule of reason analysis. *See Alston*, 594 U.S. at 98, 101–03, 107.

Moreover, that the court "narrowed" the scope of the injunction to apply only to Fourqurean undermines, rather than strengthens, his argument. Indeed, he makes no effort to rebut the NCAA's argument that a "meaningful exceptions" standard does nothing to protect *competition* and therefore it cannot be a less restrictive means of achieving a differentiated product from professional football. (NCAA 36–37.) The only thing it will do (and has already done) is render courts the arbiters of eligibility-related waiver requests under the guise of antitrust scrutiny, not only through additional waiver requests, but lawsuits seeking "antitrust" relief from NCAA waiver denials unrelated to competition. Despite Fourqurean's assertions otherwise (Resp. 40–41[12]), **this is demonstrably true**. Within the last thirty days alone, two new lawsuits were filed by student-athlete plaintiffs seeking to enjoin the Five-Year Rule – each of which heavily relies on the district court's flawed reasoning to support their claims. Compl. ¶ 22, *Brzovic v. Nat'l Collegiate Athletic Ass'n*, 2:25-cv-02885 (D. S.C. Apr. 6, 2025) ("Plaintiff's case parallels that of Nyzier Fourqurean[.]"); Compl. ¶ 32, *Johnson v. Nat'l Collegiate Athletic Ass'n*, 9:25-

---

[12] Fourqurean focuses on the date that certain waiver requests were made in the cases cited by the NCAA, but ignores that each case was filed **after** the court below issued the injunction. (Resp. 40–41.) In fact, some of those waiver denials were issued months earlier, but those student-athletes sued soon after the court's injunction opened the floodgates. (*Id.*)

cv-00060 (D. Mont. Apr. 25, 2025) (same).  This should not be countenanced; the Court should vacate the injunction.

## IV.    THE DISTRICT COURT'S IRREPARABLE HARM ANALYSIS IS INDEFENSIBLE.

The NCAA previously explained that the district court erred in three key respects in finding that, if it did not grant a preliminary injunction, Fourqurean would suffer irreparable harm: the court (i) considered the "speculative" nature of the financial harm he would allegedly suffer to be a *point in favor* of finding irreparable harm; (ii) failed to give proper weight to Fourqurean's years-long delay in seeking a waiver and in bringing his subsequent lawsuit; and (iii) ignored the fact that he could wholly avoid the harms he predicted by winning his case on the merits. (NCAA 43–49.)  Fourqurean fails even to acknowledge the last of these arguments in his response, thereby conceding its validity. *See United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008) (failure to respond to an argument in reply brief waives opposition to it).

Fourqurean seeks to avoid the NCAA's first argument, concerning the court's finding that the harm to him was speculative, by misstating it. The point is not simply that "the irreparable harm in this case is speculative, at best," but that it was error for *the court* to conclude that the alleged harm was "speculative" and then to count that as support for finding the harm "irreparable."  (*See* Order at 20; NCAA 44–46.) A finding of speculative harm should instead weigh against any finding of irreparability. As this Court has explained, "[n]ot every conceivable injury entitles a litigant to a preliminary injunction. ***For example, speculative injuries do not***

*justify this extraordinary remedy*." *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) (emphasis added). Indeed, the Court has consistently held that harm that "eludes calculation because it is **speculative**," rather than because "if it occurred, it could not be quantified" is not "irreparable harm." *Id.* at 705. Here, even if the harm Fourqurean alleges were not speculative, the underlying "harm" (missing out on a higher NFL salary based on an improved draft stock or lost NIL money based on an improved "brand") is something that could be reasonably quantified after trial, given the structure of NFL salaries and the number of NIL contracts signed by similarly-situated athletes. *See, e.g.*, *Jones*, No. 25-CV003492-310, at 26 (holding that "potential loss of compensation from proposed NIL agreements is monetary harm that can be remedied by monetary damages if appropriate"); *Smith*, No. 25-CV003480-310, at 28 (same).

Fourqurean's effort to rebut the NCAA's argument about his delay in seeking a waiver is similarly unpersuasive. The NCAA's supposed delay in responding to the waiver request – to which Fourqurean's response gives great weight despite being belied by the record[13] – is irrelevant to the irreparable harm analysis. It is **his** own delay that matters, because delay in seeking a preliminary injunction (and even more in seeking relief from the NCAA for years) calls into question "how urgent the need for [preliminary] equitable relief really is." *Michigan v. U.S. Army Corps of Engineers*,

---

[13] There is nothing "delayed" about a December 6 submission being decided by the NCAA on January 29 – particularly when, as here, the submitting party requested leave to submit, and did in fact submit, several supplemental submissions that required additional review. (SA 88–91, ¶¶ 3–17.)

