In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 25-1187

NYZIER FOURQUREAN,

*Plaintiff-Appellee,*

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 25-cv-68 — **William M. Conley**, *Judge.*

————————————

ARGUED MAY 28, 2025 — DECIDED JULY 16, 2025

————————————

Before RIPPLE, ST. EVE, and KOLAR, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Nyzier Fourqurean, a member of the University of Wisconsin-Madison ("UW-Madison")'s football team, contends that the National Collegiate Athletic Association ("NCAA") has unreasonably restrained trade, in violation of § 1 of the Sherman Act, by restricting student-athletes to four seasons of intercollegiate competition per sport—an aspect of the NCAA's Five-Year Rule. He sought, and the

district court granted, a preliminary injunction enjoining the NCAA from enforcing its Five-Year Rule to prevent him from playing a fifth season of college football.

The district court reasoned that the Supreme Court's decision in *NCAA v. Alston*, 594 U.S. 69 (2021), established that men's NCAA Division I Football Bowl Subdivision ("FBS") football is a relevant market, and because the Five-Year Rule excludes Fourqurean from this market, it has likely anticompetitive effects. The court thus concluded that Fourqurean is likely to succeed on the merits of his § 1 claim.

Market definition, however, was not at issue in *Alston*. Fourqurean must independently define the relevant market, which he has not attempted to do. Furthermore, even if men's NCAA Division I FBS football is the relevant market, Fourqurean's exclusion from this market alone does not suffice to show likely anticompetitive effects. At this stage of the litigation, Fourqurean has therefore failed to meet his burden of establishing some likelihood that he will prevail on the merits of his § 1 claim, and the district court should not have granted his motion for a preliminary injunction.

## I. Background

An effort among Harvard, Princeton, and Yale to reduce violence in college football through rule adjustments led to the creation of the NCAA in 1905. *Alston*, 594 U.S. at 75–76. Since then, the NCAA's membership and responsibilities have grown, turning the NCAA into a "sprawling enterprise." *Id.* at 79. Its membership comprises about 1,100 schools. *Id.* And the NCAA has adopted a "thicket" of bylaws governing not only playing rules but also eligibility to play and compensation, among other aspects of college sports. *Id.*

The NCAA has long defended its bylaws against Sherman Act § 1 challenges on the ground that they do not regulate commercial transactions, so § 1, which prohibits agreements "in restraint of trade or commerce," 15 U.S.C. § 1, does not apply. This argument has met mixed success in the appellate courts. *Compare Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) (reasoning that rules combatting commercialism in college sports by restricting payments to athletic recruits are not restraints on "commerce"); *Smith v. NCAA*, 139 F.3d 180, 185–86 (3d Cir. 1998) (holding that the Sherman Act does not apply to "the NCAA's promulgation of eligibility requirements" because they "primarily seek to ensure fair competition in intercollegiate athletics"), *vacated on other grounds by NCAA v. Smith*, 525 U.S. 459 (1999), *with O'Bannon v. NCAA*, 802 F.3d 1049, 1066 (9th Cir. 2015) (holding that the NCAA's compensation bylaws fall within the ambit of the Sherman Act). Our court flatly rejected this argument in *Agnew v. NCAA*, 683 F.3d 328, 340–41 (7th Cir. 2012) (holding that "the Sherman Act applies to the NCAA bylaws generally").

Alternatively, the NCAA has argued that its bylaws survive scrutiny under § 1 of the Sherman Act because they are necessary to create the product of college sports. In its seminal case applying the Sherman Act to the NCAA, *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), the Supreme Court rejected this argument as a justification for the NCAA's restrictions on televising college football games. The Court held that these restrictions were unnecessary to market college sports or maintain competitive balance, and ultimately that they violated § 1. *Id.* at 113–15, 117–19. Along the way to reaching its holding in *Board of Regents*, the Court distinguished restrictions on televising football games from rules that help maintain the "revered tradition of amateurism in

college sports" or "the preservation of the student-athlete in higher education," *id.* at 120.

After *Board of Regents*, rising revenue from college basketball and football, alongside looser restrictions on the benefits NCAA member schools could provide to student-athletes, put increasing pressure on the NCAA's arguments that restrictions on student-athlete compensation were not commercial in nature or that the promotion of amateurism in college sports justified them. *See Alston*, 594 U.S. at 93 (noting these changes in market realities). These circumstances eventually led to the Supreme Court's watershed *Alston* decision.

In 2014, current and former student-athletes who played NCAA basketball and football filed a class action against the NCAA and several of its conferences challenging the NCAA's student-athlete compensation framework. After years of litigation and a bench trial, a district court agreed that NCAA limits on education-related compensation or benefits violated the Sherman Act, and it enjoined those limits. *See id.* at 80, 84–85. Both sides appealed to the Ninth Circuit, which affirmed. *See id.* at 85–86. Only the NCAA appealed to the Supreme Court, which in 2021 also affirmed. *Id.* at 86, 107.