667 F.3d 765, 788 (7th Cir. 2011). And Fourquean's lengthy explanation regarding his delay does nothing to show that he acted with "reasonable diligence" in pursuing his claim. *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Indeed, courts across the country have weighed similarly-situated plaintiffs' delay in bringing suit against a finding of irreparable harm. *See, e.g.*, *Arbolida v. Nat'l Collegiate Athletic Ass'n*, No. 25-2079-JWB, 2025 WL 579830, at *4 (D. Kan. Feb. 21, 2025) (denying motion when plaintiff's alleged injury was "due in part to [p]laintiff's own actions in waiting to file the present suit"); *Jones*, 25CV003492-310, at 24–25 (plaintiffs' "lengthy delay counsels heavily against a finding of irreparable harm" despite "quickly approaching decision deadline concerning the NFL draft"); *Smith*, No. 25-CV003480-310, at 26 (same).

Fourquean's primary effort to defend the court's irreparable harm finding is wholly unconvincing and invokes an argument that the court did not even rely on – that "college students suffer irreparable harm when they are denied the opportunity to play sports." (Resp. 42.) The cases Fourquean cites are readily distinguishable and fall far short of the mark.

None is an antitrust case. Indeed, all of them involve student-athlete plaintiffs suing to enjoin their schools from eliminating their ability to compete in their desired sports as violative of Title IX, which prohibits exclusion from education programs "on the basis of sex." (*See* Resp. 42.) Moreover, none of these plaintiffs argued that by not participating in an additional season of college sports they would lose the ability to obtain speculative financial benefits linked to that "harm," such as improving their

25

"brand" or "draft stock."   Rather, in these cases, the court found irreparable harm where the schools eliminated the program altogether while the student-athletes had remaining eligibility. These Title IX cases are also distinguishable because, in most instances, the courts (a) found that being treated unequally in violation of Title IX is itself an irreparable harm, and (b) noted that no other remedy would be adequate because "Title IX does not provide for any monetary damages." *See, e.g.*, *S.A.* v. *Sioux Falls Sch. Dist.*, 4:23-CV-04139-CBK, 2023 WL 6794207 at *4 (D.S.D. Oct. 13, 2023) (quotations omitted).

Unlike these plaintiffs, Fourqurean could be compensated for being unable to play a fifth year of college football through money damages. And the harm he contends he would suffer is not the same.  Instead of arguing that he is harmed by the sheer fact that he will be unable to keep playing college football or that he is being discriminated against, Fourqurean repeatedly links his harm to financial rewards and advancement – harm that the court correctly recognized as speculative.  (Order at 19–20.)

Fourqurean's antitrust claims also differ in another key respect from the Title IX claims. As explained by one of his cases, "there is a presumption of an irreparable injury when a plaintiff has shown a violation of a civil rights statute," and where an athlete's Title IX claim is unlikely to succeed on the merits of her discrimination claim, courts have rejected arguments for irreparable harm simply by being unable to play sports. *See Mayerova v. Eastern Michigan University*, 346 F. Supp. 3d 983, 997–98 (E.D. Mich. 2018) (citations and quotations omitted).

The court's finding that Fourqurean would suffer irreparable harm unless it issued a preliminary injunction is unsupported and unsupportable. It should be vacated without delay.

## CONCLUSION

For the foregoing reasons, as well as those stated in the NCAA's opening brief, the district court's order and preliminary injunction should be vacated.

May 2, 2025.                    Respectfully submitted,

*s/ Kate E. Gehl*

Thomas L. Shriner, Jr.
Kate E. Gehl (Counsel of Record)
Max S. Meckstroth
David J. Wenthold
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202-5306
414.297.5601 (TLS)
414.297.5279 (KEG)
414.319.7022 (MSM)
414.297.4985 (DJW)
tshriner@foley.com
kgehl@foley.com
mmeckstroth@foley.com
dwenthold@foley.com

Rakesh Kilaru
Tamarra Matthews Johnson
Wilkinson Stekloff LLP
2001 M Street N.W., 10th Floor
Washington, DC 20036
202.847.4046 (RK)
202.847.4020 (TMJ)
rkilaru@wilkinsonstekloff.com
tmatthewsjohnson@wilkinsonstekloff.com

*Counsel for Defendant-Appellant National Collegiate Athletic Association*

27

4925-3798-5083

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g), I hereby certify:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) and Cir. R. 32(c) because it contains 6,997, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word-count feature of Microsoft Word Professional Plus 2016 in preparing this certificate.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Professional Plus 2016 in 12-point Century Schoolbook font (for text) and 11-point Century Schoolbook font (for footnotes).

Dated: May 2, 2025

*s/ Kate E. Gehl*
Kate E. Gehl

4925-3798-5083

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated: May 2, 2025

*s/ Kate E. Gehl*
Kate E. Gehl

4925-3798-5083