The *Alston* Court rejected both a request by the NCAA for "special dispensation from the Sherman Act on the ground that" the NCAA "seeks to maintain amateurism in college sports as part of serving the societally important non-commercial objective of higher education," *id.* at 94–96 (citation modified); and two versions of the argument that its bylaws are necessary to produce college sports, *id.* at 90–91, 101–02; *see also id.* at 109–110 (Kavanaugh, J., concurring).

*Alston* paved the way for significant changes in student-athlete compensation—far beyond the direct effect of the *Alston* ruling, which concerned only education-related compensation and benefits. Indeed, shortly after oral argument in this appeal, in a trio of antitrust cases against the NCAA and several of its conferences, a district court granted final approval for a settlement that permits the NCAA's member schools to directly pay student-athletes for the first time. *In re Coll. Athlete NIL Litig.*, No. 20-CV-03919 CW, 2025 WL 1675820 (N.D. Cal. June 6, 2025). Under a new revenue sharing model established as part of the settlement, each NCAA Division I member school party to the settlement can distribute about $20 million in name, image and likeness ("NIL") revenue to student-athletes over the 2025–26 season. *Id*. at *18.

In addition, *Alston* emboldened plaintiffs to challenge not just NCAA bylaws regulating compensation but also those concerning eligibility. A coalition of states filed suit against the NCAA in 2023, challenging the NCAA's transfer eligibility rule, which required students-athletes who transfer more than once to sit out one year of competition. The parties ultimately resolved the case through a settlement permanently barring restrictions on transfer eligibility. *Ohio et al. v. NCAA*, No. 1:23-cv-00100 (N.D. W.V. final judgment and permanent injunction entered Aug. 30, 2024).

More recently, some student-athletes have challenged aspects of the NCAA's "Five-Year Rule," which restricts student-athletes to four seasons of competition in any one sport within a five-year window. *See Elad v. NCAA*, No. CV 25-1981, 2025 WL 1202014 (D.N.J. Apr. 25, 2025) (granting a preliminary injunction allowing the plaintiff additional eligibility); *Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024) (same).

*But see Goldstein v. NCAA*, No. 3:25-CV-00027-TES, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025) (rejecting a request for a preliminary injunction). Fourqurean, too, challenges an aspect of this rule. He has already played four seasons of college football: two seasons at Grand Valley State University ("GVSU"), in the NCAA's Division II, and two seasons at UW-Madison, in the NCAA's Division I. He graduated from UW-Madison with a bachelor's degree in December 2024, but he would like to play another season at UW-Madison—in part to profit from the new revenue-sharing opportunities created by the settlement in *In re College Athlete NIL Litigation.*

The NCAA's Five-Year Rule stands in his way. So in December 2024, UW-Madison filed a request with the NCAA on behalf of Fourqurean for a waiver of the Five-Year Rule, citing circumstances present during his first season: the fewer total snaps Fourqurean completed in this season relative to later seasons, the lack of roster depth, team injuries, blow-out victories, and the death of his father. The NCAA denied Fourqurean's waiver request in January 2025, and Fourqurean responded by immediately filing this suit.

Fourqurean argues that the Five-Year Rule constitutes an illegal restraint of trade or commerce under § 1 of the Sherman Act because it prevents student-athletes like Fourqurean from competing in NCAA Division I football. Along with his complaint, Fourqurean filed a motion under Federal Rule of Civil Procedure 65 for a preliminary injunction enjoining the NCAA from enforcing its Five-Year Rule. Fourqurean sought a ruling on this motion by February 7, 2025, the deadline to declare for the National Football League ("NFL") draft.

On February 6, 2025, after briefing and a preliminary injunction hearing, the district court concluded that Fourqurean

had shown a likelihood of success on the merits of his Sherman Act claim. To reach this conclusion, the court relied on *Alston* and the "trend in the law since *Alston*." *Fourqurean v. NCAA*, 771 F. Supp. 3d 1043, 1050 (W.D. Wis. 2025). The court reasoned that Fourqurean did not need to define the relevant market because the "Supreme Court had already defined it" in *Alston* as men's Division I football—and under *Alston*, per the court, the NCAA and its members enjoy monopsony power in this market. *Id*. at 1051. In the court's view, the NCAA's monopsony power, combined with Fourqurean's evidence that the Five-Year Rule excludes student-athletes from playing college football after four seasons of competition, "when their marketability for NIL income is more likely than not to be at its apex," sufficed to establish that the Five-Year Rule has an anticompetitive effect. *Id*. at 1052.

The district court agreed with the NCAA that the Five-Year Rule also has a procompetitive benefit by "linking a student-athlete's college athletic career to ordinary degree progression," which "differentiates NCAA Division I football from professional football leagues like the NFL." *Id*. But the court concluded that the NCAA could achieve this benefit with a less anticompetitive means: a Five-Year Rule with "*meaningful* exceptions . . . to avoid unfairness to student-athletes whose individual circumstances may justify a departure…." *Id*. at 1054. After evaluating the other requirements for a preliminary injunction, the district court granted a preliminary injunction enjoining the NCAA from enforcing its Five-Year Rule against Fourqurean "absent a more meaningful demonstration that exceptions to that rule should not apply to [his] requested, additional season of eligibility given the unique circumstances surrounding his 2021–2022 season at Division II GVSU." *Id*. at 1058–59.

The NCAA appealed the preliminary injunction, invoking our appellate jurisdiction under 28 U.S.C § 1292(a)(1).

## II. Discussion

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. In evaluating the merits element, courts "approach the record from a neutral and objective viewpoint, assessing the merits as … they are likely to be decided after more complete discovery and litigation." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 792 (7th Cir. 2022). This approach differs significantly from the approach at the motion to dismiss stage or the summary judgment stage. *See id.* at 791 (at the preliminary injunction stage, a court does not accept the plaintiff's allegations as true, nor give him the benefit of all reasonable inferences, nor give him the benefit of conflicting evidence).

In an appeal from a grant of a preliminary injunction, we review the district court's legal conclusions de novo, its factual findings for clear error, and its balancing of the equities for an abuse of discretion. *Id.* We start and end our analysis here with Fourqurean's likelihood of success on the merits.

Fourqurean claims that the NCAA's Five-Year Rule violates the Sherman Act's prohibition on agreements "in restraint of trade or commerce…." 15 U.S.C. § 1. The Supreme Court "has 'long recognized that in view of the common law and the law in this country when the Sherman Act was

passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Alston*, 594 U.S. at 81 (quoting *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 540 (2018)); *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("[T]his Court has long recognized that Congress intended to outlaw only unreasonable restraints."). Whether a challenged restraint is undue or unreasonable for purposes of the Sherman Act depends on its effect on competition, "especially its capacity to reduce output and increase price." *Alston*, 594 U.S. at 88; *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999) (identifying the "essential" question in this context as "whether or not the challenged restraint enhances competition" (quoting *Bd. of Regents*, 468 U.S. at 104)). The inquiry needed to make this determination changes with "the circumstances, details, and logic of a restraint." *Cal. Dental*, 526 U.S. at 781.

## A. Sherman Act Framework

Caselaw recognizes three Sherman Act frameworks: the rule of reason, which the district court applied, "quick look" analysis, and *per se* rules. "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for … 'rule of reason analysis.'" *Alston*, 594 U.S. at 81 (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). This analysis involves a fact-specific assessment of "whether the challenged agreement is one that promotes competition or one that suppresses competition." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 691 (1978). To prevail under the rule of reason, a plaintiff must offer evidence of anticompetitive effects.

Certain kinds of restraints, however, qualify as illegal *per se*: agreements between two or more competitors to fix prices, otherwise known as horizontal price-fixing agreements, *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (per

curium); market allocation, *see United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); certain types of group boycotts or concerted refusals to deal, *see Nw. Wholesale Stationers v. Pac. Stationery & Printing*, 472 U.S. 284, 294–95 (1985); and some kinds of tying arrangements, *see Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34–37 (2006).

When challenging a restraint that falls within one of these *per se* categories, the plaintiff can establish a violation of § 1 of the Sherman Act without evidence of anticompetitive effects because the Supreme Court has deemed these restraints "so plainly anticompetitive and so often lack any redeeming virtue that they are conclusively presumed illegal...." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7–8 (1979) (citation modified); *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1108 (7th Cir. 1984), *abrogated on other grounds by Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023) (explaining that "when the plaintiff adequately states a *per se* violation of § 1 of the Sherman Act," "an allegation of anticompetitive effects is not required" because "conduct constituting a *per se* violation is viewed by the law as so inimical to free competition that the pernicious effects are conclusively presumed; stated in another manner, *per se* violations of the antitrust laws are anticompetitive by definition"); *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 555 (7th Cir. 1980) (same).

Between the rule of reason and *per se* rules, an abbreviated or "quick-look" analysis may suffice when the anticompetitive or procompetitive effects of a restraint are sufficiently obvious—but the restraint does not fall neatly within a *per se* illegal category. On one side, an "abbreviated or 'quick-look' analysis" may be appropriate when "an observer with even a rudimentary understanding of economics could conclude

that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental*, 526 U.S. at 770. On the flip side, "some restraints may be so obviously incapable of harming competition" that a court can approve the restraints in the "twinkling of an eye." *Alston*, 594 U.S. at 88 (quoting *Bd. of Regents*, 468 U.S. at 110 n.39).

Both parties nominally agree that ordinary rule of reason analysis applies in this case. Fourqurean agreed at oral argument, and the NCAA 's brief noted, "the rule of reason standard … applies here." At the same time, however, the NCAA argues that its eligibility bylaws should be considered presumptively procompetitive, which amounts to an argument for quick-look approval, not the rule of reason.

In *Alston*, the Supreme Court left open the possibility that "restraints necessary to produce a game," such as agreements "on things like how many players may be on the field or the time allotted for play," might qualify for quick-look approval. 594 U.S. at 90–91 (citation modified). In this case, the NCAA does not argue that the Five-Year Rule is necessary to produce a game in the same way as rules about the number of players on the field or playing time. Rather, the NCAA makes the subtly different argument that the Five-Year Rule is necessary to produce "collegiate athletics." In support of this argument, the NCAA relies on our comment in *Agnew* that eligibility bylaws "define what it means to be an amateur or a student-athlete, and are therefore essential to the very existence of the product of college football." 683 F.3d at 343.

The NCAA relies too heavily on *Agnew*. Eligibility bylaws were not at issue in *Agnew*, which concerned compensation bylaws. In that case, prior to *Alston*, we interpreted language in *Board of Regents* as "a license to find" a presumption of

procompetitiveness in favor of NCAA bylaws "clearly meant to help maintain the 'revered tradition of amateurism in college sports' or the 'preservation of the student-athlete in higher education'…." *Id*. at 341–43 (quoting *Bd. of Regents*, 468 U.S. at 120). We reasoned that this category included eligibility bylaws—but not the compensation bylaws actually at issue in *Agnew*. *Id*. at 343–45. That is, *Agnew* discussed eligibility bylaws only as a foil for compensation bylaws. In this context, while *Agnew* may suggest that courts should consider the specific characteristics of different NCAA bylaws when assessing competitive effects, *Agnew* does not resolve whether eligibility bylaws are necessary to produce college football—or what other procompetitive benefits they may have.

Furthermore, to the extent the NCAA is attempting to "relabel [the Five-Year Rule] as a product feature and declare [it] 'immune from § 1 scrutiny,'" *Alston*, 594 U.S. at 101 (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 n.7 (2010)), the Supreme Court already rejected this type of maneuver in *Alston*, *id*. The key question for determining whether the Five-Year Rule is so incapable of harming competition so as to justify quick-look approval is whether college football can proceed without this rule. *See id*. at 91. The NCAA has not offered any argument or evidence that its member schools would disband their football teams if the NCAA eliminated this rule.

Accordingly, the district court properly applied the rule of reason—and we, too, apply the rule of reason here.

## B. Likelihood of Success on the Merits

As evidence of anticompetitive effects from the NCAA's Five-Year Rule, Fourqurean offers his own exclusion from participating in college football. The Sherman Act does not

condemn all agreements that exclude competitors. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 295–98 (1985) (concluding that the expulsion of Pacific Stationery and Printing Co. from a cooperative buying group "was certainly a restraint of trade," but the adverse effect on Pacific did not, on its own, establish a Sherman Act violation); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26–31 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (finding insufficient evidence in the record to show that an exclusive contract between a hospital and a group of anesthesiologists unreasonably restrained competition in violation of the Sherman Act, although the contract prevented a non-affiliated anesthesiologist, the plaintiff, from providing anesthesia to his patients at the hospital); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984).

To decide whether an agreement that excludes competitors unreasonably restrains trade or commerce in violation of § 1 the Sherman Act, we consider its potential to deprive the public of the benefits of competition, especially competitive prices, taking into account market power and market structure. *See Alston*, 594 U.S. at 88 (describing the rule of reason as "'a fact-specific assessment of market power and market structure' aimed at assessing the challenged restraint's 'actual effect on competition'—especially its capacity to reduce output and increase price" (quoting *Amex*, 584 U.S. at 541)); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 500–01 (1940) (a restraint does not violate § 1 "unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition").

For restraints that exclude competitors, including exclusive dealing agreements and group boycotts, the usual antitrust concern is that the parties to the agreement are trying to create, protect, or enhance a dominant position in the market. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (artificial teeth manufacturer's exclusivity policy with dealers helped keep "sales of competing teeth below the critical level necessary for any rival to pose a real threat to [the manufacturer's] market share"); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 461–62, 466–68 (1941) (clothing designers' refusal to sell to retailers who also purchased clothing from manufacturers of knockoffs of clothing designs operated to exclude those manufacturers from the market). A dominant position can confer market power, or the ability to set prices and output (e.g., an employer's ability to depress wages below the competitive level). *See Alston*, 594 U.S. at 86.

One of the cases the dissent cites, *Radovich v. NFL*, 352 U.S. 445 (1957), involved such a theory. The *Radovich* plaintiff, a football player in the now-defunct All-America Conference, alleged that his blacklisting by the NFL was part of a conspiracy by the NFL's members to destroy the All-America Conference "and thus to strengthen the monopolistic position of the National Football League." *Id*. at 449.

Fourqurean has made no effort to establish this theory of anticompetitive effects. To prove a Sherman Act violation under this theory, a plaintiff "must prove that [the agreement] is likely to keep at least one significant competitor of the defendant from doing business in a relevant market" and that "the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from it." *Roland*, 749 F.2d at 394. The threshold issues are the relevant market and the defendant's

market share. *See Prods. Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 644 (7th Cir. 1982). "[T]he relevant market is defined as the area of effective competition," which is typically "the arena within which significant substitution in consumption or production occurs." *Amex*, 585 U.S. at 543 (citation modified). In the labor market context, as here, the market is comprised of those employers seen by workers as reasonably good substitutes. *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (discussing market definition in cases involving buyer-side restraints challenged under § 1).

As an initial matter, Fourquean relies entirely on *Alston* to define the relevant market. In his and the district court's view, the Supreme Court in *Alston* established that men's NCAA Division I FBS football is a relevant market. But Fourquean overstates the scope of the Court's ruling. The *Alston* Court did not decide the question of market definition. Instead, it noted that the parties did not challenge the district court's definition of the relevant market as "the market for athletic services in men's and women's Division I basketball and FBS football" and "observ[ed] that the NCAA enjoys near complete dominance of, and exercises monopsony power in," that market. *Alston*, 594 U.S. at 81 (citation modified).

We are also cognizant that "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities." *Id.* at 93. The market realities for college sports have changed in the four years since *Alston*. Indeed, Fourquean explains that he "would rather return to UW-Madison to play Division I football" than declare for the NFL draft for reasons including opportunities to profit from revenue sharing and NIL—which did not exist pre-*Alston*.

Recognizing that *Alston* does not define the relevant market in this case, the dissent turns to Fourqurean's complaint. In the dissent's view, Fourqurean's assertions that "[t]he NCAA and its member institutions control the highest and most popular level of collegiate athletics" and that the NCAA "possesses a dominant position in the relevant market" are sufficient to define the market and establish the NCAA's market power at the preliminary injunction stage. In support of this view, the dissent cites cases concerning the standard to survive a motion to dismiss. As these cases recognize, "courts hesitate to grant motions to dismiss for failure to plead a relevant … market" because "market definition is a deeply fact-intensive inquiry…." *Todd*, 275 F.3d at 199–200; *accord Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). The preliminary injunction inquiry, however, is a "decidedly far more searching inquiry than the question of whether a complaint properly alleges a claim for relief." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 134 (D.C. Cir. 2020). We think that Fourqurean needs more than the sparse and conclusory allegations the dissent identifies.

Even if men's NCAA Division I FBS football is the relevant market, Fourqurean has a more fundamental problem. To establish the theory of anticompetitive effects in cases such as *Dentsply*, *Fashion Originators' Guild*, and *Radovich*, Fourqurean would need to show that the Five-Year Rule creates, protects, or enhances the NCAA's dominant position in the market—and thus the NCAA's ability to depress student-athlete compensation below the competitive level—by making it more difficult for the NCAA's existing or potential rivals to compete against the NCAA. But Fourqurean relies solely on his own exclusion from participating in college football as proof of anticompetitive effects. He is not a rival of the NCAA, and

he has not drawn a link from his exclusion to an adverse effect on an existing or potential rival of the NCAA. *Compare Fashion Originators' Guild*, 312 U.S. at 461–62, 466–68 (boycott of retailers who sold knockoffs of clothing designs caused retailers to stop carrying knockoffs, which impaired knockoff manufacturers' ability to compete against Guild members).

The dissent concludes that the Five-Year Rule depresses student-athlete compensation by pushing out the most experienced players (a different theory of anticompetitive effects). Fourqurean has offered no evidence in support of this mechanism for depressing compensation. Under ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation.[*] The Five-Year Rule may operate differently, but the record contains no evidence that would allow us to draw that conclusion.

---

[*] A restraint that limits the supply of workers in a labor market is distinguishable from a restraint that limits the mobility of workers within a labor market, such as a no-poach agreement. As this court recognized in *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332 (7th Cir. 1967), one of the cases the dissent cites, no-poach agreements diminish competition among employers for each other's workers. *See id*. at 336–37. They "make it impossible for the participants to 'steal' an employee from a different employer by offering a better salary or other terms," which can depress worker compensation, in the same way that market division agreements among producers or distributors can increase customer prices. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2013a (5th ed. May 2025 Update). The Five-Year Rule does not reduce competition among the NCAA's member schools for each other's players. Rather, the Five-Year Rule forces member schools to compete over a smaller pool of eligible players.

Given the dearth of evidence (or even allegations) of anti-competitive effect offered by Fourqurean so far, he has failed to show some likelihood that the Five-Year Rule constitutes an unreasonable restraint of trade—and thus some likelihood of success on the merits of his Sherman Act claim.

We do not exclude the possibility that on a fuller record, Fourqurean will succeed in establishing his claim. We also recognize that the 2025–26 college football season begins soon. In this context, we encourage the parties and the district court to expedite the coming litigation. While it is not our prerogative to direct the parties how to proceed, we also note that the NCAA's bylaws allow the NCAA's Committee for Legislative Relief to grant "relief from application of NCAA legislation to a particular situation in which no other entity has the authority to act," which appears to create some flexibility for the NCAA to address the hardship to Fourqurean that concerned the district court.

*        *        *

The judgment of the district court is

REVERSED.

Ripple, *Circuit Judge*, dissenting.

The panel reverses the district court's grant of Mr. Fourqurean's motion for a preliminary injunction. Because, in my view, Mr. Fourqurean plausibly alleges a relevant market in which the NCAA has monopsony power and has engaged in anticompetitive conduct not justified by procompetitive efficiencies, I respectfully dissent.

I begin with the standard of review we employ when considering the grant of a preliminary injunction. I then assess whether Mr. Fourqurean is likely to succeed on the merits of his antitrust claim brought under § 1 of the Sherman Act. Finally, I turn to Mr. Fourqurean's likelihood of suffering irreparable harm.

## I

### A.

We review an appeal of a preliminary injunction for abuse of discretion. *See Lukaszczyk v. Cook County*, 47 F.4th 587, 598 (7th Cir. 2022). "A district court abuses its discretion 'when it commits a clear error of fact or an error of law.'" *Id.* (quoting *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021)); *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022).

The concerns motivating deferential review are particularly present here. "[S]ubstantial deference" is warranted when we review district courts' decisions on preliminary injunctions, "bearing in mind that the district judge had to act in haste." *American Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 594–95 (7th Cir. 1986); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 390 (7th Cir. 1984) (discussing thoroughly the standard of review for the grant of a preliminary injunction); *Abbott Labs. v. Mead Johnson & Co.*, 971

F.2d 6, 13 (7th Cir. 1992) ("[T]he district court's ultimate weighing of all four factors is entitled to great deference."). We are cognizant that "in dealing with the parties and their witnesses and counsel in the hectic atmosphere of a preliminary-injunction proceeding the judge may have developed a feel for the facts and the equities that remote appellate judges cannot obtain from a transcript." *American Hosp. Supply Corp.*, 780 F.2d at 595. "To reverse an order granting or denying a preliminary injunction, therefore, it is not enough that we think we would have acted differently in the district judge's shoes; we must have a strong conviction that he exceeded the permissible bounds of judgment." *Id.*

In Mr. Fourqurean's case, time was especially of the essence. He filed his complaint on January 29, 2025, the same day that the NCAA denied his waiver request. The district court entered its order granting a preliminary injunction on February 6, 2025, the day before the deadline to enter the NFL draft.

Additionally, when the grant of a preliminary injunction is appealed, the Supreme Court counsels that we ought to consider whether "the potential harms from reversing the injunction outweigh those of leaving it in place by mistake." *Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004). Here, reversing the injunction potentially deprives Mr. Fourqurean of a season of collegiate play to which he may be entitled, at a time when he can no longer enter the NFL draft and therefore has, as a practical matter, no other way of forwarding his football career. In stark contrast, the NCAA has identified no harm it would suffer were the injunction to stand.

## B.

The parties (and all the judicial officers who have participated in this case) agree that Mr. Fourqurean's claim should be evaluated under the rule of reason. Mr. Fourqurean therefore bears "the initial burden to prove that the challenged restraint has a substantial anticompetitive effect" in the relevant market. *NCAA v. Alston*, 594 U.S. 69, 96 (2021) (quoting *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018)).[1] If he succeeds, the burden shifts to the NCAA "to show a procompetitive rationale for the restraint." *Id.* (quoting *American Express Co.*, 585 U.S. at 541). "If the defendant can make that showing, 'the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.'" *Id.* at 96–97 (quoting *American Express Co.*, 585 U.S. at 542).

## 1.

I cannot accept my colleagues' heavy reliance on the exclusive dealing cases—cases that arise in a very different economic ambiance from the rather complex present situation. In my view, the analogy to exclusive dealing arrangements does not reflect with the requisite precision the economic

---

[1] The rule of reason requires a more nuanced investigation. Indeed, it is this requirement that distinguishes this analytical tool from *per se* and quick look analyses. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 28–32 (1984) (finding an exclusive contract was not illegal *per se* under the Sherman Act and remanding for further proceedings), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295–97 (1985) (finding that the expulsion of a member of a cooperative buying group was not a "group boycott" and should be analyzed under the rule of reason, not as a *per se* violation); Maj. Op. at 13.

arrangement before us. We are confronted, in essence, with a competitive restriction on the labor market for football players in Division I of the NCAA. Therefore, the appropriate inquiry before us is whether the NCAA's imposition of the Five-Year Rule has an anticompetitive effect on the Division I football labor market.

Mr. Fourqurean's case is hardly the first time the judiciary has been called upon to adjudicate the application of the policies embodied in the Nation's antitrust laws to athletic labor markets. For instance, in *Radovich v. National Football League*, 352 U.S. 445 (1957), the Supreme Court determined that a football player's antitrust claim challenging the legality of the NFL's blacklisting him from competing in affiliated leagues was viable. *See id.* at 448, 453–54. We had occasion to interpret *Radovich* in *Nichols v. Spencer International Press, Inc.*, 371 F.2d 332 (7th Cir. 1967). We reasoned that Radovich's claim was viable because

> the service supplied to the public by a professional football club was highly dependent upon the ability of the players employed by the club, and a black-listing agreement was, from the point of view of the public, an impairment of competition as to the quality of the service supplied, even though, as between player and club it is only a restriction on freedom to employ.

*Id.* at 336 (citation modified).

In *Nichols*, the plaintiff alleged that his former employer entered into "no-switching" agreements with its rivals, through which the competitors refused to hire each other's employees. *Id.* at 333. Nichols brought an antitrust action

challenging the agreements and seeking "damages resulting from loss of opportunity for employment." *Id.* We held that Nichols had stated a cognizable antitrust claim and reasoned that even though

> the antitrust laws were not enacted for the purpose of preserving freedom in the labor market, nor of regulating employment practices as such, nevertheless it seems clear that agreements among supposed competitors not to employ each other's employees not only restrict freedom to enter into employment relationships, but may also, depending upon the circumstances, impair full and free competition in the supply of a service or commodity to the public.

*Id.* at 335–37; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 352c, p.320 (5th ed. 2021) ("Antitrust law addresses employer conspiracies controlling employment terms precisely because they tamper with the employment market and thereby impair the opportunities of those who sell their services there.").[2]

Accordingly, rather than considering whether a competitor of the NCAA is kept from doing business,[3] we must

---

[2] I cite *Radovich v. National Football League*, 352 U.S. 445 (1957), and *Nichols v. Spencer International Press, Inc.*, 371 F.2d 332 (7th Cir. 1967), only for the proposition that labor markets properly may be the subject of scrutiny under the antitrust laws of the United States.

[3] This consideration was key in the exclusive dealing cases cited to support the majority's theory of anticompetitive conduct, *United States v. Dentsply*

instead determine whether the NCAA rule excludes Mr. Fourqurean and other similarly situated athletes from competing in the labor market of NCAA Division I football and whether that exclusion reduces competition in that market. *See Agnew v. NCAA*, 683 F.3d 328, 346 (7th Cir. 2012) ("[L]abor markets are cognizable under the Sherman Act."); *see also Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1185 (D.C. Cir. 1978) (recognizing the "player-service market" and finding the NFL draft "undeniably anticompetitive").[4] By enacting and enforcing its eligibility rules, the NCAA operates as an organization of employers who are, in essence, forcing players out of the league in order to limit the labor market.

We need not spend a great deal of additional time on this question. In *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012), we indicated that identifying the relevant market as the "labor market for student-athletes … would meet plaintiffs' burden of describing a cognizable market." *Id.* at 346. In his complaint, Mr. Fourqurean alleges that "[t]he NCAA and its member institutions control the highest and most popular level of collegiate athletics."[5] Elsewhere he states that the NCAA "possesses a dominant position in the relevant

---

*International, Inc.*, 399 F.3d 181 (3d Cir. 2005), and *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457 (1941).

[4] *See also Banks v. NCAA*, 977 F.2d 1081, 1095 (7th Cir. 1992) (Flaum, J., dissenting) (defining as the relevant market "the nationwide labor market for college football players" and explaining that "NCAA member colleges are the purchasers of labor in this market, and the players are the suppliers"). We revisited *Banks* in *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012), and rejected the *Banks* majority's view that "the market for scholarship athletes cannot be considered a labor market." *Agnew*, 683 F.3d at 346.

[5] R.1 ¶ 8.

market."[6] With these assertions, the NCAA was on notice that the relevant market was Division I football. *See* Fed. R. Civ. P. 8(a)(2); *cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (requiring plaintiffs to plead "only enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss). And "[b]ecause market definition is a deeply fact-intensive inquiry," *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001), I would hesitate to require a more detailed showing from Mr. Fourqurean before he has had an opportunity for discovery.

Within the relevant market of Division I football, the NCAA cannot plausibly dispute that it possesses monopsony power. Therefore, the remaining inquiry is whether the NCAA's Five-Year Rule has an anticompetitive effect within that market. In my view, it plainly does.

The NCAA's Five-Year Rule decreases competition in the labor market by forcing out the market's most experienced athletes. In so doing, the NCAA depresses NIL compensation by declaring ineligible the very players who would be entitled to the most lucrative financial arrangements because they have spent years developing their skills. *Cf. Elad v. NCAA*, No. 25-1981, 2025 WL 1202014, at *8 (D.N.J. Apr. 25, 2025) (unpublished) (explaining that another rule that restricts players' eligibility "distorts the labor market by reducing competition, depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in NIL agreements"). As a result, I do not doubt that Mr. Fourqurean will be able to demonstrate the anticompetitive effect of the Five-Year Rule. The elimination of experienced players like Mr. Fourqurean

---

[6] *Id.* ¶ 54.

also lowers the level of competition in Division I, making it a less desirable form of athletic entertainment, and makes it more difficult for the participating schools and conferences to put on such entertainment. Moreover, this restriction depresses the ancillary industries, such as television, which have a symbiotic relationship with Division I athletics. This depression of competition will, in time, harm the compensation of all Division I players.

**2.**

As a procompetitive justification for this constraint, the NCAA submits that its Five-Year Rule preserves differentiation between collegiate and professional football by linking eligibility to an athlete's academic progression. But other NCAA bylaws undercut the current legitimacy of the NCAA's interest in keying athletic eligibility to degree progression and amateurism. Whatever the legitimacy of such an argument in the past, the NCAA revised recently its bylaws to allow athletes to transfer schools as many times as it appears economically advantageous to the individual player. Permitting athletes to change schools with such frequency impeaches significantly the NCAA's professed interest in academic progression within the Division I market. *See Pavia v. NCAA*, 760 F. Supp. 3d 527, 543 (M.D. Tenn. 2024) ("The Court finds it highly implausible that frequent transfers, even those within NCAA institutions, benefit an athlete's academic career and promote 'natural and standard degree progression.'"). Moreover, Division I teams now perform against the backdrop of a lucrative NIL industry that, in its current state, is significantly divorced from higher education. When viewed in the context of an industry drastically changed by

these lucrative compensation arrangements,[7] the notion that the NCAA protects its athletes' amateur status appears disingenuous.

To support its proffered procompetitive justification, the NCAA's expert nevertheless maintained that without the Five-Year Rule, athletes would be "older and less aligned with standard collegiate progression." R.20 at 8. But the Five-Year Rule excepts years spent in military service, on religious mission, or engaged in foreign assistance programs from the years counted toward an athlete's eligibility,[8] seemingly enabling other older athletes to compete at the collegiate level. That some older athletes may compete, but not those like Mr. Fourqurean, undermines the NCAA's argument that it is preserving the league's youthful demographic. *See Pavia*, 760 F. Supp. 3d at 541–42; *Elad*, 2025 WL 1202014, at *9.[9]

Nor is the NCAA's interest in permitting new athletes to take the place of athletes who have exhausted their eligibility a legitimate justification for the Five-Year Rule. The transfer portal allows universities to select players who have already gained experience and developed as athletes to fill vacant spots on their rosters. This practice belies significantly the professed concern with Division I filling its roster spots with "new blood." As now organized, the Division must focus on

---

[7] *See* R.4-5 at 3 (explaining that the NIL market has grown "to an expected $1.67 billion in 2024–25," and that revenue sharing is expected to increase athletes' compensation even further).

[8] *See* R.4-6 at 66 (NCAA Bylaw 12.8.1.2).

[9] The district court was entitled to consider the factual assessments and economic analyses of earlier decisions in making its decision on the propriety of a preliminary injunction.

a steady stream of highly competitive games that produce tel-
evision revenues, alumni donations, and support for a myriad
of related industries (including gambling interests). From the
point of view of its member institutions, the economic beat
must go on at a steady pace. The NCAA has failed to offer a
legitimate procompetitive justification for its Five-Year Rule,
as applied to Mr. Fourqurean.[10]

## C.

Finally, I agree with the district court's assessment that
Mr. Fourqurean would suffer irreparable harm without a pre-
liminary injunction. If Mr. Fourqurean is entitled to play the
2025–26 football season but he misses out on that season, that
loss cannot be compensated through monetary damages. *See
E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*,
414 F.3d 700, 703 (7th Cir. 2005) ("An injury is irreparable for
purposes of granting preliminary injunctive relief only if it
cannot be remedied through a monetary award after trial.");
*Ohio v. NCAA*, 706 F. Supp. 3d 583, 597 (N.D. W. Va. 2023)
("Courts have repeatedly found that '[c]ollege students suffer
irreparable harm when they are denied the opportunity to
play sports.'" (alteration in original) (quoting *S.A. v. Sioux
Falls Sch. Dist. 49-5*, No. 23-CV-04139, 2023 WL 6794207, at *9
(D.S.D. Oct. 13, 2023))) (collecting cases).

Even disregarding the inherent value of athletics or the
opportunity to improve his future NFL opportunities,
Mr. Fourqurean would also lose compensation from NIL

---

[10] Because I believe that the NCAA has offered no legitimate procompeti-
tive justification for its Five-Year Rule, I do not reach the question of
whether there are alternative means of achieving the stated procompeti-
tive justifications for the Five-Year Rule.

opportunities. This is not a speculative injury, as it is virtually certain to occur, and it would be very difficult to calculate. *See E. St. Louis Laborers' Loc. 100*, 414 F.3d at 705 ("A plaintiff may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate."). Not playing in the NCAA's 2025–26 football season, even if he could play a later season of collegiate football, would cause immeasurable harm to Mr. Fourqurean's marketability for NIL deals and to his development as a player.

The NCAA also contends that Mr. Fourqurean delayed in bringing this action, indicating that the harm would not be irreparable. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (explaining that delay is relevant in that it "may raise questions" regarding irreparable harm). This argument is without merit. Although the University of Wisconsin did not request an exemption for Mr. Fourqurean until December 2024, Mr. Fourqurean moved with haste to bring this action against the NCAA. His attorney contacted the NCAA multiple times as it reviewed Mr. Fourqurean's application, and he filed a complaint and motion for a temporary restraining order and injunction on the same day he received the NCAA's denial. The record does not reveal any delay that casts doubt on Mr. Fourqurean's harm being irreparable.

In sum, the district court did not err in finding that Mr. Fourqurean would suffer irreparable harm without a preliminary injunction.

## Conclusion

Because I believe Mr. Fourqurean adequately alleges that the NCAA engaged in anticompetitive conduct in regulating Division I football, for which the NCAA has offered no

legitimate procompetitive justifications, I would affirm the district court's grant of the preliminary injunction. I respect-fully dissent.